1 | GEORGE E. SCHULMAN (State Bar No. 064572)
JOHN N. TEDFORD, IV (State Bar No. 205537)
2 | AARON E. DE LEEST (State Bar No. 216832)
DANNING, GILL, DIAMOND & KOLLITZ, LLP
3 | 2029 Century Park East, Third Floor
Los Angeles, California 90067-2904
4 | Telephone: (310) 277-0077
Facsimile: (310) 277-5735
5 |
Plaintiff R. Todd Neilson, Chapter 7 Trustee
6 |

7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **LOS ANGELES DIVISION**

11 |

12 | In re ) Case No. 2:04-35757-VZ
)
13 | PECK/JONES CONSTRUCTION ) Chapter 7
CORPORATION, )
14 | )
)
15 | Debtor. )
)
16 | R. TODD NEILSON, CHAPTER 7 TRUSTEE, ) Adv. No. 2:07-01050-VZ
)
17 | Plaintiff, ) **PRE-TRIAL STIPULATION**
)
18 | vs. ) Appendices 1 and 2 filed contemporaneously
) herewith
19 | INTEGRATED MECHANICAL SYSTEMS, )
INC., a California corporation, ) Date: August 21, 2008
20 | ) Time: 11:00 a.m.
Defendant. ) Place: Courtroom 1368
21 | ) 255 E. Temple St.
) Los Angeles, CA 90012
22 |

23 |

24 |

25 |

26 |

27 |

28 |

-1-

327125.01 [XP]    24132

## PRE-TRIAL STIPULATION

Plaintiff R. Todd Neilson, Chapter 7 trustee (the "Trustee" or "Plaintiff") for the estate of Peck/Jones Construction Corporation (the "Debtor"), and Defendant Integrated Mechanical Systems, Inc. ("IMS" or "Defendant"), by and through counsel, submit the following pre-trial stipulation and order pursuant to Local Bankruptcy Rule 7016-1(b)(2).

I.    UNDERLYING ISSUES OF FACT COMMON TO ALL CLAIMS FOR RELIEF

A.    Peck/Jones Construction Corporation ("Debtor") was a general contractor which engaged in large construction projects

NOT CONTESTED

B.    On or about March 12, 2002, Robert F. Kennedy Medical Center (as "RFK" or "Owner") and Debtor (collectively "the Parties") entered into a Standard Form of Agreement Between Owner and Contractor (the "Contract") for a project commonly known as the Robert F. Kennedy Medical Center Psychiatric Unit/Central Storage Remodel and New Patient Tower (the "Project").

NOT CONTESTED

C.    In its capacity as general contractor on the Project, Peck/Jones required heating ventilating and air conditioning ("HVAC") equipment to be delivered to the Project in a Subcontract Agreement executed between Peck/Jones and Integrated Mechanical Systems ("IMS") dated November 24, 2003.

NOT CONTESTED

D.    IMS was the HVAC subcontractor on the Project.

NOT CONTESTED

E.    IMS engaged a number of materialmen and subcontractors, including but not limited to DMG Corporation, M.W. Sausse & Co., Inc., Control Management Systems, Inc., Haldeman, Inc., Air Conditioning Specialties Company, Strobic Air, and York International Corporation to provide materials and/or services under its subcontract agreement with Peck/Jones.

NOT CONTESTED

-2-

327125.01 [XP]    24132

1    F.    Pursuant to its subcontract agreement, IMS submitted an Application and

2    Certification for Payment Number 3 for the month of June 2004, which sought payment from the

3    Debtor in the total amount of $376,672.00.

4              NOT CONTESTED

5    G.    On or about July 1, 2004, Debtor submitted Application and Certificate for Payment

6    Number 34 ("Payment Application 34") to RFK for the Period ending June 30, 2004, for the

7    Project.

8              NOT CONTESTED

9    H.    The total amount sought by Debtor from RFK in Payment Application 34 was

10    $728,008.13, $376,672.00 of which was for IMS.

11              NOT CONTESTED

12    I.    RFK paid Debtor the sum of $651,506.13 in Check Number 221078 dated August 4,

13    2008, representing the full amount Debtor sought in Payment Application 34 less certain credits.

14              NOT CONTESTED

15    J.    Debtor deposited check number 221078 into its general account on August 20, 2004.

16              NOT CONTESTED

17              The balance in the Debtor's general account as of the close of business on August

18    19, 2004, was $172,680.87.

19              NOT CONTESTED

20    K.    On Friday, August 20, 2004, there were two deposits into the Debtor's general

21    account: (1) a deposit in the amount of $651,506.13; and (2) a deposit in the amount of $75,698.00.

22    There were no other deposits to the Debtor's account on August 20, 2004.

23              NOT CONTESTED

24    L.    The balance in the Debtor's general account as of the close of business on August

25    20, 2004, was $861,315.00.

26              NOT CONTESTED

27

28

327125.01 [XP]    24132

1    M.    The following Monday, August 23, 2004, a lump sum of $650,000.00 was wire

2    transferred out of the Debtor's general account into Wells Fargo Bank account number

3    7038281585.

4            NOT CONTESTED

5    N.    The $650,000 transferred out of the Debtor's general account on August 23, 2004,

6    was transferred out of the Debtor's general account into Wells Fargo Account Number

7    7038281585, an account held by one of the Debtor's principals, Guillermo Montero ("Montero").

8            NOT CONTESTED

9    O.    Also on August 23, 2004, an aggregate of $92,144.36 of checks cleared the account.

10    There were zero deposits into the general account on August 23, 2004.

11            NOT CONTESTED

12    P.    The balance in the Debtor's general account as of the close of business on August

13    23, 2004, was only $119,170.64

14            NOT CONTESTED

15    Q.    Montero used the $650,000 as security for a line of credit by Wells Fargo Bank for a

16    company Montero owned.

17            NOT CONTESTED

18    R.    The $650,000 transferred from the Debtor's general account to Montero's personal

19    account (# 7038281585) remained in Montero's personal account until at least December 31, 2004.

20            NOT CONTESTED

21    S.    Montero's personal account # 7038281585 maintained a balance of at least

22    $650,000.00 until at least December 31, 2004.

23            NOT CONTESTED

24    T.    The balance in the Debtor's general account as of the close of business on

25    September 9, 2004, was $21,426.89.

26            NOT CONTESTED

27    U.    The balance in the Debtor's general account as of the close of business on October

28    4, 2004, was $180,901.86.

-4-

NOT CONTESTED

V.      On or about September 29, 2004, Debtor sent IMS Subcontract Change Order No. 1 by facsimile.

NOT CONTESTED

W.      On or about September 16, 2004, Debtor issued Check Number 21629 in the amount of $29,481.61 to IMS, which cleared the Debtor's bank account on September 20, 2004.

NOT CONTESTED

X.      On or about September 23, 2004, Debtor issued Check Number 21668 in the amount of $46,458.00 jointly to IMS and Control Management Systems, Inc., which cleared the Debtor's bank account on September 29, 2004.

NOT CONTESTED

Y.      On or about September 27, 2004, Debtor issued Check Number 21697 in the amount of $10,650.72 jointly to IMS and Haldeman, Inc., which cleared the Debtor's bank account on October 1, 2004.

NOT CONTESTED

Z.      On or about October 4, 2004, Debtor issued Check Number 21719 in the amount of $29,832.62 jointly to IMS and Air Conditioning Specialties Company, which cleared the Debtor's bank account on October 12, 2004.

