1  GEORGE E. SCHULMAN (State Bar No. 064572)
   JOHN N. TEDFORD, IV (State Bar No. 205537)
2  AARON E. DE LEEST (State Bar No. 216832)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone:  (310) 277-0077
   Facsimile:  (310) 277-5735
5
   Attorneys for Plaintiff R.
6  Todd Neilson, Chapter 7
   Trustee
7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11 | In re                              | ) Case No. 2:04-35757-VZ
   |                                    | )
12 | PECK/JONES CONSTRUCTION            | ) Chapter 7
   | CORPORATION,                       | )
13 |                                    | )
   |           Debtor.                  | )
14 |                                    | )
   | _____| )
15 | R. TODD NEILSON, CHAPTER 7 TRUSTEE,| ) Adv. No. 2:07-ap-01058-VZ
   |                                    | )
16 |           Plaintiff,               | )
   |                                    | )
17 |     vs.                            | )
   |                                    | )
18 | AMERICAN TECHNOLOGIES, INC.,       | )
   |                                    | )
19 |           Defendant.               | )
   |                                    | )
20 | _____| )
   | R. TODD NEILSON, CHAPTER 7 TRUSTEE,| ) Adv. No. 2:07-ap-01060-VZ
21 |                                    | )
   |           Plaintiff,               | )
22 |                                    | )
   |     vs.                            | )
23 |                                    | )
   | D & M STEEL,                       | )
24 |                                    | )
   |           Defendant.               | )
25 | _____| )
   |                                    | )
26 | R. TODD NEILSON, CHAPTER 7 TRUSTEE,| ) Adv. No. 2:07-ap-01034-VZ
   |                                    | )
27 |           Plaintiff,               | )
   |                                    | )
28 |     vs.                            | )
   |                                    | )

DMG CORPORATION,

      Defendant.

R. TODD NEILSON, CHAPTER 7 TRUSTEE,    Adv. No. 2:07-ap-01050-VZ

      Plaintiff,

    vs.

INTEGRATED MECHANICAL SYSTEMS, INC.,

      Defendant.

R. TODD NEILSON, CHAPTER 7 TRUSTEE,    Adv. No. 2:07-ap-01048-VZ

      Plaintiff,

    vs.

MALCOLM DRILLING CO.,

      Defendant.

R. TODD NEILSON, CHAPTER 7 TRUSTEE,    Adv. No. 2:07-ap-01026-VZ

      Plaintiff,

    vs.

WEISS SHEET METAL COMPANY,

      Defendant.

R. TODD NEILSON, CHAPTER 7 TRUSTEE,    Adv. No. 2:07-ap-01035-VZ

      Plaintiff,

    vs.

WESTERN ALLIED CORPORATION,

      Defendant.

**PLAINTIFF'S EXHIBITS 1-6 FILED IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE FOR AN ORDER EXCLUDING CERTAIN TRIAL WITNESSES AND/OR EXPERT TESTIMONY FROM CERTAIN TRIAL WITNESSES**

Date:   December 11, 2008
Time:  10:00 a.m.
Place:  Courtroom 1368
       255 E. Temple St.
       Los Angeles, CA 90012

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

**CERTIFIED COPY**

In re                            )

PECK/JONES CONSTRUCTION          )

CORPORATION,                     )

           Debtor.            )

_____)

R. TODD NEILSON, CHAPTER 7       )

TRUSTEE,                         )

          Plaintiff,  ) Case No. 2:04-35757-VZ

        vs               ) Pages 1-76

AMERICAN TECHNOLOGIES, INC., a )

California Corporation,          )

         Defendant.    )

_____)

DEPOSITION OF JOHN D. TOLMAN

REPORTED BY:

SHARON E. GONZALEZ

CSR No. 4501



**MICHELS COURT REPORTERS**

11740 WILSHIRE BOULEVARD., # A607
LOS ANGELES, CALIFORNIA 90025
310-312-0333  818-346-1808  800-353-1500
WWW.MICHELSCOURTREPORTERS.COM

**EXHIBIT 1**

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                  LOS ANGELES DIVISION

 4

 5

 6   In re                        )

 7   PECK/JONES CONSTRUCTION       )

 8   CORPORATION,                  )

 9                    Debtor.      )

10   _____)

11   R. TODD NEILSON, CHAPTER 7    )

12   TRUSTEE,                      )

13                    Plaintiff,   ) Case No. 2:04-35757-VZ

14            vs                   )

15   AMERICAN TECHNOLOGIES, INC. a )

16   California Corporation,       )

17                    Defendant.   )

18   _____)

19

20   DEPOSITION OF JOHN D. TOLMAN, taken on behalf of the

21   Plaintiff and Trustee, at 2030 Main Street, 12th Floor,

22   Irvine, California, commencing at 10:00 a.m., on Friday,

23   July 18, 2008, before Sharon E. Gonzalez, CSR No. 4501,

24   a Certified Shorthand Reporter within and for the State

25   of California, pursuant to notice.
```

2

```
 1

 2                    APPEARANCES OF COUNSEL:

 3

 4   FOR THE PLAINTIFF and TRUSTEE:

 5          DANNING, GILL, DIAMOND & KOLLITZ, LLP
            BY:  GEORGE E. SCHULMAN, ESQ.
 6          2029 Century Park East
            Third Floor
 7          Los Angeles, California 90067-2904
            (310) 227-0077
 8

 9   FOR THE DEFENDANT AMERICAN TECHNOLOGIES, INC.:

10          JACKSON/DeMARCO/TIDUS/PECKENPAUGH
            BY:  EDWARD A. GALLOWAY, ESQ.
11          2030 Main Street
            Suite 1200
12          Irvine, California 92614
            (949) 752-8585
13
            -- and --
14
            KEVIN CASENHISER
15          General Counsel
            American Technologies, Inc.
16          210 Baywood Avenue
            Orange, California 92865
17          (714) 283-9990