NOT CONTESTED

AA.      On or about October 4, 2004, Debtor issued Check Number 21720 in the amount of $22,622.34 jointly to IMS and Strobic Air, which cleared the Debtor's bank account on October 14, 2004.

NOT CONTESTED

BB.      On or about October 4, 2004, Debtor issued Check Number 21721 in the amount of $40,593.75 jointly to IMS and York International Corporation, which cleared the Debtor's bank account on October 13, 2004.

NOT CONTESTED

327125.01 [XP]      24132

CC.     On or about October 4, 2004, Debtor issued Check Number 21723 in the amount of $2,754.86 to IMS, which cleared the Debtor's bank account on October 14, 2004.

NOT CONTESTED

DD.     On or about December 14, 2004 (the "Petition Date"), an involuntary bankruptcy petition was filed against the Debtor in the within bankruptcy case.

NOT CONTESTED

EE.     The Bankruptcy Court entered its Order for Relief in the Debtor's bankruptcy case on or about January 21, 2005, and thereafter, the Trustee was appointed as Chapter 7 Trustee for Debtor's bankruptcy estate.

NOT CONTESTED

FF.     On January 19, 2007, the Trustee filed his Complaint to Avoid and Recover Preferential Transfers alleging a single cause of action under Bankruptcy Code Sections 547 and 550 by which the Trustee seeks to avoid and recover seven transfers to IMS from the Debtor totaling $182,393.90.

NOT CONTESTED

GG.     The Court has jurisdiction of the proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b )(2)(F).

NOT CONTESTED

II.     **CLAIMS FOR RELIEF**

A.      **First Claim: Preferential Transfer - § 547(b)**

    1.      Elements of the Claim:

        a.      A transfer

NOT CONTESTED

        b.      of property of the estate

CONTESTED

<u>Plaintiff</u>: The $182,939.90 in funds transferred from the Debtor's bank account to IMS was property of the Debtor's estate. It came from the Debtor's bank account.

-6-

With respect to IMS's argument that the funds were trust funds, the burden is on IMS to establish the existence of a trust and, if a trust existed, that the funds actually received by IMS constituted trust funds. Under Ninth Circuit law, there is a presumption that alleged trust funds that are commingled with non-trust funds constitute property of the debtor. Danning v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214 (9th Cir. 1988) ("Because this money could have been used to pay other creditors, it presumptively constitutes property of the debtor's estate"). Therefore, where a construction trust fund exists, "a laborer/materialman is only entitled to funds under a trust if it can prove that the money it received or claims can be traced to funds paid to the subcontractor by the contractor. In re Sierra Steel, Inc., 96 B.R. 271, 274 (B.A.P. 9th Cir. 1989); see also Bullion Reserve, 836 F.2d at 1218 ("even if an express trust were created, [the transferee] would still have a duty under federal bankruptcy law to trace his funds to the [assets] he received. Such a tracing requirement is necessary to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors.").

There is no dispute that the $651,506.13 received by the Debtor from RFK was deposited by the Debtor into the Debtor's own general Wells Fargo Bank account. There is no dispute that these funds were commingled with other funds of the Debtor. There is no dispute that Montero took virtually all of the funds that the Debtor received from RFK and deposited them into his personal account. There is no dispute that IMS was eventually paid $182,939.90 by checks drawn against the Debtor's general account. In light of such facts, under Bullion Reserve, the money paid to IMS is presumed to have constituted property of the Debtor, and IMS has the burden of tracing the $182,939.90 it received to the alleged trust res. IMS cannot do so, even if it can establish generally that a trust existed in the first place.

327125.01 [XP]    24132

1    Evidence:

2    Testimony of Guillermo Montero and Gary Melnik

3    Exhibits: In addition to any exhibits identified by IMS, the Trustee identifies

4    Defendant's Exhibits 123 and 124

5

6    Defendant: Defendant alleges that, to the extent transfers of property were made to

7    Defendant as alleged in the Complaint, such transfers were not of property which constituted

8    property of the debtor, but, rather, were disbursements of trust funds pursuant to a contract

9    between Robert F. Kennedy Medical Center and the debtor, of Robert F. Kennedy Medical

10   Center to Integrated Mechanical Systems for the labor and materials furnished by Integrated

11   Mechanical Systems to the Robert F. Kennedy Medical Center.

12   On or about March 12, 2002, Robert F. Kennedy Medical Center ("RFK") and

13   Peck/Jones entered into a Standard Form of Agreement Between Owner and Contractor (the

14   "Contract" for a project commonly known as the Robert F. Kennedy Medical Center

15   Psychiatric Unit/Central Storage Remodel and New Patient Tower (the "Project"). The

16   General Conditions of the Contract for Construction (the "General Conditions") were

17   incorporated by reference into the Contract. The general form of the Contract and the

18   General Conditions were both drafted by the American Institute of Architects ("AIA"), but

19   certain modifications were made to the forms by the parties. The Contract is AIA Document

20   A111-1997, and the General Conditions is AIA Document A201-1997.

21   In its capacity as general contractor on the Project, Peck/Jones required HVAC

22   materials to be furnished and installed by IMS to the Project in a Subcontract Agreement

23   executed between Peck/Jones and IMS dated November 24, 2003.  IMS sent a preliminary

24   20-Day Notice via certified mail to the owner and Peck/Jones.  IMS submitted invoices to

25   Peck/Jones for payment of monies representing the progress portion of monies then due and

26   owing to IMS for labor and materials provided to the Project.  The invoices were received

27   by Peck/Jones in September, 2004.

28

-8-

327125.01 [XP]    24132

1    On or about July 1, 2004, Peck/Jones submitted Payment Application 34 to RFK for

2    the period ending June 30, 2004 for the Project. The total amount sought by Peck/Jones

3    from the owner in Payment Application #34 was $728,008.13.  The total amount sought by

4    Peck/Jones from the owner in Payment Application #34 included money for HVAC

5    furnished and installed by IMS at the Project.  RFK paid Peck/Jones the sum of

6    $651,506.13 in Check Number 221078, representing the full amount Peck/Jones sought in

7    Payment Application #34 less certain credits.  Peck/Jones deposited this check into its

8    general account on August 20, 2004.

9    On or about September 27, 2004, and October 4, 2004, Peck/Jones issued checks to

10    IMS which are the checks that the Trustee alleges were preferential transfers to IMS. By

11    this transaction, Peck/Jones disbursed RFK's trust funds to IMS for the HVAC materials

12    furnished by IMS to the Project.

13    Section 9.6.7 of the General Conditions states:

14        "Unless the Contractor provides the owner with a payment
           bond in the full penal sum of the Contract Sum, payments
15        received by the Contractor for Work properly performed by
           Subcontractors and suppliers shall be held by the Contractor
16        for those Subcontractors or suppliers who performed Work or
           furnished materials, or both, under contract with the
17        Contractor for which payment was made by the Owner.
           Nothing contained herein shall require money to be placed in
18        a separate account and not commingled with the money of the
           Contractor, shall create any fiduciary liability or tort liability
19        on the part of the Contractor for breach of trust or shall entitle
           any person or entity to an award of punitive damages against
20        the Contractor for breach of the requirements of this
           provision."