18

19

20

21

22

23

24

25
```

3

1                               I N D E X

2
     DEPONENT                EXAMINATION              PAGE
3
     JOHN D. TOLMAN          BY MR. SCHULMAN            5
4
                             BY MR. GALLOWAY           71
5

6

7

8

9
                            E X H I B I T S
10

11   Plaintiffs'            Description               Page

12      1              Deponent's file, 294 pages      62

13

14

15
                        INFORMATION REQUESTED
16
                             (None)
17

18

19
               QUESTIONS INSTRUCTED NOT TO ANSWER
20                   Page              Line

21                           (None)

22

23

24

25

                                                        4

1          Irvine, California, Friday, July 18, 2008

2                    10:00 a.m.

3

4                   JOHN D. TOLMAN,

5          having been sworn, testified as follows:

6

7                   EXAMINATION

8    BY MR. SCHULMAN:

9       Q.   Would you state and spell your name for the

10   record, please.

11      A.   John David Tolman; J-o-h-n, D-a-v-i-d,

12   T-o-l-m-a-n.

13      Q.   Thank you, Mr. Tolman.

14           Mr. Tolman, you're here today designated as an

15   expert witness by American Technologies.   Do you

16   understand that, sir?

17      A.   Yes.

18      Q.   Have you ever had your deposition taken

19   before?

20      A.   Yes.

21      Q.   About how many times?

22      A.   Twice.

23      Q.   Tell me generally what sort of cases those

24   were.

25      A.   Those were both construction defect cases.

5

1     Q.    What was your role?

2     A.    I was an expert to talk about the role of the

3  general contractor in the first case, which was called

4  the CCS case, and discussed, generally, the defects

5  alleged, the timing of the contract, the timing of the

6  construction, et cetera.

7     Q.    And the second case, what label do you put on

8  that?

9     A.    The same thing, construction defect.  I was

10 representing the developer in that case.  And we were

11 defending the claims made by the owner that there were

12 defects in the home, in their home.

13    Q.    In both cases, you were retained as an expert?

14    A.    Yes.

15    Q.    Let me briefly go over the ground rules, even

16 though I know that you've heard them before.

17         One rule is that I ask you to wait until I

18 finish with my questions before you start your answers

19 so that the court reporter can get a clean record.

20         Similarly, I have to wait until you finish

21 your answer before I start the next question.

22         If you think that stepped on one of your

23 answers and didn't give you enough time, just say so and

24 we'll give you all the time that you want to provide an

25 answer.  Is that okay, sir?

6

1     A.   Yes.

2     Q.   Is there any reason why you can't testify

3 today?

4          Any health reason or medical reason or any

5 drug or medicine you're taking that would interfere with

6 your ability to testify?

7     A.   No.

8     Q.   When the deposition is completed, the court

9 reporter is going to prepare a transcript.  I presume

10 you've seen transcripts before.

11    A.   Yes.

12    Q.   You're going to have an opportunity to review

13 it and make any changes or corrections that you may wish

14 in that.

15         Do you understand that, sir?

16    A.   Yes.

17    Q.   I, or anybody else in the case, could comment

18 on any of the changes or corrections.  So it is

19 important that today, you give your best testimony.

20 Understandably, if you change an answer from "yes" to

21 "no" or "no" to "yes," it might look funny later.

22         Do you understand that, sir?

23    A.   Yes.

24    Q.   There's no harm in saying "I don't know."

25 Today's examination is not really a test, a number of

7

1  correct answers.  If I ask you something to which you

2  don't know the answer to, it's perfectly okay to say "I

3  don't know."

4          Do you understand that, sir?

5     A.   Yes.

6     Q.   We don't want you to guess.  If I ask you a

7  question that calls for what you think is a guess, would

8  you let us know?

9     A.   Yes.

10    Q.   We may ask you to estimate.  I know based upon

11 your experience, you're probably used to estimating

12 things.

13         For example, I might say, could you tell me

14 how many people are in this building today, and you

15 would have to guess at that.

16         Would you agree with that, sir?

17    A.   Yes.

18    Q.   But if I asked you how big this table was, my

19 guess is with your expertise, you could give us a good

20 estimate as to the length of the table.

21    A.   Possibly.

22    Q.   I won't test you on that now.

23         Tell me about your arrangement with ATI.  Do

24 you have a contract with ATI?

25         I'm sorry, with whom do you have a contract?

                                                        8

1    A.    With the law firm.

2    Q.    And I take it you're being compensated for

3 your work as an expert and your work in testifying; is

4 that correct?

5    A.    Yes.

6    Q.    What is the rate that you're being paid for

7 those services?

8    A.    Our rates recently had an adjustment.  I

9 believe that we sent over our rate sheet that had my

10 standard rate for analysis and so forth at $165 an hour.

11 I believe that's increased recently, as of July 1st, to

12 up to $185 an hour.

13        The hourly rate for deposition testimony was

14 360.  I think it's gone to 420 as of July 1st.

15    Q.    And I take it, the contract is between your

16 employer, the company that you work for, and the law

17 firm.  Is that right?

18    A.    Yes.

19    Q.    And the name of the employer, sir?

20    A.    My employer?

21    Q.    Yes.

22    A.    Bert L. Howe & Associates, Inc.

23    Q.    And what is your relationship with Bert L.

24 Howe & Associates, Inc.?

25    A.    I am a senior consultant.

9

1       Q.   Are you an owner of the company?

2       A.   No.

3       Q.   Are you compensated by Bert L. Howe &

4    Associates by salary or by payment per job?

5       A.   I'm salaried.

6       Q.   Does that mean that the amount that you get

7    paid by the company does not depend upon the amount that

8    Mr. Galloway's firm is paying your company for your

9    services?

10      A.   Yes, that's correct.

11      Q.   Other than the two times that you testified as

12   an expert, have you ever been retained as an expert

13   before?

14      A.   No.

15      Q.   What are the usual services that you provide

16   at Bert L. Howe & Associates?

17      A.   I am assigned a case that is related in some

18   way to construction because that's my background.  And

19   depending upon the goals of the case, I analyze and

20   prepare an opinion based upon my experience of the facts

21   of the case.

22      Q.   Who do you prepare the opinion for?

23      A.   Whomever has hired Bert L. Howe & Associates.

24      Q.   Well, what is the business, then, of Bert L.

25   Howe & Associates?

10

1      A.    They're a consulting firm whose principal

2  focus is construction litigation, and providing analysis

3  and expert testimony for construction litigation

4  matters.

5      Q.    So other than the two depositions which you

6  testified previously, and the current matter involving

7  ATI, you have worked on other construction litigation

8  cases.

9      A.    Can you define what you mean by I've worked on

10  them?

11      Q.    You've provided some sort of services in terms

12  of analysis, reports or anything.

13      A.    Well, as an employee of the various

14  construction firms which I have been employed by over

15  the years, I have been involved in one way or another

16  with a number of lawsuits.

17      Q.    But you told us that the Howe Company's

18  principal focus is on providing services in construction

19  litigation cases --

20      A.    Yes.

21      Q.    -- is that correct?

22            And what is your role at the Howe Company

23  then?

24      A.    To do just that, to provide expert testimony

25  for the clients of Bert L. Howe & Associates based upon

                                                        11

1  the cases that are assigned to me.

2      Q.   How long have you been employed by the Howe

3  Company?

4      A.   Since November of 2007.

5      Q.   Can you give us an estimate of how many

6  matters that you've worked on since you've been employed

7  by the Howe Company?

8      A.   When you say "matters," I presume that you

9  mean separate cases.

10     Q.   Separate cases, yes.

11     A.   Probably two dozen separate cases.

12     Q.   Now, when was the case that you called the CCS

13  case, when did that occur?

14     A.   That was one of the first cases I was

15  assigned.  It ranged from November of '07 into May of

16  '08.

17     Q.   When did you testify?

18     A.   In deposition, I testified in February of '08.

19     Q.   You testified in trial, as well?

20     A.   I testified in arbitration.

21     Q.   When was that?

22     A.   And that was probably late April, early May of

23  '08.

24     Q.   For whom was Howe providing services in that

25  case?

1     A.    To the law firm of Green Hall.

2     Q.    And who did Green Hall represent?

3     A.    They represented the general contractor, CCS.

4     Q.    Do you know the outcome of the arbitration?

5     A.    Yes.  CCS was -- won the case.  They were

6  awarded all the -- respondent was awarded nothing.

7     Q.    Can you just tell us briefly what the

8  litigation was about?  I'm not looking for the details,

9  but just a label.

10    A.    It was a construction defect case.

11    Q.    Well, you worked on the side of the general

12  contractor.  Who was on the other side?  Is it the

13  owner?

14    A.    The owner.

15    Q.    Or subcontractors?

16    A.    No, the owner.

17          It was the -- CCS had sued the owner for

18  improper termination, and the owner countered-complained

19  against CCS for construction defects.

20    Q.    And you said the result was that the owner

21  recovered nothing; is that right?

22    A.    That's right.

23    Q.    Did CCS recover anything for its improper

24  termination?

25    A.    Yes.  They were rewarded their lost profits,

13

1  they were rewarded unpaid sums from the job, et cetera.

2       Q.   What areas did your expert report cover?

3       A.   It covered their, the counter-complaint from

4  the owner, Mr. Kilbride, against CCS, and the claims of

5  delay and defect that he alleged were the result of

6  CCS's improper work.

7       Q.   Now, you said there was a second case in which

8  you've been engaged and testified as an expert.   The

9  only label I have on that so far is that you represented

10 a developer, if I got that right.

11      A.   Yes, we can call that.   That's the Lang case,

12 Lang Development.

13      Q.   Is it correct to say that you were

14 representing the developer?

15      A.   Yes.

16      Q.   And who was on the other side of that case?

17      A.   The owner.

18      Q.   And what was the general allegation in that

19 case?

20      A.   Once again, construction defects.

21      Q.   You testified at deposition?

22      A.   And at arbitration.

23      Q.   And at arbitration.

24           When were those?

25      A.   They were January/February of '08.

                                                    14

1    Q.   Do you know the outcome of that arbitration?

2    A.   Yes.  The -- Lang had offered $600,000 as an

3  offer in compromise.  The arbitrator awarded $300,000 to

4  the owners.  Everyone considered that Lang had won hands

5  down because not only did they -- was the award half of

6  what they were looking for, it was less than the 998

7  offer, so everybody was thrilled that Lang won.

8    Q.   That is often the way I look at results of

9  cases.  I appreciate that description.

10        And those are the only two matters before ATI