21

22    It is customary in the construction industry for general contractors to hold funds

23    received from the owner in trust for subcontractors and material suppliers who furnish labor

24    and/or materials to construction projects. By its contract with the Owner, Peck/Jones was

25    required to hold funds it received from the owner in trust for labor and/or materials

26    provided to the Project by suppliers and subcontractors for those material suppliers and

27    subcontractors pursuant to Section 9.6.7 of the General Conditions.  This requirement

28    establishes a trust in favor of subcontractors and suppliers of monies received by the

-9-

327125.01 [XP]    24132

1   contractor by reason of work and materials of its subcontractors and suppliers.  This

2   subparagraph gives subcontractors and suppliers a preference in the event of the

3   contractor's bankruptcy and thereby protects the owner from lien claims which could have

4   been asserted by those entities had they not been furnished with this preference.  As the

5   recipient of the trust funds, the contractor is under an obligation to properly apply the funds

6   for the account of the subcontractors and suppliers.

7        The funds transferred to IMS were held in trust for IMS by Peck/Jones, and it is

8   well-settled that "[b]ecause the debtor does not own an equitable interest in the property he

9   holds in trust for another, that interest is not Aproperty of the estate" See, Begier v. Internal

10   Revenue Service (496 U.S. 53, 59).  To create a valid express trust, California requires: (1)

11   intent to create a trust; (2) trust property; (3) a lawful trust purpose; and (4) a beneficiary.

12   Prob. Code § 15201 et seq.

13        Here, the Contract detailed the relationship between the parties.  With respect to

14   payments for the numerous parties engaged in actually providing the work, labor and/or

15   materials to the Project, the Contract created an express trust to benefit those parties and

16   insure that they received payment, by virtue of Section 9.6.7 of the General Conditions

17   states, in pertinent part:

18        Section 9.10.2 of the General Conditions further evidences the creation of an

19   express trust, stating, in pertinent part:

20             "...If a Subcontractor refuses to furnish a release or waiver
          required by the Owner, the Contractor may furnish a bond

21             satisfactory to the Owner to indemnify the Owner against the
          lien.  If such lien remains unsatisfied after the payments are

22             made, the Contractor shall refund to the Owner all money that
          the Owner may be compelled to pay in discharging the lien,

23             including all costs and reasonable attorneys' fees."

24        Section 9.10.2 thus obligates Peck/Jones to return any funds it holds in trust for

25   material suppliers and subcontractors to the owner to compensate the owner for any

26   unsatisfied liens recorded on the owner's property.  As such, it is clear that Peck/Jones did

27   not hold equitable title to funds it received from the owner for labor and/or materials

28   furnished by material suppliers and subcontractors to the Project.

327125.01 [XP]   24132

1    Thus, the Contract established an express trust, wherein Peck/Jones acted as trustee,

2    holding funds received from the Owner for material suppliers and subcontractors who

3    furnished labor and/or materials to the Project. The terms of the express trust permitted

4    Peck/Jones to commingle the trust funds received from the Owner.  Article 9.6.7 of the

5    Contract provides, "[n]othing herein shall require money to be placed in a separate account

6    and not commingled with money of the Contractor..."  This provision authorized

7    Peck/Jones to place trust funds in any of its accounts and to mix with its own general funds;

8    there was no requirement that the trust res be segregated or held in a separate account. As

9    such, all of Peck/Jones accounts were collectively a repository for the trust res.

10    Thus, the owner transferred funds to Peck/Jones, which Peck/Jones held in valid

11    express trust in its various bank accounts, and then that Peck/Jones distributed the trust

12    funds to IMS for the HVAC equipment furnished and installed by IMS in the Project.

13    Funds held in trust for the benefit of another are not property of the estate of the debtor.

14    Begier v. Internal Revenue Service (1990) 496 U.S. 53, 59.  Tracing of the trust funds is not

15    necessary where a trust fund is distributed to the IRS as beneficiary of a statutorily-created

16    express tax trust, and a preference action is subsequently undertaken to recapture that

17    distribution. Begier v. IRS (1990) 496 U.S. 53, 67.  Begier determined that where the trust

18    fund obligation is voluntarily paid to the beneficiary, Athe required nexus between the

19    amount held in trust and the funds paid is established. Id.

20    Since Begier was decided, the United States Bankruptcy Court for the District of

21    Connecticut applied the Supreme Court's reasoning to preference actions involving

22    ordinary express trusts as well as statutorily-created tax trusts. In re Coarrozzella &

23    Richardson (D. Conn., 2000) 255 B.R. 267 275 (...this Court believes that the legal source

24    and unique posture of bankruptcy preference litigation substantially relieves a defendant

25    trust fund claimant of a tracing burden.) IMS has no obligation to demonstrate that the

26    funds placed into the trust by the owner were the same funds eventually distributed to IMS,

27    which are the alleged preferential payment transfers, were not the funds Peck/Jones

28    received on or about August 20, 2004, to be held in trust.  Therefore, since funds held in

-11-

1  trust for another are not property of the estate of the debtor, and because the undisputed

2  facts demonstrate that Peck/Jones paid IMS the funds it held in trust therefor, the Trustee

3  cannot establish that the alleged transfer was a transfer of Aan interest of the debtor in

4  property as required for an avoidable preference in 11 U.S.C. § 547(b).

5          Evidence:

6          Testimony of Vachik Armenian

7          Testimony of Steve Malczewski

8          Exhibits "A" through "X".

9  NOT CONTESTED

10          c.    to or for the benefit of a creditor

11  NOT CONTESTED

12          d.    for or on account of an antecedent debt

13  NOT CONTESTED

14          e.    made while the debtor was insolvent

15  NOT CONTESTED

16          f.    that enables the creditor to receive more on account of his debt than

17          he would receive in a Chapter 7 liquidation

18  NOT CONTESTED

19

20  III.    **DAMAGES**

21      A.    **By reason of the forgoing, the Trustee is entitled to recover the amount of**

22      **$182,393.90, plus interest from the date of filing the complaint, from IMS.**

23  CONTESTED

24      Plaintiff:

25          Evidence:

26          Testimony of Greg Jones

27          Exhibits 68, 116, 117, 118, 119, 125, and 126

28      Defendant:

-12-

1    Evidence:

2    Testimony of Vachik Armenian

3    Testimony of Steve Malczewksi

4    Exhibits "A" through "W"

5

6    IV.    **DEFENDANT'S AFFIRMATIVE DEFENSES**

7    A.    **FIRST AFFIRMATIVE DEFENSE**: 11 U.S.C. § 547(c)(2)

8    CONTESTED

9    <u>Defendant</u>: Defendant alleges that any payments Integrated Mechanical Systems

10    received from the debtor fall within the exception to preferential transfers as set forth in

11    11 U.S.C. Section 547(c)(2) in that any and all payments received by Integrated

12    Mechanical Systems during the preference period were deliveries of monies by the

13    Debtor: (a) in payment of a debt incurred by Peck/Jones Construction in the ordinary

14    course of business or financial affairs of Peck/Jones Construction and Integrated

15    Mechanical Systems; (b) made in the ordinary course of business or financial affairs of

16    Peck/Jones Construction and Integrated Mechanical Systems; and (c) made according

17    to ordinary business terms.