11 which you've provided testimony so far; is that correct?

12   A.   Yes.

13   Q.   On any of the other assignments that you've

14 had, or on any of the assignments you've had for the

15 Howe Company, have you ever provided any expert analysis

16 or report with regard to bankruptcy preferences?

17   A.   No.

18   Q.   So ATI is the first time that this has

19 happened?

20   A.   Yes.

21   Q.   During the course of your experience in the

22 construction industry, had you ever come across any

23 preference issues?

24   A.   No.

25   Q.   And never provided services to somebody who

                                                    15

1    filed for bankruptcy?

2        A.   No.

3        Q.   You're a very lucky guy.

4             Let's talk a little bit about your background,

5    sir.

6             You're a licensed general contractor; is that

7    correct?

8        A.   Yes.

9        Q.   Do you hold any other licenses other than,

10   say, a driver's license?

11       A.   No.

12       Q.   How long have you been a licensed general

13   contractor?

14       A.   I was first licensed in 1981.

15       Q.   And that's here in the State of California?

16       A.   Yes.

17       Q.   Has your license ever been revoked or

18   suspended?

19       A.   It lapsed because I wasn't using it.  I don't

20   remember the dates.

21            It was also placed on probation due to a

22   matter that I was involved in in 1985 or '86, when I was

23   acting as a general contractor.  And I think those are

24   the only two flaws.

25       Q.   Tell me about this matter in which you were

                                                         16

1  put on probation.

2      A.   It occurred in the mid '80s.   I was a general

3  contractor building at the time.   My superintendent

4  agreed with the framing contractor to make certain

5  changes in the framing that were defects, and an action

6  was, a court action was initiated, and they also made a

7  report to the Contractor's State License Board.

8          The Contractor's State License Board reviewed

9  it and said I should have known better, and placed my

10  license on probation for a couple of years.

11     Q.   And then you successfully came off of the

12  probation?

13     A.   Yes.

14     Q.   And no problems since then?

15     A.   No.

16     Q.   I take it you started working as a general

17  contractor in 1981.

18     A.   No, I didn't.   1981, I was employed by Watt

19  Industries.

20     Q.   What were you employed as, sir?

21     A.   I was a purchasing agent.

22     Q.   How long were you a purchasing agent for Watt

23  Industries?

24     A.   A couple of years.

25     Q.   What were you purchasing?

17

1    A.    Subcontractors' services and materials.

2    Q.    After being employed by Watt Industries, what
3  was your next occupation?

4    A.    I went to work for Republic Development
5  Company.

6    Q.    During what years?

7          Now, remember, I told you this was not a test.

8    A.    Late '80s.

9    Q.    What was your job at Republic Industries --
10  I'm sorry, Republic Development?

11    A.    Republic Development Company built both
12  residential and commercial office buildings.  And I was
13  the operations manager or director for Republic
14  Development Company.  I oversaw the purchasing, as well
15  as construction of their residential tracts, as well as
16  their office buildings.

17    Q.    After Republic Development, where did you
18  work?

19    A.    For 555 Development would probably be next in
20  line.

21    Q.    What was your job at 555 Development?

22    A.    I was a -- became a VP for them, for their
23  construction.

24          They wanted to build shopping centers in
25  Southern California, and they wanted me to help them

18

1  find land and work with some other contacts they had in

2  Southern California to build, to find and build shopping

3  centers.

4      Q.    During what period of time did you work for

5  555 Development?

6      A.    That would have been late '80s, early '90s.

7      Q.    After 555 Development, where did you work

8  next?

9      A.    I worked for myself.  I was a general

10  contractor.

11      Q.    What sort of work were you doing?

12      A.    Commercial and residential.

13      Q.    And where were you doing this, sir?

14      A.    In Southern California.

15      Q.    And how long were you a general contractor?

16      A.    Probably three or four years.

17          Actually, let me backtrack.  There were two

18  stints as a general contractor.  In the middle '80s, I

19  worked briefly for a couple of years as a general

20  contractor, a year and a half or so, two years.  And

21  then again in the early '90s, as a general contractor.

22      Q.    And my question that occurs to me was not

23  fair.  When I say when did you work as a general

24  contractor, I meant actively out using your license.

25  But I understand you were using your license since '81.

                                                    19

1  I didn't mean to imply that you weren't a general

2  contractor during that time.

3       So you said you had a second stint as a

4  general contractor after 555 Development.  What did you

5  do next?

6    A.   Built tilt-up buildings, office buildings,

7  some more residential work.

8    Q.   What did you do next after building tilt-up

9  buildings and residential?

10   A.   555 called me again and wanted me to come back

11  to work for them, so I had a second stint with 555.

12   Q.   During what period of time was that?

13   A.   Late '90s, early 2000.

14   Q.   After early 2000, what were you doing?

15   A.   I became the director of L&R Construction.

16   Q.   And how long were you the director of L&R

17  Construction?

18   A.   Two years.

19   Q.   What was your job at L&R?  What did being

20  director mean?

21   A.   As director, I was responsible for everything

22  that happened.  To bring in new work, to oversee the

23  existing work.  The buck stopped with me.  I was the guy

24  in charge.

25   Q.   And you left L&R Construction.  Where did you

20

1  work next?

2      A.    I went to work for K Hovnanian Homes.

3            THE COURT REPORTER:   K what?

4            THE WITNESS:   I'll spell it for you.   The

5  letter K, Hovnanian, H-o-v-n-a-n-i-a-n, Homes.

6      Q.    BY MR. SCHULMAN:   What was your job with

7  Hovnanian?

8      A.    I was initially hired as the VP of operations,

9  and then became an area president for them.

10     Q.    For what areas?

11     A.    Southern California.

12     Q.    And what did your job entail?   What sort of

13  work was Hovnanian doing?

14     A.    Hovnanian built single-family homes.

15     Q.    How long were you a Southern California

16  president of Hovnanian?

17     A.    About a year.

18     Q.    And then where did you go work, sir?

19     A.    Then I went to work for Bert Howe.

20     Q.    Tell me about your education, sir.   Do you

21  have a college degree?

22     A.    I do.

23     Q.    Where is that from?

24     A.    I have a degree in business from the

25  University of Redlands, Bachelor's degree.   I have a

21

1 Bachelor's degree in law from Western State University

2 College of Law, and I have a Juris Doctorate from

3 Western State University.

4      Q.   Have you ever practiced as a lawyer?

5      A.   No.

6    ' Q.   Have you ever taken the Bar exam?

7      ·A.   Yes.

8      Q.   Have you ever taken any courses in bankruptcy

9 law?

10     A.   No, I don't believe there was a specific

11 course in bankruptcy.

12     Q.   Perhaps you took a course in what might have

13 been called Creditor's Rights, or something like that,

14 when you were in law school.

15     A.   I could have.  I'm sure we covered

16 bankruptcies.  I remember the discussions.  But I don't

17 recall if the course was specifically regarding

18 bankruptcy.

19     Q.   Other than the degrees, the three degrees that

20 you identified, do you have any other college or

21 post-college-level coursework?

22     A.   Yes.  I started work with the University of

23 Washington on a Master's degree in construction

24 management.

25     Q.   And did you finish that course?

22

1    A.   No.   I'm still working on it.

2    Q.   That's something that you can do long

3 distance?

4    A.   Yes.

5    Q.   How far along are you on that course?

6    A.   Oh, I've only taken two or three courses.

7    Q.   And how many courses does it take to get the

8 degree?

9    A.   I don't know.  A lot more than two or three.

10    Q.   Other than those four things, the three

11 degrees you have and the one that you're working on, is

12 there any other college or post-college work that you've

13 done?

14    A.   No.

15    Q.   Do you have any awards or distinctions or

16 honors you've received for any of your work in the

17 construction field?

18    A.   Not that come to mind.

19    Q.   Nobody's given you an award as builder of the

20 year or something like that?

21    A.   No.

22    Q.   Have you written any articles on anything

23 having to do with construction?

24    A.   No.

25    Q.   Have you taught any courses on anything having

23

1  to do with construction?

2      A.    I teach an MCLE course through Bert Howe

3  regarding construction basics.

4      Q.    And who is that course offered to?

5      A.    Attorneys.

6      Q.    How long have you been teaching that course?

7      A.    Since I was employed by Bert Howe.

8      Q.    And is that a one-hour course, two-hour

9  course?  How long is that course?

10     A.    It's a one-hour course.

11     Q.    And you've done that several times?

12     A.    Twice.

13     Q.    And that's taught to attorneys?

14     A.    Yes.

15     Q.    So they get credit with the Bar Association?

16     A.    Yes.

17     Q.    Whoever keeps track of our credits.

18           How are attorneys as students?

19     A.    Attentive.

20     Q.    You're kind.

21           When is this course being offered next?

22     A.    We don't have any current plans to offer it.

23  We offer it as requested by law firms.

24     Q.    I was just wondering whether I could come by

25  and watch.  I might have to ask Mr. Galloway for

                                                        24

1  permission.

2          Is your engagement with Mr. Galloway's firm

3  reflected in a writing?

4     A.   Yes.

5     Q.   Do you recall what your assignment was?

6     A.   Yes.

7     Q.   And what is your assignment?

8     A.   To render an opinion on the relationship of

9  contractors and subcontractors in the construction

10  industry, generally, as to the ordinary course of

11  business with respect to general contractors' payments

12  to subcontractors.

13     Q.   Is that it?  Is there any other assignment?

14     A.   No, that's it.

15     Q.   And you carried out this assignment?

16     A.   Yes.

17     Q.   Did anybody else at the Howe Company work with

18  you on this assignment?

19     A.   Yes.

20     Q.   Can you give me an estimate of the relative

21  amount of work done by you and everybody else at Howe?

22          In other words, did you do half of it and

23  everybody else did the other half?

24     A.   I did 80 percent of the work and one other

25  person did 20 percent.

                                                        25

1     Q.    Who is the other person?

2     A.    Allen Strum.

3     Q.    And what sort of work did Mr. Strum do on this

4  project?

5     A.    He analyzed the checks and invoices, and

6  prepared a matrix of the checks and invoices between

7  Peck/Jones and ATI.

8     Q.    And that's a matrix that's attached to your

9  report?

10    A.    No.   I took Mr. Strum's work and then

11  augmented it so that I would say yes and no.

12          His work is a portion of that matrix, and then

13  I augmented it and updated it and added to it.

14    Q.    And that's what you augmented and added to,