18    In its capacity as general contractor on the Project, Peck/Jones required HVAC

19    materials to be furnished and installed by IMS to the Project in a Subcontract

20    Agreement executed between Peck/Jones and IMS dated November 24, 2003. IMS

21    sent a preliminary 20-Day Notice via certified mail to the owner and Peck/Jones. IMS

22    submitted invoices to Peck/Jones for payment of monies representing the progress

23    portion of monies then due and owing to IMS for labor and materials provided to the

24    Project. The invoices were received by Peck/Jones in September, 2004.

25    On or about July 1, 2004, Peck/Jones submitted Payment Application 34 to

26    RFK for the period ending June 30, 2004 for the Project. The total amount sought by

27    Peck/Jones from the owner in Payment Application #34 was $728,008.13. The total

28    amount sought by Peck/Jones from the owner in Payment Application #34 included

-13-

327125.01 [XP]    24132

money for HVAC furnished and installed by IMS at the Project.  RFK paid Peck/Jones

the sum of $651,506.13 in Check Number 221078, representing the full amount

Peck/Jones sought in Payment Application #34 less certain credits.  Peck/Jones

deposited this check into its general account on August 20, 2004.

On or about September 27, 2004, and October 4, 2004, Peck/Jones issued

checks to IMS which are the checks that the Trustee alleges were preferential transfers

to IMS. By this transaction, Peck/Jones disbursed RFK's trust funds to IMS for the

HVAC materials furnished by IMS to the Project.

In addition, the owner imposed additional requirements upon Peck/Jones

before Peck/Jones could receive each progress payment on the Project.  First, before

Peck/Jones could receive each progress payment, the owner required Peck/Jones to

obtain from each material supplier and subcontractor, including IMS, a written

document whereby the supplier or subcontractor agreed to waive and release its rights

to file a mechanic's lien on the owner's property upon receipt of payment.  IMS

accordingly offered to waive its mechanic's lien rights upon receipt of payment for the

HVAC materials furnished and installed at the Project by submitting a document

entitled AConditional Waiver and Release Upon Progress Payment to Peck/Jones in

September 2004.

Next, after Peck/Jones received each progress payment, but before the next

progress payment would be submitted to Peck/Jones, the owner required Peck/Jones to

obtain from each material supplier and subcontractors, including IMS, a written

document whereby the supplier or subcontractor unconditionally waived and released

its right to file a mechanic's lien on the owner's property after the subcontractor or

supplier received payment for the labor and/or materials it provided to the Project.

After receiving payment from Peck/Jones, IMS accordingly submitted to Peck/Jones a

document entitled AUnconditional Waiver and Release in which IMS released its

mechanic's lien and stop notice rights in the amount of the payment IMS received.

-14-

1    Then, before any subsequent progress payment would be submitted to

2    Peck/Jones, the owner required Peck/Jones to certify in each payment application that

3    the amounts received from the owner requested in previous payment applications had

4    been paid to the material suppliers and subcontractors.

5    Under Section 547(c)(2) of the United States Bankruptcy Code applicable at

6    the time the within action was filed, the Trustee may not avoid a preferential transfer to

7    the extent the transfer was:

8    (A) in payment of a debt incurred by the debtor in the ordinary course of

9    business or financial affairs of the debtor and the transferee;

10    (B) made in the ordinary course of business or financial affairs of the debtor

11    and the transferee; and

12    (c) made according to ordinary business terms.

13    The alleged transfer to IMS from Peck/Jones was on account of a debt incurred

14    by Peck/Jones in the ordinary course of business between Peck/Jones and IMS.

15    Peck/Jones was a general contractor which engaged in large construction projects.  In

16    its ordinary capacity as a General Contractor, Peck/Jones required HVAC equipment to

17    be furnished to and installed in the Project.  After furnishing and installing HVAC

18    equipment to the Project as required by Peck/Jones, IMS submitted invoices to

19    Peck/Jones for the labor and materials provided by IMS, for which Peck/Jones

20    distributed the alleged transfer to IMS.

21    Consequently, the alleged transfer to IMS was on account of a debt incurred by

22    Peck/Jones in the "ordinary course of business" within the meaning of 11 U.S.C. §

23    547(c)(2).

24    A subjective standard governs whether a payment is made in the ordinary

25    course of business: Awhether the parties themselves considered the transaction

26    ordinary. In re Chocolat (1995) 176 B.R. 540, 549.  In determining whether the debt

27    was paid in the ordinary course of business, courts consider a variety of factors,

28    including: the length of the debtor's and creditor's business relationship; whether the

-15-

1  amount or form of the transfer was inconsistent with the parties' past practices;

2  whether the creditor employed any unusual collection strategy; and whether the

3  creditor knew and took advantage of the debtor's precarious financial condition. In re

4  Grand Chevrolet (1994) 25 F.3d 728, 732. Even where the parties have not dealt with

5  each other previously, summary judgment is still proper where the parties' transaction

6  was ordinary in reference to the parties' practice with others. In re Ahaza Systems, Inc.

7  (2007) 482 F.3d 1118.

8       Peck/Jones, in its capacity as general contractor on the Project, required HVAC

9  equipment to be delivered to the Project in a Subcontract Agreement executed between

10  Peck/Jones and IMS.  IMS then submitted invoices to Peck/Jones for the HVAC

11  materials installed at the Project.  Pursuant to the owner's requirements discussed

12  above, IMS offered to waive its mechanic's lien rights upon receipt of payment for the

13  HVAC equipment supplied to the Project by submitting a document entitled

14  AConditional Waiver and Release Upon Progress Payment to Peck/Jones.  After

15  receiving payment from Peck/Jones, pursuant to the owner's requirements, IMS

16  submitted to Peck/Jones a document entitled AUnconditional Waiver and Release in

17  which IMS released its mechanic's lien and stop notice rights in the amount of the

18  payment IMS received.

19       According to the foregoing, the disbursement of funds from Peck/Jones to IMS

20  was squarely within the terms of the purchase order between Peck/Jones and IMS, as

21  Peck/Jones disbursed the funds requested by IMS's invoices by the 20th of the month

22  following submission of IMS's invoices.  Additionally, the disbursement of funds from

23  Peck/Jones to IMS was entirely consistent with the requirements enforced by the

24  owner, as IMS submitted a conditional waiver and release before receiving funds from

25  Peck/Jones, and an unconditional waiver and release after receiving funds from

26  Peck/Jones.

27       The alleged transfer to IMS was disbursed pursuant within the terms of the

28  Subcontract Agreement between IMS and Peck/Jones.  Therefore, the alleged transfer

-16-

1  was made within the ordinary course of business within the meaning of 11 U.S.C. §

2  547(c)(2).

3       An objective standard governs whether a challenged transfer is ordinary. In re

4  Kaypro (1999) 230 B.R. 400, 404.  This objective test is satisfied Aas long as the

5  payment was made within "the range of terms that encompasses the practices in which

6  firms similar in some general way to the creditor in question engage...only dealings so

7  idiosyncratic as to fall outside the broad range should be deemed extraordinary..." In re

8  Chocolat 176 B.R. 540, 550.

9       It is the ordinary custom and practice of Peck/Jones to enter into Subcontract

10  Agreements with its subcontractors to supply labor and materials to construction

11  projects such as the one at issue in this case.  Consequently, the alleged transfer was

12  paid in accordance with ordinary business terms within the meaning of 11 U.S.C. §

13  547(c)(2).

14       Because it is undisputed that the alleged transfer to IMS was on account of a

15  debt incurred by Peck/Jones in the ordinary course of business, and because it is

16  undisputed that the alleged transfer was paid in the ordinary course of business, and

17  because it is undisputed that the alleged transfer was made in accordance with ordinary

18  business terms, IMS has a complete "ordinary course" defense to the Trustee's claims

19  under § 547(c)(2).