15  that's attached to your report; is that correct?

16    A.    Yes.

17    Q.    So whatever work Mr. Strum did, you had an

18  opportunity to review before you integrated it into the

19  report?

20    A.    Yes.

21    Q.    And I take it you were satisfied with the work

22  or you corrected whatever you were not satisfied with;

23  is that right?

24    A.    Yes.

25    Q.    If I recall correctly, that sounds to me like

                                                          26

1  Exhibit 3 to your report.  Does that sound right?

2      A.   Yes.

3      Q.   Although I suspect that some of that may have

4  found its way into other parts of the report.  Would

5  that be right, too?

6      A.   Yes.

7      Q.   Let's talk about what you did to carry out

8  your assignment.

9           Did you talk to anybody other than Mr. Strum

10  and Mr. Galloway?

11      A.   Yes, I did.

12      Q.   Who did you talk with?

13      A.   Well, I visited the offices of ATI to get a

14  better understanding of their business and how they

15  conducted their business.

16           I met with their general counsel and discussed

17  with her, their business, and we talked generally about

18  ATI and ATI's performance.

19      Q.   Okay.  Who else did you talk with?

20      A.   I talked to Ron Roberts briefly in a telephone

21  conversation.

22      Q.   Mr. Roberts is somebody who provides courses,

23  among other things, for subcontractors; is that correct?

24      A.   Yes, I believe that's correct.

25      Q.   And there was some email between you and

27

1  Mr. Roberts; is that right?

2       A.   Yes.

3       Q.   You've attached some of that to your report?

4       A.   Yes.

5       Q.   And you also spoke to him?

6       A.   Yes.

7       Q.   Who else did you speak with?

8       A.   I may have had conversations with other

9  experts in the Bert Howe offices.  I don't recall

10  specifically, but it is my practice to bounce ideas or

11  concepts off of other individuals in the office.

12            I don't have a specific recollection, but it

13  wouldn't surprise me if I had bounced ideas or concepts

14  off of other experts for feedback.

15       Q.   Other than Mr. Galloway, did you talk to

16  anybody else at this firm about the assignment?

17       A.   Yes.  Don Leonhardt.

18       Q.   Did you talk to anybody else?

19       A.   I don't think so.

20       Q.   If anybody comes to mind, please let us know.

21            One of my admonitions that I forgot to give is

22  you only have to give an audible answer.  You can't

23  shake your head because the court reporter is not

24  permitted to interpret.

25            So let me ask you again.  Did you speak to --

                                                    28

1  I'm sorry, the question that I think I didn't get an

2  answer to is if anybody else comes to mind, would you

3  please let us know?

4       A.   Yes.

5       Q.   Thank you, sir.

6            Did you speak with anybody at my firm?

7       A.   No.

8       Q.   Did you speak with Mr. Cade?

9       A.   No.

10      Q.   Did you speak with anybody in Mr. Cade's

11  office?

12      A.   No.

13      Q.   Did you visit Mr. Cade's office?

14      A.   No.

15      Q.   Did you speak to anybody who worked at

16  Peck/Jones?

17      A.   No.

18      Q.   For example, did you speak to Greg Jones?

19      A.   No.

20      Q.   Did you speak with Alan Friedberg?

21      A.   No.

22      Q.   Did you speak with Guillermo Montero?

23      A.   No.

24      Q.   Did you speak with Gary Melnik?

25      A.   No.

29

1    Q.    Let's go back to the people who you did speak

2  to.

3         How many times have you spoken to Mr. Galloway

4  and Mr. Leonhardt about this case?

5    A.    Plus or minus eight times.

6    Q.    Do you recall any of those conversations?

7    A.    Generally.

8    Q.    Can you tell me what they said?

9    A.    They laid out my assignment for me initially.

10 And they wanted to know my experience.  And I probably

11 told them my experience similar as I've explained it to

12 you.

13   Q.    Did they tell you what conclusion you were to

14 reach?

15   A.    No.

16   Q.    Did they tell you that you were not permitted

17 to look at particular things?

18   A.    No.

19   Q.    Did they restrict who you could talk to?

20   A.    No.

21   Q.    Is there any restriction that they put on your

22 work at all?

23   A.    No.

24   Q.    Is there a maximum amount that the firm could

25 charge for your services?

30

1     A.    I'm not aware of it.

2     Q.    You said you spoke to Mr. Roberts briefly.   Is

3  it you just spoke with him on that one occasion?

4     A.    Yes.

5     Q.    And there was an email exchange with

6  Mr. Roberts.   Is that the extent of your communications

7  with Mr. Roberts?

8     A.    Yes.

9     Q.    When you spoke to other experts at the Bert

10  Howe Company, was anybody employed by Bert Howe who had

11  any experience at all in dealing with alleged

12  preferences in bankruptcy cases?

13     A.    No.

14     Q.    Now, you say you visited ATI and you spoke

15  with the general counsel.   Who was that?

16     A.    She went by the name of C.C., and I,

17  apologetically, don't recall her name.

18     Q.    Is she still employed by ATI?

19     A.    I don't believe so.

20     Q.    Now, you see sitting two seats down to your

21  left is Mr. -- and forgive me if I get the pronunciation

22  wrong.   You'll correct me, sir -- Mr. Casenhiser.

23          Did I get that right?

24          MR. CASENHISER:   That's perfect.

25     Q.    BY MR. SCHULMAN:   Before today, had you met

                                                          31

1  Mr. Casenhiser?

2      A.    No.

3      Q.    Did you talk with Mr. Casenhiser today?

4      A.    Just to say hello.

5      Q.    Tell me what you looked at.  We've covered who

6  you talked to.  Tell me what you looked at to carry out

7  your assignment.

8      A.    I looked at the documents that were provided

9  to me.  I guess they were provided during discovery to

10  the attorneys, which were the contracts and checks and

11  invoices that were exchanged between Peck/Jones and ATI.

12  There were letters, change orders, a couple of

13  depositions.  I don't believe -- I don't recall any

14  other documents at this moment.

15     Q.    Do you recall who the depositions were of?

16     A.    They were of Peck/Jones' employees.

17     Q.    Do you recall who at Peck/Jones?

18     A.    It could have been Jerry Melnik.  I don't

19  recall specifically.  I believe they're in my report,

20  but I don't recall.

21     Q.    Do you recall anything else that you looked

22  at?

23     A.    Not as I sit here.

24     Q.    You looked at Mr. Cade's report; is that

25  correct?

32

1     A.    I did.  Sorry, yes.  Thank you.

2     Q.    And you looked at his -- he did a supplemental

3  report, as well, I think.

4     A.    He actually did three reports.  He did a

5  preliminary report, then a supplemental preliminary

6  report, then he did a response to the Bert Howe report.

7  And, thank you, I looked at all three of those.

8     Q.    Anything else that comes to mind that you

9  looked at?

10    A.    Not as I sit here.

11    Q.    Okay.

12          Do you know if anybody on your behalf went to

13  Mr. Cade's office to look at the documents that he had

14  collected with regard to the matters at issue in the

15  case?

16    A.    No.  Let me step back to your prior question

17  regarding what I've looked at.

18          I did a great deal of research on the

19  Internet, as well.  And the various attachments to my

20  report, I obviously had to look at.  So the Inspector

21  General's report, the information regarding LAUSD, all

22  of the attachments, the Ron Roberts' information, et

23  cetera.

24          So I would have looked at all that

25  information, plus a host of other articles that I read,

33

1  including a Ninth Circuit Court of Appeals' opinion

2  regarding bankruptcy cases.

3      Q.   Do you recall what case that was in?

4      A.   I don't.  It's in my report, though.  I'm

5  trying to go through my file.

6      Q.   You went out and did some research; is that

7  correct?

8      A.   Yes, sir.

9      Q.   In fact, you typed into Google something like

10  "late payment to subcontractors" and got more than a

11  thousand hits; is that right?

12     A.   Yes.

13     Q.   And I think your only surprise was that it was

14  as low as a thousand.  Is that about right?

15     A.   Yes.

16     Q.   And you looked at some reports that some trade

17  associations had done; is that right?

18     A.   Yes, I did.  The ASA survey.  Thank you.

19     Q.   I don't mean to exclude anything that's

20  obviously attached to the report.

21     A.   Yes.  And I guess as I answered the question,

22  I was thinking that that was kind of a given that I

23  looked at all those things, so I apologize if I seemed

24  vague.

25     Q.   Well, I'm trying to get at things that you

34

 1  looked at that I don't know about.  And I just suggest

 2  the others as a means of tripping your memory to see if

 3  that will get you to recall anything else.

 4       A.   Thank you.

 5       Q.   Is there some place where you store what you

 6  collected in your office?

 7       A.   Yes.  On our server.

 8       Q.   Do you have some place where you store paper

 9  with respect to assignments, or is everything electronic

10  today?

11       A.   Everything's electronic.

12       Q.   We need your advice in our office.

13            It's tough to ask the next question, the

14  bigger than the bread box question of how much is stored

15  when it's all electronic.  I'm going to try that.

16            Can you give us an estimate in some way that

17  makes sense as to how much you have stored that you

18  looked at?  Either by bytes or megabytes or gigabytes or

19  terabytes?

20       A.   No, I have no idea.  I think that everything,

21  however, in my files relative to this case have been

22  provided to you today.

23       Q.   Well, I haven't gotten to that question, but I

24  will.

25            But, generally speaking, with respect to this

                                                         35

1 assignment, you did not keep paper; is that correct?

2    A.    Yes, that's correct.

3    Q.    Generally speaking, it's electronic.

4    A.    Yes.

5    Q.    Did you get to do everything that you wanted

6 to do to do your work?

7    A.    Yes.

8    Q.    Was there anybody else you wanted to speak to,

9 or anything else you would want to look at before

10 reaching any conclusions?

11    A.    Not that comes to mind.

12    Q.    Assuming that the case goes to trial, is there

13 anything that you plan to do before you testify?

14        Let's leave off the possibility that

15 Mr. Galloway will ask you to do something.  Just what

16 you have in your mind that you plan now.

17        I mean, let's start with this.  I presume

18 before you testify, you'll look at your report and

19 you'll think about it again.  Is that about right?

20    A.    Yes.

21    Q.    You'll prepare.

22    A.    Yes.

23    Q.    Particularly so I don't ask some question to

24 trick you up, you'll be ready; right?

25    A.    Yes.

36

1    Q.   But is there any more research or

2  investigation that you plan to do?

3    A.   I don't have any plans to do any additional

4  investigation as I sit here today; however, I might.

5    Q.   Where would you might do some more

6  investigation?

7    A.   I don't know.

8    Q.   Let's assume for the moment that I restrain

9  Mr. Cade and he doesn't write any more reports, so you

10  don't have that to do.  Do you have any idea what else

11  you would do before you would testify?

12   A.   I don't know.

13   Q.   Were you able to find out during your

14  investigation whether ATI provided any services to

15  Peck/Jones with respect to any of the project other than