20                    Evidence:

21                    Testimony of Vachik Armenian

22                    Testimony of Steve Malczewski

23                    Exhibits "A" through "X".

24

25  Plaintiff: The transfers from the Debtor to IMS were not made in the ordinary course

26  of business or financial affairs between the Debtor and IMS.  The transfers were not

27  made in the ordinary course of business terms in the construction industry.

28

327125.01 [XP]    24132

1  The showing that must be made by a creditor who asserts a defense under §

2  547(c)(2), as to whether a transfer was made in the ordinary course of business or

3  financial affairs of the debtor and the transferee is as follows:

4      To satisfy § 547(c)(2)(B) the creditor must demonstrate that
the relevant payments were "ordinary in relation to past

5  practices between the debtor and [the] ... creditor." In re
Food Catering & Hous., Inc., 971 F.2d at 398.  Effectively

6  this breaks down into two components.  First, the creditor
must show a baseline of past practices between itself and the

7  debtor.  See id.; 5 Collier on Bankruptcy ¶ 547.04[2][a], 547-
60 (rev. 15th ed. 2006).  Second the creditor must show that

8  the relevant payments were "ordinary in relation to [these]
past practices." In re Food Catering & Hous., Inc., 971 F.2d

9  at 398.  This is most commonly done by demonstrating that
the relevant payments did not differ from past payments in

10  "amount" or "form," were not the result of "unusual
collection or payment activit[ies]," or did not come as a result

11  of the "creditor [taking] advantage of the debtor's
deteriorating financial condition." Sulmeyer v. Suzuki (In re

12  Grand Chevrolet, Inc.), 25 F.3d 728, 732 (9th Cir. 1994).  But
see In re Ahaza, Inc., 482 F.3d at 1129 (finding that

13  traditional factors are non-exclusive and other factors bearing
on past practices may be relevant).

14

15      In re Healthcentral.com, 504 F.3d 775 (9th Cir. 2007).

16      Furthermore a determination of whether a transaction falls outside of the

17  ordinary course of business is a question of fact depending on the nature of industry

18  practice.  In re Jan Weilert RV, Inc., 315 F.3d 1192, 1196 (9th Cir. 2003).

19      In Healthcentral.com, the Ninth Circuit also reiterated the showing that must

20  be made by a creditor asserting a defense under § 547(c)(2), with respect to whether

21  a transfer is made according to ordinary business terms:

22

23      To satisfy § 547(c)(2)(C) the creditor must demonstrate that
the relevant payments were "ordinary in relation to prevailing

24  business terms." In re Food Catering & Hous., Inc., 971 F.2d
396, 398 (9th Cir.1992).  As before, this effectively breaks

25  down into two components.  First the creditor must establish
the "broad range" of business terms employed by similarly

26  situated debtors and creditors, including those in financial
distress, during the relevant period.  In re Jan Weilert RV,

27  Inc., 315 F.3d at 1197-98.  Second, the creditor must show
that the relevant payments were "ordinary in relation to

28  [these] prevailing business terms." See In re Kaypro, 218
F.3d at 1074.  In general, § 547(c)(2)(C) should not pose a

-18-

1

particularly high burden for creditors.  See <u>In re Jan Weilert RV, Inc.</u>, 315 F.3d at 1198 (holding only payments which are so unusual as to be "aberration[s] in the relevant industry" do not satisfy § 547(c)(2)(C)).

2

3

<u>In re Healthcentral.com,</u> 504 F.3d 775 (9th Cir. 2007).

4

5

Here, it was also not ordinary because the Debtor received the funds from

6

RFK on or about August 4, 2004.  Thereafter, the Debtor's principal withdrew

7

$650,000 in funds from the Debtor's account, including virtually all of the funds it

8

received from RFK for payment of IMS, and deposited such funds in his personal

9

account.  The Debtor received other funds into its account and cut checks payable to

10

IMS on September 16, 2008, September 23, 2008, September 27, 2008 and October

11

4, 2008.  Such payments were not made within the time prescribed by the applicable

12

statue, contract, or the ordinary course of the parties and industry.

13

In addition, the Trustee's expert witness will testify that the $182,393.90 in

14

transfers from the Debtor to IMS were not paid within the ordinary course of

15

business between the parties or according to ordinary business terms prevailing in

16

the construction industry.

17

Evidence:

18

Testimony of Alan Cade, Greg Jones, Gary Melnik, Vachik

19

Armenian and Guillermo Montero

20

Exhibits: In addition to any exhibits identified by IMS, the Trustee

21

identifies Exhibits 30, 34, 36, 58, 63, 67, 68, 71, 116, 117, 118, 119

22

120, 121, 122, 123, 124, 125, 126 and 127.

23

24

B.    **SECOND AFFIRMATIVE DEFENSE:**

25

<u>CONTESTED</u>

26

<u>Defendant:</u>  Defendant alleges that potential payments to Defendant from third

27

parties, including property owner's representatives, for materials ordered against a

28

-19-

1    credit account of the debtor, Peck/Jones, for required lawful releases of statutory

2    mechanic's lien and/or stop notice rights and/or bond rights and other rights,

3    constitute valuable and new consideration for which no preferential treatment may

4    be applied and claims for repayment to the Trustee of such potential sums are

5    improper and to the extent required, would unjustly enrich the Bankruptcy Estate

6    and the Trustee.

7    Under Section 547(c)(1) of the United States Bankruptcy Code, the trustee

8    may not avoid a preferential transfer—

9    "to the extent the transfer was —
    (A) intended by the debtor and the creditor to or for whose
10    benefit such transfer was made to be a contemporaneous
    exchange for new value given to the debtor; and

11

    (B) in fact a substantially contemporaneous exchange."

12    Courts have applied the language of §547(c)(1) to determine that "[a]

13    transfer does not diminish the estate [of the debtor] if the estate receives "new

14

15    value" on account of and equal to the amount of the transfer. [Citations omitted]." *In

16    re Chocolat* (1995) 176 B.R. 501, 506 (the "new value" defense "is grounded in the

17    principle that the transfer of new value to the debtor will offset the payments, and

18    the debtor's estate will not be depleted to the detriment of other creditors. [Citations

    omitted]").

19

20    In accordance with the policy behind Section 547(c)(1), the alleged transfer

21    to IMS did not deplete the estate of Peck/Jones.  On the contrary, the transfer helped

22    to ensure that Peck/Jones could obtain further payments and retention from the

    owner, and the transfer released Peck/Jones from a Contractual obligation to return

23    any undisbursed trust funds back to the owner and to reimburse the owner's costs

24    associated with discharging any unsatisfied liens.

25    Here, the undisputed evidence demonstrates that Peck/Jones had a

26    Contractual obligation, enumerated in Section 9.6.2 of the General Conditions, to:

27    "...promptly pay each Subcontractor, upon receipt of payment
    from the Owner, out of the amount paid to the Contractor on

28

-20-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

account of said Subcontractor's portion of the Work, the
amount to which said Subcontractor is entitled, reflecting
percentages actually retained from payments to the Contractor
on account of such Subcontractor's portion of the Work."