16  the Santa Monica Hospital project?

17   A.   I am not aware of any other projects.

18   Q.   And did you ask that question?

19   A.   As I recall, this was their first project

20  together.  I'm not aware that we discussed any other

21  projects.

22   Q.   So to the extent that we're looking at

23  historical payments from the time between billing and

24  payments, it would only be with respect to this hospital

25  project for ATI and Peck/Jones; is that right?

37

1    A.    Yes.

2    Q.    Let me ask you the same question with respect

3  to the industry, in general.

4          You looked at some reports which indicated

5  that subcontractors were concerned with late payment; is

6  that correct?

7    A.    Yes.

8    Q.    And you know from your experience in the

9  business that subcontractors wanting to get paid is

10 always an issue; is that correct?

11   A.    Yes.

12   Q.    You were a contractor.  Subcontractors came to

13 you and said, where's my money?

14   A.    Yes.

15   Q.    Other than that piece of information which

16 comes from your years of experience in the business, did

17 you do any studies of how quickly contractors pay

18 subcontractors on jobs?

19   A.    No.

20   Q.    Did you find any studies that others had done

21 during the course of your work on this project?

22   A.    Only the ASA study that I included in my

23 report.

24   Q.    That's the study that identified that late

25 payment by contractors to subcontractors was an issue of

38

1  very high importance to the subcontractors; is that

2  right?

3      A.    Yes.

4      Q.    If I just recall -- I could pull it out, but

5  if I recall, something like 78 percent of them said this

6  is our number one issue.

7      A.    Something like that.

8      Q.    Some number in that range.

9            THE COURT REPORTER:  Was that a yes?

10           THE WITNESS:  Yes.  I'm sorry, I didn't know

11  that was a question.

12           Yes.

13     Q.    BY MR. SCHULMAN:  I'll try to do better on

14  putting question marks on the end.

15     A.    Thank you.

16     Q.    Are you familiar with any legal requirements,

17  statutory requirements about when a subcontractor has to

18  be paid by a contractor?

19     A.    Yes.

20     Q.    What are the legal or statutory requirements

21  in California for a contractor to pay a subcontractor?

22     A.    As I recall, the statute requires payment

23  within seven days of the contractor having received

24  payment from the owner.

25     Q.    Do you recall where you'd find that in the

                                                    39

Michels Court Reporters - 310.312.0333   818.346.1808  800.353.1500

1   statutes?

2       A.    I don't.

3       Q.    Can that requirement be varied?

4       A.    I think by agreement between the subcontractor

5   and contractor that statute can be varied, yes.

6       Q.    They can agree to some other term?

7       A.    Yes.

8       Q.    With respect to this particular project

9   between Peck/Jones and ATI at Santa Monica Hospital, was

10  there a contractual variance to the statutory term?

11      A.    As I recall, the contract between Peck/Jones

12  and ATI stipulated payment within 30 days of the general

13  contractor having received payment from the owner.

14      Q.    Do you recall where in the contract that was?

15      A.    I believe it was in the general conditions.

16      Q.    And do you recall in whose contract that was?

17      A.    I don't understand your question.

18      Q.    Are the general conditions part of the

19  contract between the contractor and the owner?

20      A.    Yes, there are general conditions in the

21  contract between the owner and the general contractor.

22      Q.    Does that bear upon when the general

23  contractor has to pay the subcontractors?

24      A.    I believe that's correct, yes.

25      Q.    And then is it correct to say that on

40

1  occasion, that contracts between the general contractor

2  and the subcontractor pick up those general conditions?

3      A.   Yes.

4      Q.   Is that what happened in this instance?

5          MR. GALLOWAY:   I'm going to object as vague

6  and ambiguous and calls for a legal conclusion, but you

7  can answer.

8          MR. SCHULMAN:   I'm going to try it again.

9      Q.   You said your understanding, in the contract,

10 it was a requirement for payment within 30 days from the

11 time the general contractor was paid.

12         Did I understand you correctly, sir?

13     A.   Yes.

14     Q.   And I want to try to identify what contract

15 that was in.

16     A.   Within the Peck/Jones/ATI contract.

17     Q.   Do you know if there was any requirement in

18 the contract between Peck/Jones and the Hospital as to

19 when the subcontractors had to be paid?

20     A.   As I recall, there is a provision in the

21 general conditions of the owner/Peck/Jones contract,

22 requiring payment of subcontractors within either seven

23 or ten days of the general contractor receiving payment

24 from the owner.

25     Q.   Do you have an understanding as to why there

                                                      41

 1  would be a provision in the contract between the owner

 2  and the general contractor affecting payments to

 3  subcontractors?

 4        I'm sorry, that's probably not very good.  Let

 5  me try again.

 6        Do you have any understanding as to why

 7  there's a provision as to the timing of payments to

 8  subcontractors which appears in the contract between the

 9  owner and the general contractor?

10   A.   I think that the provision that you're

11  referring to is a boilerplate provision that is likely

12  included routinely in those agreements.

13   Q.   Do you have an understanding as to why the

14  owner cares when the subcontractors are paid?

15   A.   Yes.

16   Q.   And what is that, sir?

17   A.   The owner wants to make sure that the general

18  contractor pays the subcontractors promptly so that the

19  job is not negatively impacted by non-payment or slow

20  payment.

21   Q.   Is the owner also concerned about liens which

22  may be recorded by the subcontractors?

23        MR. GALLOWAY:  I'm going to object that this

24  is calling for speculation, but you can answer to the

25  extent you understand the question.

                                                    42

1      Q.   BY MR. SCHULMAN:  You may go ahead, sir.

2      A.   Yes, I think an owner would be concerned about

3   liens being filed by anyone.

4      Q.   Is it correct to say that a subcontractor who

5   provides services with respect to a construction project

6   is entitled to file a mechanic's lien when he has not

7   been paid pursuant to his contract?

8           MR. GALLOWAY:  Objection; incomplete

9   hypothetical, calls for speculation.

10          You can answer to the extent you understand.

11          THE WITNESS:  No.

12     Q.   BY MR. SCHULMAN:  He can't file a mechanic's

13   lien?

14          MR. GALLOWAY:  Same objections.

15          THE WITNESS:  Would you rephrase your

16   question.  Re-ask your question.

17     Q.   BY MR. SCHULMAN:  What's the remedy of a

18   subcontractor when he has not been paid pursuant to his

19   contract?

20          MR. GALLOWAY:  Incomplete hypothetical.

21          You can answer to the extent you understand

22   the question.

23          THE WITNESS:  A remedy, one remedy of a

24   subcontractor when he hasn't been paid is to file a

25   mechanic's lien against the property.

43

1      Q.    BY MR. SCHULMAN:   Are there any other

2  remedies?

3      A.    Yes.

4      Q.    And what are the other remedies?

5            MR. GALLOWAY:   Incomplete hypothetical.

6            You can answer to the extent you understand

7  the question.

8            THE WITNESS:   Anywhere from calling to request

9  payment, notifying the owner that they haven't been

10  paid, stop notices to the owner, the bank, the general

11  contractor, a lawsuit without a mechanic's lien being

12  filed, et cetera.

13     Q.    BY MR. SCHULMAN:   You said in your

14  report, sir, and if I mischaracterize it, please let me

15  know, that you understood that Peck/Jones was in

16  financial difficulty around the time that it was

17  actually making payments to ATI.

18           Did I understand that correctly?

19     A.    Yes.

20     Q.    Where did you learn that piece of information?

21     A.    I concluded that they were in financial

22  difficulty only based upon the fact that they declared

23  bankruptcy later in the year.

24     Q.    Well, Peck/Jones didn't declare bankruptcy,

25  some of its creditors put it into bankruptcy.   Would

                                                        44

1  that make a difference to you?

2       A.   With respect to the answer to that question,

3  no.

4       Q.   Was there anything else that led you to the

5  conclusion that Peck/Jones was in financial difficulty?

6       A.   No.

7       Q.   Nothing that you saw during the course of your

8  investigation?

9       A.   No.

10       Q.   How did the -- I'm sorry, let's try again.

11            How did your conclusion that Peck/Jones was in

12  financial difficulty affect your opinion with respect to

13  the ordinary course of business of payments by

14  contractors to subcontractors?

15       A.   It made it more understandable as to what was

16  happening in the relationship between Peck/Jones and ATI

17  relative to the distribution of payments received by

18  Peck/Jones on behalf of ATI from the owner.

19       Q.   Well, what was happening in that relationship?

20       A.   ATI was waiting for payment and Peck/Jones

21  paid them.

22       Q.   Well, how did Peck/Jones' financial difficulty

23  affect that?

24            MR. GALLOWAY:   Assumes facts not in issue.

25            He's already testified that the only fact he's

                                                        45

1 relying on is the filing of the bankruptcy, and nothing

2 else.

3         MR. SCHULMAN:  I understand.  But he says that

4 it affected his opinion.  I'm testing as to how.

5         THE WITNESS:  I don't know.

6     Q.    BY MR. SCHULMAN:  Are you assuming that

7 because Peck/Jones went into bankruptcy later in the

8 year, that that's evidence that it was in financial

9 difficulty earlier in the year, perhaps around the time

10 it was dealing with ATI?

11    A.    It's possible that they were.

12    Q.    And how did that affect your opinion with

13 respect to the payments made by Peck/Jones to ATI?

14    A.    It could explain there they were, for example,

15 a check for a hundred thousand dollars even from

16 Peck/Jones to ATI.  If Peck/Jones had been in financial

17 stress during that period, that would explain why there

18 was a check for a hundred thousand dollars rather than a

19 check in the exact amount of the invoice from ATI to

20 Peck/Jones.

21        THE COURT REPORTER:  Was that right, from ATI

22 to Peck/Jones?

23        MR. SCHULMAN:  Let's have the court reporter

24 read it back.

25        Would you kindly read the witness' answer

46

 1  back.

 2              (Record read as follows:

 3              "A.   It could explain there they

 4              were, for example, a check for a

 5              hundred thousand dollars even from

 6              Peck/Jones to ATI.  If Peck/Jones had

 7              been in financial stress during that

 8              period, that would explain why there

 9              was a check for a hundred thousand

10              dollars rather than a check in the

11              exact amount of the invoice from ATI

12              to Peck/Jones.")

13              THE WITNESS:   That's correct.

14              MR. SCHULMAN:   No, I don't think so, sir.  I

15  think the last -- I think you're saying from ATI to

16  Peck/Jones, and that's not what you mean.

17              Do you want to hear it again?

18              THE WITNESS:   Well, the invoice is from ATI to