In addition to this prompt payment requirement, Section 9.10.2 of the

General Conditions states, in pertinent part:

"Neither final payment nor any remaining retained percentage
shall become due until the Contractor submits to the Architect
(1) an affidavit that payrolls, bills for materials and
equipment, and other indebtedness connected with the Work
for which the Owner or the Owner's property might be
responsible or encumbered (less amounts withheld by Owner)
have been paid or otherwise satisfied, ...and (5), if required by
the Owner, other data establishing payment or satisfaction of
obligations, such as receipts, releases and waivers of liens,
claims, security interests or encumbrances arising out of the
Contract, to the extent and in such form as may be designated
by the Owner.  If a Subcontractor refuses to furnish a release
or waiver required by the Owner, the Contractor may furnish
a bond satisfactory to the Owner to indemnify the Owner
against such lien.  If such lien remains unsatisfied after
payments are made, the Contractor shall refund to the Owner
all money that the Owner may be compelled to pay in
discharging such lien, including all costs and reasonable
attorney's fees." [Emphasis added]

Section 9.10.2 imposes three strict requirements on Peck/Jones: (a) it

requires Peck/Jones to certify to the owner that Peck/Jones paid all of its material

suppliers and subcontractors before Peck/Jones is entitled to receive final payment

and retention from the owner; (b) it obligates Peck/Jones to return any funds it holds

in trust for material suppliers and subcontractors to the owner to compensate the

owner for any unsatisfied liens recorded on the owner's property; and (c) it requires

Peck/Jones to pay the owner's costs and reasonable attorney's fees for discharging

such unsatisfied liens."

In addition to these Contractual Requirements, the owner imposed additional

requirements upon Peck/Jones before Peck/Jones could receive each progress

payment on the Project.  First, before Peck/Jones could receive each progress

payment, the owner required Peck/Jones to obtain from each material supplier and

subcontractor, including IMS, a written document whereby the supplier or

-21-

1    subcontractor agreed to waive and release its rights to file a mechanic's lien on the

2    owner's property upon receipt of payment.  Defendant accordingly offered to waive

3    its mechanic's lien rights upon receipt of payment for the HVAC materials furnished

4    and installed at the Project by submitting a document entitled "Conditional Waiver

5    and Release Upon Progress Payment" to Peck/Jones.

6        Next, after Peck/Jones received each progress payment, but before the next

7    progress payment would be submitted to Peck/Jones, the owner required Peck/Jones

8    to obtain from each material supplier and subcontractors, including IMS, a written

9    document whereby the supplier or subcontractor unconditionally waived and

10   released its right to file a mechanic's lien on the owner's property after the

11   subcontractor or supplier received payment for the labor and/or materials it provided

12   to the Project.  Then, before the owner would submit any subsequent progress

13   payments to Peck/Jones, the owner required Peck/Jones to certify in each payment

14   application that the amounts received from the owner Peck/Jones requested in

15   previous payment applications had been paid to material suppliers and

16   subcontractors.

17       Defendant provided evidence which the Trustee cannot contradict

18   establishing that Defendant was legally entitled to record a mechanic's lien on the

19   owner's property to secure any amount Defendant did not receive for materials it

20   supplied to the Project. However, as required by the owner, before Defendant

21   received payment for the HVAC materials furnished and installed at the Project by

22   submitting to Peck/Jones a document entitled "Conditional Waiver and Release

23   Upon Progress Payment" to Peck/Jones.  After receiving payment from Peck/Jones

24   on or about September 27 and October 4, 2004, Defendant submitted to Peck/Jones

25   a document entitled "Unconditional Waiver and Release" which was dated October

26   7, 2004, in which Defendant released its mechanic's lien and stop notice rights in

27   the amount of the payment Defendant received.

28

-22-

327125.01 [XP]      24132

According to the above-quoted sections of the General Conditions, had Peck/Jones not disbursed the trust funds to Defendant for the HVAC materials furnished to the Project, Peck/Jones would not be entitled to its final payment and/or retention from the owner, and Peck/Jones would be in breach of its Contractual obligation to pay its subcontractors and material suppliers. Also, had Peck/Jones not disbursed the trust funds to Defendant, Peck/Jones could not have satisfied the additional obligations imposed by the owner before the owner would release each progress payment to Peck/Jones. In addition, had Peck/Jones not paid Defendant for the HVAC materials furnished and installed by Defendant in the Project, Defendant would have been entitled to record a mechanic's lien on the owner's property for any unpaid funds to which Defendant was entitled. Thereafter, Peck/Jones would have a Contractual obligation to return to the owner the funds Peck/Jones held in trust for Defendant to discharge Defendant's lien, and Peck/Jones would be liable to the owner for all reasonable attorneys' fees and costs in discharging Defendant's lien.

Thus, the alleged transfer from Peck/Jones to Defendant created new value in the estate of Peck/Jones in three ways: (a) it allowed Peck/Jones to certify that Defendant was paid, which was a Contractual precondition to Peck/Jones' entitlement to final payment and retention from the owner; (b) it allowed Peck/Jones to certify that Defendant was paid, which was a precondition imposed by the owner to Peck/Jones' entitlement to subsequent progress payments from the owner; and (c) it released Peck/Jones from its Contractual obligation to return the funds Peck/Jones held in trust for Defendant back to the owner as compensation for unsatisfied liens, since Defendant released its rights to file a mechanic's lien on the owner's property upon receipt of the trust funds from Peck/Jones. In other words, if Peck/Jones had not distributed the alleged transfer to Defendant, Peck/Jones would have had to return those funds to which Defendant was entitled to the owner, Peck/Jones would

-23-

1    not be able to receive the next progress payment, and Peck/Jones would not be

2    entitled to final payment or the retention from the owner.

3    Therefore, the alleged transfer to IMS did not deplete Peck/Jones' estate,

4    and, even assuming arguendo that the alleged transfer was otherwise avoidable,

5    Defendant has a complete "new value" defense to the Trustee's claims under

6    §547(c)(1).

7    Evidence:

8    Testimony of Vachik Armenian

9    Testimony of Steve Malczewski

10    Exhibits "A" through "X".

11

12    Plaintiff:  IMS's lien releases were not intended by the Debtor and IMS to be a

13    contemporaneous exchange for "new value" given to the Debtor and the transfers of

14    the funds to IMS from the Debtor were not a substantially contemporaneous

15    exchange.

16    First, the release of a mechanic's lien is not "new value". The words "new

17    value" in § 547(c)(1) constitute a defined term, meaning

18    money or money's worth in goods, services, or new credit, or
release by a transferee of property previously transferred to
19    such transferee in a transaction that is neither void nor
voidable by the debtor or the trustee any under applicable
20    law, including proceeds of such property, but does not include
an obligation substituted for an existing obligation.
21

22    11 U.S.C. § 547(a)(2).

23    IMS did not give any money, goods, services or new credit to the Debtor in

24    exchange for the funds transferred by the Debtor to IMS.  IMS also did not release

25    any property that had previously been transferred by the Debtor to IMS.

26    Second, even if IMS's release of its right to record a mechanic's lien

27    generally constitutes "new value" as defined by § 547(a)(2),  the release of such a

28    right does not constitute new value "given to the Debtor." See 11 U.S.C. §

-24-

547(c)(2)(A).  Had IMS exercised a right to record a mechanic's lien, the lien would
not have been against any property of the Debtor; instead, it would have been
against RFK's property.  See Civil Code § 3110.   As a result, IMS's release of a
right to record a mechanic's lien was actually for the benefit of RFK, and benefited
the Debtor in the sense that it may have allowed the Debtor to claim entitlement to
future progress payments.   The fact that the Debtor may have benefited in some
way from IMS's release of its mechanic's lien rights as against RFK's property does
not mean that anything has been "given to the Debtor" by IMS.