19  Peck/Jones, and I think my comment was relative to

20  instead of paying the exact amount of an invoice from

21  ATI to Peck/Jones, the check from Peck/Jones to ATI was

22  a hundred thousand dollars.

23              I think I stated what I wanted to say.

24              MR. SCHULMAN:   Okay.

25      Q.   Did you find any studies, or anything at all

                                                          47

1  during the course of your work, relative to the timing

2  of payments by contractors to subcontractors when the

3  contractors are in financial difficulty?

4        A.    No.

5        Q.    Did you find anything in the course of your

6  investigation that would explain any delay in payment to

7  ATI because of anything that ATI did in applying for

8  payment?

9        A.    No.

10       Q.    In other words, you didn't see anything in all

11  the work that you did, anything you looked at, where

12  somebody said, well, we can't pay you because you

13  haven't signed this or you didn't supply this piece of

14  paper?

15       A.    Actually, there is, but it really -- it's a

16  reference in a letter from Peck/Jones to the owners that

17  was written in October, approximately October 18th,

18  19th.  Sorry, I hadn't thought about this until you

19  mentioned it.

20             And they talked about an owner's

21  representative being onsite that had -- it was just a

22  reference that they had.  There was some kind of a

23  problem or issue with the owner's representative being

24  onsite, who had caused some difficulty, didn't like ATI.

25             Then I concluded from that that they didn't

                                                        48

1  like ATI's work, or something was going on.

2          But it was a letter written in October.  And

3  this is after the fact, relative to payments, work that

4  was done in July, I think.

5          But it referenced that they had worked out

6  this problem with the owner's representative, which had

7  previously been a problem in the past.

8          And so there could have been, based upon that

9  letter, some kind of a problem or issue going on that

10  the owner's rep was involved in.

11          And that's really about the only references

12  that I recall that might apply.

13      Q.    Would it be fair to say that that's a guess?

14      A.    Certainly.  It's certainly not factual.  Maybe

15  an informed guess or speculation, yes.

16      Q.    Okay.

17          You didn't see anything that indicated that

18  ATI didn't do the work that ATI billed for?

19      A.    No.

20      Q.    You proceeded on the assumption that ATI did

21  actually do all the work that it billed for?

22      A.    Yes.

23      Q.    And you didn't see anything at all that

24  indicated that ATI performed at any level other than a

25  professional level?

49

1      A.    No.

2      Q.    And you assumed that ATI performed all of its

3  services in a profession level; is that right?

4      A.    Yes.

5      Q.    And if I understand correctly, ATI was doing

6  mold remediation; is that correct?

7      A.    Testing and remediation, yes.

8      Q.    And I presume that would require people to

9  have a fair level of skill to do that work; is that

10 right?

11     A.    They need to be trained in that discipline,

12 yes.

13     Q.    And they need to get rid of all the mold;

14 otherwise, it will grow back; is that right?

15     A.    Yes.

16           MR. GALLOWAY:  We've been going for an hour.

17 Can we stop and take a break?

18           MR. SCHULMAN:  Sure.  Anytime you want a

19 break.

20           (Brief recess.)

21     Q.    BY MR. SCHULMAN:  Let's talk about your

22 opinion, sir.  I'm probably going to mangle this, and if

23 I do, you'll let me know.

24           I think that I got it right, that you said

25 that it was, that your job was to render an opinion

                                                50

1  about the relationship of contractors and subcontractors

2  as to the ordinary course of business regarding payments

3  to the subcontractors.  That was your assignment.

4          Is that about right?

5      A.   I think so.

6      Q.   Did you reach an opinion about what is in the

7  ordinary course of business for the timing of a payment

8  between a contractor and a subcontractor?

9      A.   Yes.

10     Q.   What is that opinion, sir?

11     A.   That the time range for contractors to pay

12 subcontractors during the ordinary course of business is

13 very broad in the construction industry.

14     Q.   Is there a range?

15     A.   The range would be anywhere from 60 to 120

16 days after a subcontractor presents an invoice.

17     Q.   Is it generally true for subcontractors who

18 are working with a contract, that the contract will have

19 a provision that I believe you call a pay when paid

20 provision?

21     A.   I'm not sure I understand your question.

22     Q.   Let me try a different way, okay?

23          You said that the range should be 60 to

24 120 days from the date of the subcontractor's invoice.

25          Did I get that right, sir?

51

1     A.    Yes.

2     Q.    What if at the end of the 120 days, the

3   contractor has still not been paid by the owner?   And

4   let's just assume for the purposes of the question, that

5   the contractor and the subcontractors have done nothing

6   wrong.   It's all the owner's fault.

7           Is the contractor still supposed to be paying

8   the subcontractor within that time?

9     A.    Technically, yes.

10    Q.    And why is that, sir?

11    A.    I'm sorry, I don't understand.

12    Q.    Why is technically yes, that the contractor

13  should pay the subcontractor even though the

14  contractor's not been paid by the owner?

15    A.    Because, technically, the law, as I understand

16  the law, indicates that regardless of whether or not the

17  general contractor has been paid by the owner, the

18  general contractor is obligated at some point to pay the

19  subcontractor.

20    Q.    Didn't you tell us that the law was that the

21  contractor was obligated to pay the subcontractor within

22  seven days after the contractor's been paid?

23    A.    I think there's more than one law on the

24  subject.

25    Q.    Okay.

                                                        52

1          So you think there's a law, also, that

2  requires the contractor to pay the subcontractor even if

3  the contractor has not been paid by the owner?

4      A.    Yes.

5      Q.    So given that, then I take it you stand on

6  this opinion that the range is 60 to 120 days from

7  invoice.

8      A.    In my experience, that is the standard range.

9      Q.    Is there anything that would make the range

10 shorter or longer?  Any occurrence or events that would

11 make it shorter or longer?

12     A.    Yes.

13     Q.    And what are those?

14     A.    Well, it can be shorter if the payment from

15 the owner to the general contractor is very quick, if

16 somehow the turnaround of payments from owner to general

17 contractor and general contractor to subcontractor is

18 extraordinarily quick, then they can be less than that

19 60 days.  And I'm sure it happens.

20     Q.    Now, your opinion that the range is from 60 to

21 120 days from invoice is based upon your experience; is

22 that correct?

23     A.    Yes.

24     Q.    That's your experience as a contractor and the

25 various jobs you told us you held; is that right?

                                                        53

1    A.    Yes.

2    Q.    And in those jobs, my guess is that you've

3  seen a fair number of invoices from subcontractors; is

4  that right?

5    A.    Yes.

6    Q.    And you've processed those as a general

7  contractor?

8    A.    Yes.

9    Q.    You've secured payments from owners; is that

10  correct?

11    A.    Yes.

12    Q.    And then you've taken that money and you've

13  deposited it in your account, or the company's account,

14  and then used that to pay subcontractors; is that right?

15    A.    When you say me, I didn't do it directly

16  myself, but I have supervised the team of individuals

17  who were involved in it, yes.

18    Q.    When you were the general contractor yourself

19  on the job, the buck stopped with you.

20    A.    Yes.

21    Q.    Even if there's somebody else who's physically

22  handling the money going from point A to point B, you're

23  the guy that's responsible; is that right?

24    A.    Yes.

25    Q.    You're the guy that the subcontractor comes to

54

1   and says, where's my money?  Or at least one of them.

2       A.   Yes.

3       Q.   And I take it that you have had some people

4   come to you and say that.

5       A.   Yes.

6       Q.   Did you ever do any studies on this time range

7   for payment from invoice?

8       A.   No.

9       Q.   You've looked here in your report.  You've

10  told us the date of the ATI invoices; is that right?

11      A.   Yes.

12      Q.   And you also had the date of the payments to

13  ATI; is that right?

14      A.   From Peck/Jones?

15      Q.   From Peck/Jones.

16      A.   Yes.

17      Q.   So you could tell the number of days between

18  those two events; is that correct?

19      A.   Yes.

20      Q.   But you never did a study overall in the

21  industry over a large number of invoices as to what the

22  payment range was.

23      A.   No.

24      Q.   Do you think it's possible to do such a study?

25      A.   Yes.

55

1     Q.    How would you do that?

2     A.    I think you'd have to contact a large number

3  of subcontractors and general contractors and ask them

4  specific questions relative to their payment habits

5  and/or experience.

6     Q.    Do you know of anybody who's done such a

7  study?

8     A.    I think that the ASA study that was done,

9  that's part of my report, is as close to a study like

10 that as I've seen.

11    Q.    And you enclosed that entire report as an

12 attachment to your report; is that correct?

13    A.    All the information I had, I included in my

14 report.

15    Q.    So if I read that correctly, they don't have

16 any range of times for payments from contractors to

17 subcontractors in that report.

18          Did I read that right?

19    A.    Yes.

20    Q.    And their principal conclusion is that

21 subcontractors continue to identify slow payment by

22 contractors as a major issue for them.

23    A.    Yes.

24    Q.    I'm not here to disagree with that, you

25 understand.

56

1          Is there any other basis for your opinion that

2  the normal range for payment is 60 to 120 days of

3  invoice, other than what you've identified?

4      A.    Are you referring to what I've identified in

5  my report?

6      Q.    Well, let me ask it better, then.

7          Is there any other basis that you have for

8  your opinion that the normal range of payment is 60 to

9  120 days from invoice, other than what's in your report

10  and other than what you've testified to here today?

11     A.    No.

12     Q.    I take it, then, that your opinion is that the

13  payments by Peck/Jones to ATI for the invoices that are

14  in dispute in our litigation were within the ordinary

15  course of business for the construction industry; is

16  that right?

17     A.    Yes.

18     Q.    That's because they were made within this

19  120-day timeframe?

20     A.    Yes, that's part of my rationale.

21     Q.    Is there any other part to your rationale?

22     A.    Yes.  The timeframe from which Peck/Jones paid

23  ATI after they received money is also of consideration

24  and important to analyze and consider as part of my

25  opinion.

57

1    Q.   Well, I was going to move on to what I think

2  is a different opinion you have in a minute.  So let me

3  tell you what the two are.

4         One is I want to talk about what the general

5  rules are in the business and the overall construction