Finally, the transfers that IMS received from the Debtor were not in
exchange for the lien release, but, instead were in exchange for materials and
services that IMS provided to the RFK project during June 2004.  Accordingly, the
$182,939.90 in transfers from the Debtor to IMS from September 29, 2004 to
October 4, 2004, was not a substantially contemporaneous exchange.

Evidence:

Testimony of Greg Jones

Exhibits: In addition to any exhibits identified IMS, the Trustee
identifies Exhibits  63, 68, 116, 117, 118, 119, 125, and 126.

-25-

327125.01 [XP]    24132

1  V.     **EXHIBITS TO BE OFFERED BY EACH PARTY AND OBJECTIONS TO**

2        **EXHIBITS**

3        A.    **Plaintiff's Exhibits:**  Plaintiff's Exhibits are filed contemporaneously herewith as

4              Appendix 1.

5

6        B.    **Defendant's Exhibits:**  Defendant's Exhibits are filed contemporaneously herewith

7              as Appendix 2.

8

9  VI.    **WITNESSES TO BE OFFERED BY EACH PARTY**

10       A.    **Plaintiff:**

11      A list of the only witnesses Plaintiff shall call to testify at trial, a summary of their intended

12  testimony, and an estimate of the length of direct and cross-examination is attached to this order as

13  Appendix 3.

14

15       B.    **Defendant:**

16      A list of the only witnesses Plaintiff shall call to testify at trial, a summary of their intended

17  testimony, and an estimate of the length of direct and cross-examination is attached to this order as

18  Appendix 4.

19

20

21  VII.   **REBUTTAL TESTIMONY**

22      Plaintiff, who has the burden of establishing each element of its claim(s) for relief, will be

23  the first to introduce evidence to prove the facts necessary to enable Plaintiff to recover.  When

24  Plaintiff rests, Defendant may then present evidence to contravene any of Plaintiff's claims or in

25  support of any affirmative defenses which the Defendant has included in this pre-trial stipulation.

26  After the close of Defendant's case, Plaintiff may present rebuttal testimony only to counter

27  evidence previously submitted by Defendant on issues not raised in Plaintiff's original presentation

28  of its case.

327125.01 [XP]    24132

1  **STIPULATION**

2      The foregoing admissions have been made by the parties, and the parties have specified the

3  foregoing issues of fact and law remaining to be litigated.  Therefore, this order shall supersede the

4  pleadings and govern the course of trial in this adversary proceeding, unless modified to prevent

5  manifest injustice.

6

7      **IT IS SO STIPULATED.**

8

9  Dated: August 7, 2008         DANNING, GILL, DIAMOND & KOLLITZ, LLP

10

11                              By: _____
                             Aaron E. de Leest

12                               Attorneys for Plaintiff R. Todd Neilson,
                             Chapter 7 Trustee

13

14  Dated: August 7, 2008         GLADYCH & ASSOCIATES

15

16                              By: _____
                             Randall S. Guritzky

17                               Attorneys for Defendant Integrated
                             Mechanical Systems, Inc.

18

19

20

21

22

23

24

25

26

27

28

-27-

327125.01 [XP]    24132

1                                **APPENDIX 1**

2  **Plaintiff Offers:**

3  Exhibit 30.......Peck/Jones check no. 21718 dated October 4, 2004, payable to DMG in the amount
        of $184,106.00; and copy thereof with check stub.

4
   Exhibit 34.......Facsimile dated September 21, 2004, from "Project Administrator" Debbie Serafini
5        to Alan Friedberg and Gary Melnik enclosing copies of purchase orders.

6  Exhibit 36.......Facsimile dated September 27, 2004, from Vachik Armenian of IMS to Gary Melnik
        of Peck/Jones enclosing June billing summary, with handwritten notes thereon.
7
   Exhibit 58.......Facsimile dated May 26, 2004, from Alfredo Llop to Gary Melnik enclosing IMS
8        purchase orders.

9  Exhibit 63.......IMS' Application and Certification for Payment number 3, for period ending on
        June 30, 2004.
10
   Exhibit 67:  ....Subcontract Change Order Number 1 dated September 29, 2004, with transmittal.
11
   Exhibit 68.......Peck/Jones check number 21668 dated September 23, 2004, payable to IMS and
12       Control Management Systems in the amount of $46,458.00.

13 Exhibit 71.......Facsimile dated October 6, 2004, from Lynn of Peck/Jones to Vachik Armenian of
        IMS.
14
   Exhibit 116.....Peck/Jones check number 21697 dated September 27, 2004, payable to IMS and
15       Haldeman in the amount of $10,650.72.

16 Exhibit 117.....Peck/Jones check number 21719 dated October 4, 2004, payable to IMS and Air
        Conditioning Specialties Co. in the amount of $29,832.62.
17
   Exhibit 118.....Peck/Jones check number 21720 dated October 4, 2004, payable to IMS and Strobic
18       Air in the amount of $22,622.34.

19 Exhibit 119.....Peck/Jones check number 21721 dated October 4, 2004, payable to IMS and York
        International in the amount of $40,593.75.
20
   Exhibit 120:  ..Prime Contract executed between Debtor and Robert F. Kennedy Medical Center
21       dated March 12, 2002.

22 Exhibit 121:  ..Subcontract executed between Debtor and Integrated Mechanical Systems dated
        November 24, 2003.
23
   Exhibit 122:  ..RFK check no. 221078 dated August 4, 2004, payable to Peck/Jones, in the amount
24       of $651,506.13; and Peck/Jones' Payment Application #34 submitted to RFK.

25 Exhibit 123:  ..Account Statements for Wells Fargo Account Number 7038281585 from August 23,
        2004 to December 31, 2004.
26
   Exhibit 124:  ..Account Statements for Wells Fargo Account Number 201-7946542 from June 30,
27       2004 to December 31, 2004

28
                                        -28-

1  Exhibit 125: ...Peck/Jones check number 21629 dated September 16, 2004, payable to IMS in the
           amount of $29,481.61.

2

3  Exhibit 126: ...Peck/Jones check number 21723 dated October 4, 2004, payable to IMS in the
           amount of $2,754.86.

4  Exhibit 127: ...Peck/Jones check number 21722 dated October 4, 2004, payable to M.W. Sausse &
           Co, Inc., in the amount of $10,262.10.

5

6  Defendant stipulates to the authenticity and admissibility of the above exhibits.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

327125.01 [XP]    24132

# APPENDIX 2

**Defendant Offers:**

A.      Subcontract Agreement of Defendant and Debtor dated November 24, 2003.

B       Submittal Comments by the Engineer dated December 15, 2003.