6  business, and that's what my question relates to.

7         And then I'm going to ask about what actually

8  happened with Peck/Jones.

9         So any other bases for your opinion that the

10 payment from Peck/Jones to ATI in this case, the

11 payments in question in this case, was, in your opinion,

12 within the ordinary course of business for the

13 construction industry, other than what you've said in

14 your report and testified to?

15    A.   No.

16    Q.   Let's talk about the actual case.  So we're

17 going to talk about what's within the ordinary course

18 for the relationship between Peck/Jones and ATI; okay?

19         Do you have that in mind, sir?

20    A.   Okay.  It may be beyond the scope of what I

21 was actually asked to testify to, though, and comment on

22 that.

23         My specific assignment was to talk about the

24 industry generally, and not specifically the

25 Peck/Jones/ATI relationship.

58

1     Q.    Okay.

2           But you looked at the Peck/Jones/ATI

3     relationship; is that right?

4     A.    Yes.

5     Q.    Is it your opinion that Peck/Jones paid ATI

6     within the ordinary course of business?

7     A.    Yes.

8     Q.    You understand that Peck/Jones was paid by the

9     owner in this case before Peck/Jones paid ATI.   You

10    understand that, sir?

11    A.    Yes.

12    Q.    Do you know how long in advance of payments to

13    ATI, Peck/Jones had the money from the owner?

14          MR. GALLOWAY:   You mean for the payments that

15    are in issue in this case?

16          MR. SCHULMAN:   The payments that are in issue

17    in the case.

18          MR. GALLOWAY:   Right.

19          THE WITNESS:   Approximately 60-some-odd-days.

20          I'm sorry, ask your question again.   I'm not

21    sure if I understand your question.

22    Q.    BY MR. SCHULMAN:   Do you know how many days

23    Peck/Jones had the money from the owner with respect to

24    the ATI invoices at issue in this case before it paid

25    ATI?

59

1     A.   Yes.

2     Q.   And about how long was that?

3     A.   It ranged from 35 to 41 days.

4     Q.   Did you find out anything in your

5  investigation as to why it took 35 to 41 days to pay?

6     A.   No.

7     Q.   Were you able to find out anything that ATI

8  did that delayed payment?

9     A.   No.

10     Q.   Do you know what Peck/Jones did with the money

11  that it received from the owner with respect to the ATI

12  invoices before it paid ATI?

13     A.   No.

14     Q.   Do you know if the money was just sitting

15  there in a bank account?

16     A.   No.

17     Q.   But as you understand it, you're not here to

18  render an opinion on the ordinary course of business

19  between ATI and Peck/Jones; is that right?

20     A.   Correct.

21     Q.   You're just here to render an opinion on the

22  ordinary course of business in the industry.

23     A.   Yes.

24     Q.   Let me show you a copy of your report, sir.

25  And I ask you to take the time, because the question I'm

                                                          60

1  going to ask you is do I have it right.

2          And I've made an extra copy so Mr. Galloway

3  can have one.

4          Mr. Casenhiser, I didn't know you were going

5  to be here; otherwise, I would have run another Xerox.

6          MR. GALLOWAY:  That's all right, no need to

7  kill any more trees.

8          THE WITNESS:  Which would you like me to look

9  at first?

10     Q.  BY MR. SCHULMAN:  Well, what I have given you

11  is what I think is your last report that Mr. Galloway

12  sent to us electronically, which we then decided to

13  print rather than keep electronically, but which he sent

14  to us electronically, which includes all of the exhibits

15  that you said were attached in the report.

16          So I'm going to ask you, is that your whole

17  report?  Do you still agree with everything in there?

18  Did I get it right?

19          Because I want to make sure that I have in

20  this deposition, when you say that's your report, that

21  you're happy with it.

22          MR. GALLOWAY:  Take a moment.

23          MR. SCHULMAN:  Why don't we go off the record

24  a minute to give the witness time to go through it.

25          (Brief recess.)

61

1     Q.    BY MR. SCHULMAN:  You had an opportunity to

2 look at the copy of your report that I put in front of

3 you; is that correct, sir?

4     A.    Yes.

5     Q.    And you looked through it to see whether,

6 generally, that it's a complete and accurate copy of

7 your report; is that right?

8     A.    Yes.  I believe it to be generally correct.

9     Q.    Now, we did identify one page that appeared to

10 have something cut off, and we're replacing that; is

11 that right?

12    A.    Yes.

13    Q.    Now, I said generally because is it fair to

14 say that the report's about an inch thick?

15    A.    A couple inches, yeah.

16          MR. GALLOWAY:  Just for the record, this one

17 is dated May 28, 2008.

18          MR. SCHULMAN:  Okay.  Let's ask the reporter

19 to mark this as Exhibit 1.

20          (Plaintiff's Exhibit 1 was marked

21          for identification.)

22    Q.    BY MR. SCHULMAN:  If you'd like to look at

23 your report, sir, and let's start about one page down,

24 going over from page 2 to page 3 of the report, where

25 you talk about the, what you call the lapse time between

                                                        62

1  the time Peck/Jones receives the invoice and the time

2  that Peck/Jones pays ATI.

3          Do you see that, sir?

4      A.   I'm not sure.

5      Q.   Towards the bottom of the page.

6      A.   Under which?

7      Q.   The heading says "Evaluation - Ordinary Course

8  of Business."

9      A.   Okay.

10     Q.   Do you see that, sir?

11     A.   Yes.

12     Q.   And it's correct that you found in your

13 investigation that the lapse time was 65 to 113 days?

14     A.   Yes.

15     Q.   So given your testimony, any payment that's

16 made from 65 to 113 days would be, in your view, within

17 the ordinary course of business in the construction

18 industry; is that right?

19     A.   Yes.

20     Q.   Did you find that there was a pattern to the

21 few invoices you had in how long it took for Peck/Jones

22 to pay ATI?

23          MR. SCHULMAN:  Let's go off the record for a

24 second.

25          (Interruption in proceedings.)

                                                    63

1           (Record read as follows:

2           "Q.  Did you find that there was a

3      pattern to the few invoices you had

4      in how long it took for Peck/Jones to

5      pay ATI?")

6           THE WITNESS:  I don't understand your

7  question.  I'm sorry.

8      Q.  BY MR. SCHULMAN:  Isn't it correct that the

9  first invoice that you looked at that Peck/Jones paid

10 was in 65 days?

11     A.  Yes.

12     Q.  And the last one was 113 days?

13     A.  Yes.

14     Q.  Did you find any significance to the length of

15 the time?

16     A.  They averaged about 100 to 104 days, someplace

17 in that range.

18          I'm not sure what your question is as far as a

19 pattern.  There aren't enough invoices and payments, to

20 me, to suggest a pattern.

21     Q.  If you take a look at page 4 of your report,

22 sir, in the second paragraph, the first line of that

23 paragraph says, "We submit that timely payment is best

24 defined as payment within the contract terms."

25          Do you see that?

                                                        64

1    A.   Yes.

2    Q.   I'm sorry, I read that wrong.  I apologize.

3         "We submit that timely payment is best defined

4   as payment within the contractual terms."

5         Do you see that, sir?

6    A.   I do.

7    Q.   That was your opinion?

8    A.   Yes.

9    Q.   That's still your opinion?

10   A.   Yes.

11   Q.   What were the contractual terms here for

12  payment by Peck/Jones to ATI?

13   A.   I believe that they were payment within

14  30 days of having been paid by the owner.

15   Q.   And did you find that ATI was paid within

16  30 days?

17   A.   No.

18   Q.   They were not paid within 30 days; is that

19  correct?

20   A.   No.

21   Q.   I'm sorry, I have a double negative.

22        Is it correct to say that Peck/Jones did not

23  pay ATI within 30 days for the payments that are at

24  issue in the lawsuit?

25   A.   Yes, it's correct to say that.

65

1      Q.    In fact, you have a chart here on page 4 that

2   shows that ATI was paid either 35 or 41 days after the

3   owner paid Peck/Jones.

4      A.    Yes.

5      Q.    When we scheduled this deposition, we asked

6   that certain documents be produced.  Did you bring any

7   documents today?

8      A.    Yes.

9      Q.    What documents did you bring today?

10     A.    My complete files on this project.

11     Q.    What's in your complete file?

12     A.    I believe copies of the report, any exhibits,

13  any emails that I received back and forth from the

14  attorneys, emails that I received that are attached to

15  the report.

16     Q.    Okay.  Well, other than emails that you wrote

17  to Mr. Roberts, that you've attached to your report, and

18  other than emails back and forth with the attorneys, is

19  there anybody else that you've emailed in the course of

20  this case?

21     A.    Not to my recollection.

22     Q.    I guess it would be best if I looked at what

23  you brought.  Do you have that handy for me to look at?

24     A.    Is this it here (indicates)?

25           MR. GALLOWAY:  (Indicates).

66

1            THE WITNESS:  Let's give this one to you

2    (indicates).

3        Q.   BY MR. SCHULMAN:  Now, part of this

4    constitutes your report, sir?

5        A.   Yes.

6        Q.   For the record, the witness has given me two

7    buckets, one of which is about an inch to two inches

8    thick, and one is about four to five inches thick.

9            Is that about right, sir?

10       A.   Yes.

11       Q.   Is one of these for me?

12       A.   They're both for you.

13       Q.   They're both for me?

14       A.   Yes.

15       Q.   More trees.

16           We can go off the record for a minute.

17           (Brief recess.)

18       Q.   BY MR. SCHULMAN:  During the break, I've had

19   an opportunity to look through the documents that you

20   produced.

21           Those are all the documents that you have with

22   respect to your assignment in this case; is that

23   correct?

24       A.   To my knowledge, yes.

25       Q.   How was the file that you kept maintained?

                                                        67

1  This was all electronic?

2      A.    Yes.

3      Q.    So you had to print all this out for us?

4      A.    Yes.

5      Q.    Is it stored on a server at your office?

6      A.    Yes.

7      Q.    Do you have a separate subfile for it?

8      A.    Yes.

9      Q.    So everything, hopefully, with regards to this

10 case should be in that file.

11     A.    I like the word "hopefully".

12     Q.    Well, there is a possibility, because I

13 certainly do it, that sometimes something gets misfiled;

14 right?

15     A.    Of course.

16     Q.    So I don't want you to say that it's

17 guaranteed that everything is here because all of us can

18 push the button electronically and send it somewhere

19 else.

20          But you've done your best to make sure that

21 everything you looked at and touched with regard to your

22 assignment that you could produce in paper form, you

23 have, and it's in these two folders?

24     A.    It's in the electronic file, and the

25 electronic file was copied and printed.

68

1     Q.    So to the best of your knowledge, you have

2 given us now all documents on which you are going to

3 rely or intend to rely in support of all the opinions

4 that you have expressed in your reports or intend to

5 express at trial; is that right?

6     A.    Yes, to my knowledge.

7     Q.    And you've produced all documents which are