C.      Response to M-E Project Engineers project review dated December 10, 2003.

D.      Application and Certification for Payment-Contractors Application for Payment dated June 22, 2004.

E.      Credit Memos with DMG for September 2004.

F.      Conditional Waiver and Release Upon Progress Payment of Defendant dated July 1, 2004.

G.      Checks paid to others dated September and October 2004 for Pay Application #34

H       Pay Application 34

I.      Preliminary 20 Day Notice for Defendant.

J.      Preliminary 20 Day Notice for Air Treatment

K.      Conditional Waiver and Release Upon Progress Payment of Defendant dated June 22, 2004.

L.      Preliminary 20 Day Notice for York International

M.      Subcontract Change Order No. 1 Revised dated November 1, 2004.

N.      Subcontract Change Order No 2 dated October 8, 2004.

O.      Invoice of Defendant to Peck/Jones dated June 22, 2004.

P.      Conditional Waivers & Releases Upon Progress Payments by Strobic Air dated August 12, 2004.

Q.      Conditional Waiver and Release of Control Management Systems dated August 4, 2004.

R.      Conditional Waiver & Release upon Progress Payment of Haldeman, Inc. dated August 12, 2004.

S.      Conditional Waiver & Release upon Progress Payment of Air Conditioning Specialties, dated August 13, 2004.

T.      Conditional Waiver of Lien of York International dated August 27, 2004.

U.      Unconditional Waiver & Release Upon Progress Payment of Defendant dated October 7, 2004.

327125.01 [XP]    24132

1  V.    Job Cost Detail of Defendant dated July 1, 2004.

2  W.    Job Cost Detail of Defendant dated March 4, 2005.

3  X.    Prime Contract between RFK and the Debtor.

4

5  Plaintiff stipulates to the authenticity and admissibility of the Defendant's exhibits A-E and H-X.

6  Plaintiff objects to Defendant's Exhibits F and G.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

327125.01 [XP]    24132

**APPENDIX 3**

**PLAINTIFF'S WITNESSES:**

1.      Alan Cade – Will testify:

      A.      As the Trustee's expert witness.

      B.      That the $182,393.90 in payments from the Debtor to IMS wer not paid within the ordinary course of business between the parties.

      C.      That the $182,393.90 in payments from the Debtor to DMG was not paid according to ordinary business terms prevailing in the construction industry.

      Estimated Direct:  1 Hour

      Estimated Cross-examination: 1 Hour

2.      Guillermo Montero – Will testify:

      A.      He was one of the principals of the Debtor.

      B.      He took $650,000 from the Debtor's general account on or about August 23, 2004, and transferred it into his Wells Fargo Bank account number 7038281585 where it remained until at least December 31, 2004.

      C.      The $650,000 was used by him as security for a line of credit by Wells Fargo Bank for another company that he owned.

      D.      His personal account # 7038281585 at Wells Fargo Bank maintained a balance of at least $650,000.00 until at least December 31, 2004.

      E.      To the course of dealing between the Debtor and IMS.

      F.      To the course of dealing between the Debtor and DMG.

      Estimated Direct:  1/2 Hour

      Estimated Cross:  1/2 Hour

3.   J. Gregory Jones – Will testify:

    A.   That he was the president of the Debtor.

    B.   To the day to day operations of the Debtor.

    C.   To the transfers between the Debtor and subcontractors.

    Estimated Direct:  1/2 Hour

    Estimated Cross: 1/2 Hour

4.   Gary Melnik – Will testify:

    A.   That he was the CFO of the Debtor.

    B.   Guillermo Montero took $650,000 from the Debtor's general account on or about August 23, 2004, and transferred it into Guillermo Montero's personal account at Wells Fargo Bank where it remained until at least December 31, 2004.

    C.   The funds transferred to IMS did not come from the Debtor or Montero.

    D.   That the funds used to pay IMS did not come from the owner of the RFK project but instead came from owners of other projects.

    E.   To the balance of the Debtor's accounts on certain dates and the source of the funds in such accounts.

    Estimated Direct:  1/2 Hour

    Estimated Cross: 1/2 Hour

5.   Ron Clement – Will testify:

    A.   To the course of dealing between RFK and the Debtor.

    B.   That RFK Received Payment Application Number 34 on or about July 1, 2004.

    C.   RFK approved Payment Application Number 34.

    Estimated Direct:  1/2 Hour

    Estimated Cross: 1/2 Hour

-33-

6.    Vachik Armenian – Will testify:

     A.    To the course of dealing between the Debtor and IMS.

     B.    To the course of dealing between IMS and DMG.

         Estimated Direct:  1/2 Hour

         Estimated Cross: 1/2 Hour

327125.01 [XP]      24132

**APPENDIX 4**

**DEFENDANT'S WITNESSES:**

      1.     Vachik Armenian – Percipient and Expert.

Mr. Armenian is the First Vice President of Defendant and has personal knowledge regarding all aspects of this case as to the defense.  Mr. Armenian will testify to the facts that support the affirmative defenses, as well as provide expert opinion as to the basis for the affirmative defenses, as necessary, i.e., that payments Integrated Mechanical Systems received from the debtor fall within the exception to preferential transfers as set forth in 11 U.S.C. Section 547(c)(2) in that any and all payments received by Integrated Mechanical Systems during the preference period were deliveries of monies by the Debtor: (a) in payment of a debt incurred by Peck/Jones Construction in the ordinary course of business or financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; (b) made in the ordinary course of business or financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; and (c) made according to ordinary business terms.  Further, it is expected that Mr. Armenian will testify that the funds that were to be paid were trust funds of the creditor to be held in trust by the debtor.

      Estimated Direct:  1 hour

      Estimated Cross:   1 hour

      2.     Stefan Malczewski – Expert

Mr. Malczewski is the Owner of Pacific West Mechanical, Inc., a subcontractor on the project at issue in this case.  Mr. Malczewski will testify to facts and issues related to the affirmative defenses of Defendant, as necessary, including that payments Integrated Mechanical Systems received from the debtor fall within the exception to preferential transfers as set forth in 11 U.S.C. Section 547(c)(2) in that any and all payments received by Integrated Mechanical Systems during the preference period were deliveries of monies by the Debtor: (a) in payment of a debt incurred by Peck/Jones Construction in the ordinary course of business or

-35-

financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; (b) made in the ordinary course of business or financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; and (c) made according to ordinary business terms.  Further, it is expected that Mr. Malczewski will testify that the funds that were to be paid were trust funds of the creditor to be held in trust by the debtor.

Estimated Direct:  1  hour

Estimated Cross:  1 hour

3.    Ron Clement: Will testify.

A.    To the course of dealing between RFK and the Debtor

B.    Issues regarding the holding of owner's funds in trust for subcontractors.

C.    Issues of ordinary course as to general contractors dealing directly with suppliers as allowed by contract.

Estimated Direct:  20 minutes

Estimated Cross:  20 minutes

-36-

**PROOF OF SERVICE**

I, Martha Gonzalez, declare:

I am the principal of a professional corporation which is a partner in the law firm of Danning, Gill, Diamond & Kollitz, LLP, in the county of Los Angeles, state of California.    I am over the age of 18 years and am not a party to the within action.  My business address is 2029 Century Park East, Third Floor, Los Angeles, California 90067-2904.

On August 7, 2008, I served the following document(s):

**PRE-TRIAL STIPULATION**

on the interested parties as follows:

<u>Attorneys for Integrated Mechanical Systems, Inc.</u>
Randall S. Guritzky, Esq.
Gladych & Associates. Inc.
1400 Bristol Street North, Suite 270
Newport Beach, CA  92660

(By Mail) I placed the document for collection and deposit in the mail.  I am familiar with this firm's practice for the collection and processing of correspondence for mailing.  Under that practice, the document would be placed in a sealed envelope and deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at 2029 Century Park East, Third Floor, Los Angeles, California 90067-2904, in the ordinary course of business.  The documents served were placed in sealed envelopes and placed for collection and mailing following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed on August 7, 2008, at Los Angeles, California.

_____
Martha Gonzalez
(Type Or Print Name)

_____
(Signature)

327125.01 [XP]    24132