8 exhibits that will be used to summarize or support your

9 opinions; is that right?

10    A.    Yes, to my knowledge.

11    Q.    And you've produced to us all correspondence,

12 including but not limited to letters, facsimiles, and

13 emails between you and any attorney in connection with

14 this case?

15    A.    Yes, to my knowledge.

16    Q.    And you've produced to us all correspondence,

17 including but not limited to letters, facsimiles, emails

18 between you and any representative of American

19 Technologies with respect to this case?

20    A.    Yes, to my knowledge.

21    Q.    Do you keep any notes with regard to your work

22 that don't go into your electronic files?

23    A.    No.

24    Q.    So you have produced all notes that you might

25 have in connection with the opinions that you are going

69

1    to express in this case?

2        A.    Yes.

3        Q.    Have you produced a copy of the agreement

4    between Bert Howe and Mr. Galloway's firm for your

5    services?

6        A.    Yes, I believe you have that.

7        Q.    You think that's in these files that you've

8    given us?

9        A.    I think there was a manila folder that was

10   separated in the front of one of those files that

11   included that information.

12       Q.    I've pulled out a manila folder that has a

13   label at the top that says 083412 Peck/Jones v. ATI.

14             Is that the manila folder you're talking

15   about, sir?

16       A.    Yes.

17       Q.    My next question was going to be invoices.

18   And the invoices also appear to be in that manila

19   folder; is that correct?

20       A.    Yes.

21       Q.    And I see invoices for April, May and, I'm

22   sorry, I see invoices dated up to June 6, 2008.

23             Do you know if an invoice has been rendered

24   past June 6, 2008?

25       A.    I don't know.

                                                        70

1      Q.   But you expect to send an invoice for services

2   you rendered since June 6, 2008; is that correct?

3      A.   If it's not in there, yes.

4      Q.   Well, I mean, if it hasn't been done yet, do

5   you expect to do it?

6      A.   I don't do the invoicing.

7           MR. SCHULMAN:   I don't have any more questions

8   at this time.

9           MR. GALLOWAY:   Let's go off the record for one

10   second.

11          MR. SCHULMAN:   Sure.

12          (Brief recess.)

13

14                         EXAMINATION

15   BY MR. GALLOWAY:

16      Q.   Mr. Tolman, in your file, one of the documents

17   that's in there is an opinion of the U.S. Court of

18   Appeals for the Ninth Circuit, and I want to ask you a

19   couple of questions about that.

20           These pages are not Bates stamped, so I'm just

21   going to read the name of the case.  It's "In re

22   healthcentral.com."  The site is 504 Fed. 3d 775.

23          MR. SCHULMAN:   Again, please, 50 --

24          MR. GALLOWAY:   504 Fed 3d 775.

25          MR. SCHULMAN:   Thanks.

71

1          MR. GALLOWAY:  And the opinion was published

2    in 2007.

3      Q.   And under the heading which is Section

4    547(c)(2)(c), "Ordinary Business Terms," which is on

5    page 16 of the printout of this opinion, I'm going to

6    read part of it and then ask you a question.  I'll just

7    show this to you as I read it.

8          About the middle of this paragraph it says:

9              "As before, this effectively

10             breaks down into two components.

11             First the creditor must establish

12             the, quote, 'broad range,' close

13             quote, of business terms employed by

14             similarly situated debtors and

15             creditors, including those in

16             financial distress, during the

17             relevant period."

18         Did you read that during the period that you

19   were preparing your opinion in this case?

20     A.   Yes.

21     Q.   And is that why you considered, among other

22   things, companies in financial distress in rendering

23   your opinion?

24     A.   Yes.

25     Q.   Next I want to turn to your report, which is

                                                      72

1  in front of you, marked as Exhibit 1.  And on page 4,

2  Mr. Schulman asked you a question about one line that

3  appears in the first full paragraph on that page.  I

4  want to read something else on there.

5        A little ways down in that paragraph, it says:

6            "Based on the ASA survey results,

7        slow pay is common in the industry

8        and thus to the dismay of

9        subcontractors within the ordinary

10       terms of business for the industry."

11       Do you see that?

12  A.   Yes.

13  Q.   So is it your opinion that the ordinary course

14  of business in the construction industry in 2004, in

15  Southern California, was not to necessarily pay within

16  what the contract terms provided?

17  A.   Yes.

18       MR. GALLOWAY:  I have no further questions for

19  now.  Thank you.

20       MR. SCHULMAN:  Let me suggest that we

21  stipulate that when the reporter prepares the

22  transcript, she'll be relieved of her statutory duty.

23       That she'll provide the original to

24  Mr. Galloway.  Mr. Galloway will provide it to the

25  witness.  The witness may sign it under penalty of

73

1   perjury.   The witness may have 30 days to review it.

2           Mr. Galloway will promptly notify us of any

3   changes or corrections that the witness makes, as well

4   as whether or not the witness has signed it under

5   penalty of perjury.

6           Mr. Galloway will maintain possession of the

7   original, and will make it available or lodge it with

8   the court on request.

9           If the original is lost, stolen, destroyed, or

10  otherwise not available, a certified copy may be used in

11  its place.

12          MR. GALLOWAY:   Yes, so stipulated.

13          MR. SCHULMAN:   Mr. Tolman, I know it's not fun

14  to be a witness.   I very much appreciate that you came

15  here today and helped us with this case.

16          Thank you, sir.

17          THE WITNESS:   Thank you.

18          THE COURT REPORTER:   Did you want a copy?

19          MR. GALLOWAY:   No.

20              (Whereupon, at 12:11 p.m., the deposition

21  was adjourned.)

22                          --o0o--

23

24

25

                                                        74

1                I hereby declare under penalty of perjury

2   that the foregoing is true and correct.

3                Subscribed at _____,

4   California, this _____ day of _____, 200__.

5

6

7                      _____
                                JOHN D. TOLMAN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

75

1  STATE OF CALIFORNIA      )
                            )  ss.
2  COUNTY OF ORANGE         )

3

4            I, Sharon E. Gonzalez, CSR #4501, do

5  hereby certify:

6            That the witness named in the foregoing

7  deposition, prior to being examined, was by me first

8  duly sworn;

9            That said deposition was taken before me

10 at the time and place herein set forth and was taken

11 down by me in shorthand and thereafter transcribed into

12 typewritten form via computer-aided transcription under

13 my direction and supervision;

14           That said deposition is a true record of

15 the testimony given by the witness and all objections

16 made at the time of the deposition.

17           I further certify that I am neither

18 counsel for nor related to any party to said action, nor

19 in anywise interested in the outcome thereof.

20           In witness whereof, I have subscribed my

21 name this 29th day of July, 2008.

22

23           _Sharon E. Gonzalez_

24           Certified Shorthand Reporter #4501

25

                                                    76

# Peck / Jones
# Construction Corporation

BHA #08-3412

## Rebuttal Report to
## DACM Expert Report of Opinion
## (March 27, 2008)

*Case # 2:04-03757-VZ*
*Adversary Case # 2:07-01058-VZ*

*May 28, 2008*

*Prepared For:*
**Donald E. Leonhardt**
**Jackson, DeMarco, Tidus, Petersen, Peckenpaugh**
**2030 Main Street, Suite 1200**
**Irvine, CA 92614**



Bert L. Howe & Associates, Inc.

**Construction Consultants**

*1-1*

## Scope:

Bert L. Howe & Associates, Inc. was retained by the firm of Jackson, DeMarco, Tidus, Petersen, & Peckenpaugh to provide an initial opinion report dated February 14th, 2008 **[Exhibit 1]**. The issue addressed was whether Peck Jones Construction Corporation's (Peck-Jones) payments to their subcontractor American Technologies Inc. (ATI), totaling $297,079.59, via check numbers 2450, 2455, 2459 and 2460, between the 10th and 21st of September 2004, were within the course of ordinary business and pursuant to business terms prevailing in the construction industry.

Bert L. Howe & Associates Inc. was also retained for the purpose of providing this rebuttal report to the opinions and conclusions reached in plaintiff's expert, DACM Project Management's report regarding the Peck-Jones/ATI payment issue recited above dated March 27th, 2008 the revised version of the DACM report dated April 30th, 2008 and the DACM report Preliminary Response to Report of Bert L. Howe Associates, Inc. dated May 5th, 2008. **[Exhibit 2]**

## Conclusion:

The heart of this case is fairly straightforward and clearly pivots on the answer to two questions.

1) Were the payments in question made within a time frame that could reasonably be regarded as being within the ordinary course of business between Peck-Jones and ATI?

And/Or:

2) Were the payments in question made according to the prevailing ordinary business terms for the construction industry in 2004?

Our expert opinion is rendered based on our analysis of the facts of this case supported by 33 years of construction experience; 27 of those years as a licensed general contractor, subcontractor and construction manager. It is our opinion that the subject payments were made within the ordinary course of business for Peck-Jones and ATI and no preference was extended to ATI. We also assert the subject payments were made pursuant to the ordinary terms of business for the construction industry in 2004. Our review and analysis of the DACM report and the deposition testimony of DACM's lead expert Alan Cade confirmed rather than swayed our opinion. We respectfully disagree with the analysis and the opinion stated in the DACM report(s) and Mr. Cade's deposition testimony as detailed in the analysis below

Bert L. Howe Associates Inc. reaffirms our opinion as declared in our initial report dated February 14, 2008, that is:

> **"Peck-Jones's release of four payments to ATI for work performed by ATI during April and May of 2004 totaling $297,079.59 via check numbers 2450, 2455, 2459 and 2460 between the 10th and 21st of September 2004 on the St. John's Regional Medical Center project were released within the ordinary course of business for Peck-Jones and ATI. Additionally, the aforementioned payments were within the business terms for payment prevailing in the construction industry at the time of the action. I am prepared to testify at deposition and trial in support of this opinion."**

## Evaluation – Ordinary Course of Business:

The ordinary course of business for the construction industry may be described as how contractors and subcontractors routinely conduct their business with each other over time on a routine and recurring basis.

As explained below and within our original report **[Exhibit 1]**, the uncommon complexity of the payment approval process in the construction industry gives way to a very broad time range within which owners pay general contractors and general contractors pay subcontractors. As detailed in the Bert Howe Payment Analysis **[Exhibit 3]**, the lapse time from the date Peck-Jones received ATI's invoice and Peck-Jones in turn paid ATI ranged from 65 to 113 days. We conclude that an analysis based on the date



Bert L. Howe & Associates, Inc.

**Construction Consultants**

1 - 2