Peck-Jones Construction v America Technologies, Inc.
BHA # 08-3412

Peck-Jones received each invoice rather than the date ATI prepared the invoice provides a more reliable basis and have used that date when available.

Prior to September 2004, Peck-Jones and ATI established a recognizable albeit short payment history. Invoice #1 was paid 65 days after receipt; #2 in 85 days; #3 was for emergency work not part of the contract and no invoice was located; Invoice #4 was paid in 99 days; #5 was apparently not accepted by Peck-Jones, it was not paid and no change order was issued; #6 was divided into two separate checks paid at 105 days and 109 days. Invoices #7, #8 and #9 are the subject invoices; they were divided among four checks and paid at 102, 108, 113, and 113 days respectively after receipt. A slightly longer time period is derived if the date on the actual invoice is used.

ATI Invoice #1 is unique from the other invoices in that the invoice amount is relatively low (under $20,000.00). Each of the subsequent ATI invoices was for amounts ranging from 350% to 2000% more. Because of its relative small amount, Invoice #1 was paid relatively quickly (65 days). It can be reasonably concluded that Invoice #1 received significantly less scrutiny than the subsequent invoices and was likely processed and paid more quickly by Peck-Jones than the much higher invoices that followed. Because of its relative low amount we suggest that Invoice #1 should not be considered to calculate an average invoice lapse time (see the table below). Based on the above, the invoice lapse time prior to the subject payments averaged 100 days. When the subject payments are included, the average lapse time increases by only 4 days to 104 days. We conclude that because the impact of the subject invoices and payments had upon the average lapse time is so insignificant the subject payments were consistent with the ordinary course of business between Peck-Jones and ATI notwithstanding the limited payment history.

| | Invoice #s used to determine average | | | |
|---|---|---|---|---|
| | 1,2,4,6 | 1,2,4,6,7,8,9 | 2,4,6 | 2,4,6,7,8,9 |
| **Average time lapse in days** | 93 | 99 | 100 | 104 |

## Evaluation – Ordinary Business Terms:

The ordinary business terms for the construction industry may be described as how contractors and subcontractors industry wide generally conduct their business with each other over time on a routine and recurring basis.

The uncommon complexity of the payment approval process in the construction industry gives way to a very broad time range within which owners pay general contractors and general contractors pay subcontractors. Vital in the case at hand is the maximum length of time subcontractors as a group ordinarily waits before being paid by general contractors. The American Subcontractors Association[1] (ASA) conducted a survey in 2007 titled, "Member Needs Assessment" **[Exhibit 4].** The ASA randomly selected 1000 subcontractors to participate. In the survey, responding subcontractors had the choice of ranking the issues presented as very serious, somewhat serious, not very serious, and not at all serious.

The survey results revealed the top 5 subcontractor issues were payment related. Slow final payment was the number one issue with 73% of the subcontractors rating it a "very serious" problem. Retention payments were also rated as "very serious" problems by 62% of the subcontractors and 60% rated slow progress payment as "very serious".

(1) The American Subcontractors Association, founded in 1966, is a non-profit association of over 5000 commercial construction subcontractors.



Bert L. Howe & Associates, Inc.

**Construction Consultants**

1-3

The same survey conducted in 2005 indicated that slow final payment was the number one issue with 78.5% of the subcontractors rating it a "very serious" problem. Slow progress payments were also rated as "very serious" problems by 71.8% of the subcontractors and 60% rated retention payment as "very serious".

We submit that timely payment is best defined as payment within the contractual terms. Subcontract agreements typically require payment within 30 days after the general contractor has received payment (as in the case at hand); slow payment is 31 days or more. Based on the ASA survey results, slow pay is common in the industry and thus to the dismay of subcontractors within the ordinary terms of business for the industry. The table below represents the lapse in days for the payments in question from the time the date Peck-Jones deposited their payment from the owner to the time they issued a check to ATI.

| Date Owners check to Peck-Jones was deposited | Date corresponding check was issued to ATI | Lapse in days |
|---|---|---|
| 8/6/2004 | 9/10/2004 | 35 |
| 8/6/2004 | 9/16/2004 | 41 |
| 8/11/2004 | 9/21/2004 | 41 |
| 8/11/2004 | 9/21/2004 | 41 |

As the table demonstrates, no payment to ATI was delayed longer than 41 days once Peck-Jones deposited their payment from the owner. Establishing a time period equivalent to what the ASA subcontractors identified as being very serious is difficult. The chart shows that worst case, Peck-Jones delayed payment to ATI 11 days longer than the standard industry wide 30 day payment provision. We submit that an 11 day indeed a 21 day delay would fall within the ordinary (slow pay) construction business terms identified by the 72% of the ASA survey respondents as very serious.

Consideration must also be given to the impact on the ordinary course of business that result from a period of financial hardship. Certainly in nearly every business, financial hardship ordinarily results in lengthening the time creditors must wait to receive payment. The ordinary business terms for the construction industry flex considerably when a general contractor experiences financial hardship. The facts of this case are clear that Peck-Jones was experiencing financial hardship during the summer and fall of 2004. Their hardship would have further extended the ordinary invoice/payment lapse time. DACM asserts the opposite in their report and in Alan Cades deposition; It is their opinion that financial hardship should not be considered when evaluating the subject payments, They further assert that financial hardship is evidence that a business is "clearly not in the ordinary course of business" page 12, May 5th DACM Response Report.

**Rebuttal Summary:**

DACM's report identifies the deletion of a retention withholding clause from the Peck-Jones/ATI subcontract agreement. They maintain this is so unusual as to form the basis of their opinion. DACM neglects to disclose or consider that eliminating retention was negotiated by the parties. No retention contracts are familiar practices in the construction industry. This element adds no strength to the DACM conclusion regarding the release of the payments in question.  **(see pgs. 5-6 below)**

DACM's report alleges that ATI started work without a signed subcontract agreement and that such action is foundational to their opinion. DACM does not disclose that Peck-Jones and ATI executed a binding letter agreement authorizing work to commence and continue. Starting work without a signed contract



**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

occurs frequently in the construction industry and adds no legitimacy to the DACM opinion.   **(see pg. 6
below)**

DACM's report relies on the "rather unique occurrence" of full payment by Peck-Jones to ATI as an
accounting irregularity evidencing Peck-Jones's departure from the ordinary course of business. Paying a
vendor 100% of their outstanding invoices is not unique notwithstanding possible common clerical
modifications or perceived errors in the billing processes of either Peck-Jones or ATI.   **(see pgs. 6-7
below)**

DACM's conclusions rely on the Los Angeles Unified School District (LAUSD) as an industry example.
The LAUSD is a public entity and an owner not a private general contractor. Owners and general
contractors are not similarly situated in the construction industry. Further, the LAUSD evaluation relies on
current practices not those of 2004, further degrading any value this example held in support of their
opinion.  **(see pgs. 8-9 below)**

DACM's report relies on the statement of Construction Business Coach Ron Roberts. When fully
examined Ron Roberts refutes the DACM opinion and reinforces the conviction that Peck-Jones's actions
were within the ordinary course of business. **(see pg. 8 and pg. 12 below)**

DACM's report projects the viewpoint of an industry observer rather than an insider. DACM relies on the
description of business practices established and evaluated in the vacuum of sterile contractual and
statutory interpretations, industry association pamphlets and dictionary definitions. Similar to many
industries, contractors rely on commercially practicable arrangements and understandings that extend
beyond the four corners of their written agreements. DACM completely overlooks the significance of
these time-proven interactions.  Contractor's business terms are evidenced best by how they transact.
Their actions form the core of the construction industry's prevailing business terms in turn establishing the
ordinary course of business. **(see pgs. 11-12 below)**

Under comprehensive analysis, the relevant data provided in the DACM report provides further
convincing evidence that Peck-Jones released the payments in question to ATI within the ordinary course
of business and according to prevailing construction industry ordinary business terms.

## Detailed DACM Report Rebuttal

The heading item numbers and heading titles used below correspond with those used by DACM in their
report.

1.  **Scope of Analysis**

    No commentary.

2.  **Project Background**

    DACM relies on the elimination of the retention withholding clause and the allegation that ATI
    started work without a signed contract as the basis of their opinion that Peck-Jones acted beyond
    the ordinary course of business.  These issues as discussed below are common in the
    construction industry, cast no shadow over either Peck-Jones or ATI and are irrelevant to the
    issue of whether Peck-Jones released payments to ATI during the ordinary course of business.

    - Retention: DACM suggests the absence of a retention clause in the Peck-Jones/ATI
      subcontract agreement is suspiciously irregular to the degree it forms a basis for their
      opinion.  DACM neglects to consider or point out that retention was a negotiating point
      between the parties prior to the contract execution and is evidenced by the letter from
      Peck-Jones to ATI dated March 8th, 2004 regarding contract terms. **[Exhibit 5]**. The
      actual subcontract agreement between Peck-Jones and ATI was a time and materials
      agreement, not a fixed fee contract. Time and materials contracts often are not subject to
      retention withholding. The subcontract agreement was executed March 9th, 2004 and
      change order #1 excising the retention clause was executed March 11th, just 2 days later.



**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

1~5

Withholding retention by general contractors (typically 10% of the contract amount) has drawn increasing criticism in recent years from contractors and their respective associations. Subcontractors overwhelmingly prefer, and increasing numbers demand "no retention" subcontract agreements. The DACM report quotes the Association of General Contractors (AGC) publication, "Guidelines for A Successful Construction Project" to demonstrate the importance of retention. DACM fails to include the complete AGC quote regarding retention that adds, "Whenever practical, however, retainage should be eliminated or reduced." The booklet is sponsored by the AGC as well as the American Subcontractor's Association (ASA) **[Exhibit 6]**.

A news release from the ASA **[Exhibit 7]** addresses numerous issues relevant to subcontractors including slow pay from general contractors and retention. The article referring to retention withholding describes it as "the antiquated harmful practice of retention that financially punishes all contractors regardless of performance". The ASA news release also discloses that in 2007, four states adopted legislation limiting retention withholding while one state has made the practice completely illegal. To comply with federal law (DOT, 49 CFR, Part 26 requirements), CALTRANS stopped withholding retention on all federally funded highway projects beginning in 2004. Many cities and counties in California and across the country have also adopted this practice for similar projects.

The practice of eliminating retention is not uncommon nor should any dubious distinction be attached. Whether or not retention was withheld from ATI by Peck-Jones has no relevance to the issue of Peck-Jones's payment release time frame.

- Signed Subcontract: DACM claims that ATI started work without a signed contract and that this fact is foundational to the formation of their opinion. DACM does not mention or take into account that Peck-Jones and ATI entered a binding time and materials letter of intent executed on December 29th, 2003, three days prior to ATI starting any work. **[Exhibit 8]** The letter not only authorized ATI to start work, it specifically referred to and anticipated the execution of the subcontract agreement. The letter of intent anticipated the subcontract agreement would be executed by January 9th, 2004. Actual execution of the subcontract agreement was delayed until March 9th, 2004. All work until that date was performed under the valid letter agreement that remained binding.

For a variety of reasons subcontractors start work without a signed subcontract agreement. This practice is generally a result of project exigency and is often sanctioned (as in this case) by a letter of intent. Many times verbal assurance from the general contractor that the subcontract agreement will be completed and executed in short order is all that is provided. Sophistication of larger firms aside and debatable, this occurs often in both large and small firms. Similar to the discussion above regarding retention, commencing work without an actual signed subcontract agreement has no relevance to the issue of whether Peck-Jones released payments to ATI during the ordinary course of business nine months later.

## 3. Key Issues and Facts

The key issues and facts of full payment, alleged invoicing errors or invoice corrections relied on by DACM to formulate their opinions have no bearing on the issue of Peck-Jones's action releasing payment to ATI.

On page 5 of their report, DACM refers to a "rather unique occurrence". DACM evidently considers the Owners payment to Peck-Jones and Peck-Jones's subsequent full payment of ATI's invoices questionable because the amounts were the same. We question the value of this point. Why wouldn't Peck-Jones pay ATI the very same amount ATI billed for? The Peck-Jones payment request to the Owner was based in part on ATI's invoices.

**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

1 - 6

In summary, ATI submitted the three invoices in question totaling $297,079.59 to Peck-Jones in late May of 2004. Peck-Jones in turn included the amount of $297,079.59 in their June 10th, 2004 payment application to the Owner. Peck-Jones consolidated two of the invoices from ATI on one line in their payment application. The consolidations were based on the task types, destructive testing coded as 001 and remediation coded as P-2. The owner issued two checks to Peck-Jones on July 29th, 2004 and August 5th, 2004 totaling $594,764.08. Peck-Jones deposited each check respectively on August 6th and August 11th, 2004 of which $297,079.59 was earmarked payable to ATI. Peck-Jones next issued 4 checks to ATI (the four payments in question) on September 10th, another on the 16th, and two more on September the 21st. The first three checks (check numbers 245, 2455 and 2459) paid in full Invoices #7 and #9. The final payment paid Invoice #8 in full. DACM points out that Invoice #8 for $67,752.25 was flawed bearing a differing job number. We believe the number they refer to (001) is actually a Peck-Jones task description added to the end of each job number and is not erroneous. DACM does not mention that the jobsite name, St. John's Regional Medical Center and the jobsite address were included and consistent on each and all of ATI's invoices to Peck-Jones. The inclusion of the job name and address should clear up any confusion as to whether the invoices were correct.

Whether the "rather unique occurrence" observed by DACM is that Peck-Jones paid ATI the precise amounts ATI billed for, the consolidation of two of ATI's invoices by Peck-Jones on their payment application to the Owner or the use of a different task number is not clear. The more likely explanations of these occurrences are that they are clerical accounting procedures or billing corrections common in any accounting department. The fact that Peck-Jones issued the four checks in question and that their total equals the three outstanding ATI invoice amounts suggests only that Peck-Jones was in a cash bind. The facts suggest that Peck-Jones had intended to pay ATI, but likely waited while their capacity caught up with their desire. This is also evidenced by the amounts of the first two checks (each was $100,000 even). Peck-Jones likely paid ATI as much as they could afford to at the time. Holding payments to vendors for such purposes is not only common practice for cash challenged general contractors; it is commonplace in every industry.

DACM also suggests that the absence of releases that match each invoice evidences peculiar behavior. We agree proper releases should/must accompany invoices for proper protection from future claims. The fact that payment was made from the Owner to Peck-Jones and then to ATI is a strong indication that the appropriate releases were timely provided. The facts suggest there are numerous documents that have not been located/provided during discovery including releases.

Processing invoices in the construction industry as explained in section 5 below is complex and problematic. This difficult procedure is unique to the construction industry. The time period and effort needed by accounting staff to process invoices is greatly extended beyond that of other industries. Because of the protracted time period, the standard time range within which contractors expect to be paid is consequently very broad.

The Invoice and Payment Analysis **[Exhibit 3]** identifies the ATI invoices and Peck-Jones payments from January 1st, 2004 through September 21st, 2004. Also provided in the table is the corresponding time lapse in days. Calculating the lapse in days using the date on the ATI invoice produces the longest possible lapse period. While the date of receipt is uncertain, it may be reasonably concluded that the invoice date identified on the Peck-Jones check stub is the date Peck-Jones actually received the ATI invoice and thus more reliable to gauge the Peck-Jones/ATI behavior.

4. **Documents Reviewed**

DACM lists the documents they reviewed in this section and we have no comment.



**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

### 5. Industry Standards

On page 8 of their report, DACM quotes contractors business coach Ron Roberts saying, "The natural billing cycle for work contracted through a general contractor can lead to delays. Jobs are billed once a month and ideally the client has around 15 days to pay the invoice. The general can take seven to ten days to pay the subcontractors. That puts a delay between a mid-month expense and payment at 45 days." In essence, Roberts says that payment delays are natural, or ordinary, in the construction industry.

Desiring clarification of the Roberts quotation, we e-mailed Mr. Roberts the question below **[Exhibit 9]**:

> "Hello Ron, I am interested in your opinion as to what the range of time in days is (minimum to maximum) for commercial general contractors to pay their subcontractors during the ordinary course of business once the general contractor has received payment from the owner."

His reply was:

> "I would say that General Contractors ordinarily pay their subs within 45 days of receiving their money, and most frequently pay them within 20 days."

Ron Roberts's opinion cited by the DACM report in reality supports the opinion that Peck-Jones's payments to ATI were made within the ordinary course of business. Per the payment analysis, **[Exhibit 7]** none of the payments in question exceeded a 41-day lapse after Peck-Jones received payment from the Owner.

On Page 7 of their April 30th report, DACM states: "Within the Los Angeles area, Owners typically understand the benefits and value of processing pay applications promptly and are doing so". DACM then references the LAUSD as their single industry comparison. The LAUSD is a public owner significantly distancing any application to Peck-Jones's, a private general contractor's actions. DACM's declaration regarding the practice of public owners lacks practical relevance to the issue of whether Peck-Jones's payments to ATI were made in the ordinary course of business. Notwithstanding, we add the following commentary in response to DACM's opinion relative to owners, general contractors and industry standards.

In 2004, the LAUSD was hardly the poster-child for well run organizations. The LAUSD Facilities Modernization and New Construction Program cited by DACM in their report was established in 1997, and after 5 years failed to meet its accounting requirements. The Inspector General's Office audited the LAUSD in 2003. In an inter-office memo dated January 21st, 2003 **[Exhibit 10]**, the Inspector General reported that District staff members had been "…unable to meet their financial accounting performance requirements…" The report also noted that "…lack of action resulted in… 108 warrants totaling $3.8 million remaining on hold from 2 days to more than 1 year, and approximately 10,000 open purchase orders and unpaid invoices (totaling approximately $33.5 million) remaining on file as long as 3 years."

DACM asserts that the LAUSD currently processes payment applications in 17 to 21 days. Even in the event that this is the current average, the comparison to the LAUSD fails both the timeliness and similarly situated business tests. While a 17 to 21 day period might be achievable for the LAUSD under ideal circumstances, based on the inspector generals report it was not the case in 2003 and 2004. From the issues outlined in the Inspector General's memo, the LAUSD initiated a Project called "Vision Statements" in March 2004 **[Exhibit 11]**. As a result of the project, their payment delay times began to improve. The LAUSD Vendor Guide dated July 1st, 2006 **[Exhibit 12]** states "During the last 3 years, the Accounts Payable Branch has been working to improve its processes, systems, and guidelines…What previously took the District well over 60 days on average to pay now averages less than 45 days…" It should be noted again that none of the payments from Peck-Jones to ATI lapsed longer than 41 days once Peck-Jones



**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

received funding from the Owner. The LAUSD was a public owner in a superior position with respect to their capacity to pay. The LAUSD pamphlet entitled "Did You Know…" prepared by the Procurement Services Group and in use currently notwithstanding DACM's assertion of a 17 to 21 turn around informs prospective contractors that "District Payment Terms are 45 days". **[Exhibit 13]**

DACM suggests on page 8 that after receiving payment from the owner general contractors process and deliver subcontractors payments in a "maximum of approximately 5 to 8 business days" with many general contractors completing the process in even shorter times. We disagree with DACM, as well as the omissions, assumptions and generalizations necessary to reach this idyllic conclusion. Ron Roberts, the construction business coach quoted above in the DACM report also disagrees. Mr. Roberts, as stated above said, "This period ordinarily ranges from 20 to 45 days". DACM provides numerous notes at the bottom of their attachment #1 on page 19 and the top of page 20 explaining there are additional tasks (processes and prerequisites) in the billing process, but allows no time for their completion. DACM further completely omits the complicated process general contractors perform relative to the processing and approval of each subcontractor invoice which includes:

a) Obtaining and verifying the presence of field and project management payment approvals for each subcontractors invoice.

b) Verifying the receipt of the correct type, correctly dated, and validly signed conditional lien releases from the subcontractor.

c) Checking records for the receipt of preliminary lien notices from the subcontractor's materials suppliers or sub-subcontractors.

d) Verifying the receipt of the correct type, correctly dated, and validly signed conditional lien releases from the subcontractor's materials suppliers and sub-subcontractors.

e) Verifying the receipt of the correct type, correctly dated, and validly signed un-conditional lien releases from the subcontractor for the prior payment.

f) Verifying the receipt of the correct type, correctly dated, and validly signed un-conditional lien releases from the subcontractor's materials suppliers and sub-subcontractors for prior payments.

g) Pulling the subcontractors subcontract agreement and comparing the amount invoiced to the specific terms of payment (amount, retention etc.) agreed to in the contract documents.

h) Calculating and comparing the paid to date totals for each subcontractor with their respective subcontract agreements to prevent over payment for work performed to date.

i) Verifying the mathematical calculations used by the subcontractor in preparation of their invoice.

j) Verifying the validity and sufficiency of the subcontractors' liability insurance.

k) Verifying the validity of the subcontractors' workers compensation insurance.

l) Verifying the validity and sufficiency of the sub-subcontractors liability insurance.

m) Verifying the receipt and validity of the sub-subcontractors workers compensation insurance.

n) Verifying the subcontractor has a valid contractor's license.

o) Verifying the sub-subcontractor has a valid contractor's license.

p) Verifying the subcontractor has obtained a valid City License.

q) Verifying the sub-subcontractor has obtained a valid City License.



**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

1 - 9

Peck-Jones Construction's America Technologies, Inc.
BHA # 08-3412

r) Preparing the check by entering all relevant information into the computer program.

s) Running the bulk check run.

t) Preparing each check for signatures, (most firms require two signatures to prevent fraud), by attaching each check to the back-up documents needed for the check signers to review, approve and execute each check and accompanying invoice.

u) Preparing each check for mailing.

Due to the liability general contractors are exposed to, each of the above tasks should be completed for every subcontractors invoice prior to payment. Very often the invoice information provided by the subcontractor is incorrect or incomplete. The general contractor's accounts payable clerk must contact the subcontractor's accounting department and work out any problems. It is often necessary to return the invoice to the subcontractor for resubmission or request replacement or additional documentation. As a result of these complexities, the need to complete or repair defective work etc., extended payment processing time is very common in the construction industry routinely extending up to 120 days.

Many reasonable justifications effectively staying the statutory time frame requirements can be suggested as to why Peck-Jones did not immediately pay ATI after receiving funding from the Owner including: waiting for incomplete or inadequate work to be completed or corrected, obtaining field and management approvals, waiting for proper releases from ATI or their suppliers, waiting for insurance verification etc. While the facts neither support nor refute the incidence of these or other issues, payments to subcontractors are routinely deferred for these and other legitimate purposes.

In section 5 paragraph 4, DACM refers again to the AGC pamphlet "Guidelines for a Successful Construction Project". The AGC pamphlet states "general contractors must pay promptly but not later than seven days after receiving payment". DACM assumes that general contractors conscientiously adhere to this period and that seven days is usual for the industry. Thirty years of management experience in the construction industry negotiating and writing contract specifications, writing payment terms, approving, signing, receiving, and waiting for checks to arrive from Owners and general contractors has convinced me that industry time frames are much broader than the AGC pamphlet suggests and the DACM report advocates.

Anyone can enter the query "contractors slow pay" in the Google search engine to find thousands of results dealing with the issue. Entering the specific question "How long does it take for a general contractor to pay a subcontractor" in the Google search engine provides over 1000 results. The very first result is from Wiki.answers.com that asserts, "Each contractor is different, some will only pay after the job is final and others will pay as phases of the job are finished; some pay within 30 days (which is rare) and some take as long as 90-120 days..." **[Exhibit 14]**.

If subcontractors have heard the excuse from general contractors: "We can't pay you because we haven't been paid yet" once, they have heard it 1,000 times. Even after receiving payment, general contractors typically take from 30 to 60 days to obtain correct invoices, receive corresponding lien releases, verify insurance coverage, cut and distribute checks. In the case at hand, the Owner's payments to Peck-Jones were deposited in Peck-Jones's bank on August 6th and 11th 2004. Peck-Jones cut checks the following month. The last check released by Peck-Jones to ATI was dated September 21st, or 41 days following the date that Peck-Jones deposited their payments from the Owner. Forty one days falls well within the standard time frame in the construction industry and well within the expectations of general contractors and their subcontractors.

Builder and author of numerous construction industry books, Carl Heldmann comments on his website, "Subcontractors are used to abuse from professional General Contractors. Contractors never pay their subs on time, and always try to pay them less than the subcontractor wants." (www.byoh.com/carpentry.htm)



Bert L. Howe & Associates, Inc.

**Construction Consultants**

1 - 10

6.  **Project Specific Contract Requirements** and

7.  **Basis of Opinions**

DACM's report Sections 6 and 7 and the final paragraphs of Section 5 are essentially based on the same arguments, in the interest of brevity we considered them together.

The contract documents and the combination of codes, statutes and dictionary definitions referenced by DACM in these sections may correctly quote the contract provisions, the codes and the lexicon of terms. However, when considered in light of industry practices, standards and the actual expectations of the contracting parties, they fail to support the DACM opinion regarding Peck-Jones's actions.

The Peck-Jones/ATI subcontract agreement payment terms specifically require that ATI should be paid within 30 days of Peck-Jones receiving payment from the owner. DACM asserts a shorter period can be inferred by applying the terms of the general conditions of the Owner/Peck-Jones contract. Peck-Jones/ATI paid particular attention to the payment terms of their subcontract initialing the specifics agreed to on page 3 of the general terms. **[Exhibit 15]**. We submit that based upon their mutual acknowledgements, a meeting of the minds is self evident and the 30 day payment terms prevail. According to Alan Cade, DACM's Vice President and Lead Expert's deposition regarding payment lapse duration, "any duration that exceeds the specific contractually provided-for duration under a given contract would be outside the ordinary course of business," (pg. 13). He further declares on page 14 that 95% of payments from contractors to subcontractors are paid per the contract terms. His opinion is contrary to that of his own expert Ron Roberts, contrary to our experience as both a general contractor and subcontractor, contrary to the payment history between Peck-Jones and ATI and contrary to the ASA survey of 1000 subcontractors.

Each of the payment terms regarding payment timing referenced by DACM are pre-printed boiler plate clauses included routinely in most contract/subcontract agreements. Rarely are boiler plate payment time frames strictly relied upon or enforced by contractors or subcontractors. No written demands based on the contract terms, no threats of work stoppage or mechanics liens from ATI were located for the subject payments. The absence of written demands or threats from ATI to Peck-Jones over the course of the job demanding payment infers ATI considered the timing of the payments reasonable and within industry standards. DACM in their Response to Reoprt of Bert L. Howe Associates dated May 5th, 2008 on page 12 stated; "DACM knows of no professionally managed and prudent subcontractor that would wait 120 days (approximately 4 months from issuance of an invoice – for work previously completed) prior to commencing some form of collection activity. In fact, ATI satisfies all of the above criteria and waited as long in the case at hand!

Based on their experience in the industry, contractors know the stated payment terms may not be followed for every/any payment. No payment was ever made within the contractually prescribed time frame from either the Owner to Peck-Jones or from Peck-Jones to ATI. Not to suggest that contractors are casual about being paid, they are not. They are realistic calculating and patient. General contractors understand owners are often slow. Subcontractors understand that general contractors are also often slow and must be paid before they can be paid.

The correspondence below is a follow-up inquiry to the question posed to Ron Roberts (quoted by DACM in their report) and in section 5 above. We e-mailed Mr. Roberts, asking his opinion regarding payments to subcontractors from general contractors with respect to the timing of payments from owners **[Exhibit 9].**

**Bert L. Howe & Associates, Inc.**

**Construction Consultants**

My question:

> "Sorry but I have a follow-up question: There are many statutes that require general contractors to pay their subcontractors regardless of whether they (the general contractor) have received payment from the owner. In light of these statutes, in the ordinary course of business, do commercial general contractors pay their subcontractors progress payments before receiving payment from the owner or do they wait to pay their subcontractors until after they have received payment from the owner?"

Response from Ron Roberts:

> "Commercial general contractors pay AFTER they've been paid."

Regardless of what the contract provisions, statutes and or codes say, general contractors pay their subcontractors after they have been paid. Simply put, general contractors cannot pay their subcontractors if they do not have the money. General contractors do not have the cash on hand to distribute what could easily range from hundreds of thousands to millions of dollars per payment period. That burden is spread out to and over the subcontractors. They considered it in their proposals and bid accordingly. If the owner doesn't pay the general contractor a lawsuit may ensue, the contract terms are relied on and the statutes are applied. Business is conducted this way on every project, public and private with few if any exceptions.

While payment terms are often relaxed, there are other boiler plate terms which are routinely ignored. Consider the boiler plate clause found in virtually every subcontract agreement requiring all change orders to be written and signed prior to the subcontractor performing extra work. Nearly every general contractor and subcontractor repeatedly violates this provision because of the ordinary custom and practice in the industry to do so. Subcontractors will perform work immediately when circumstances require relying on the verbal authorization and assurance that a change order will be issued. This practice violates the very strong contractual language not to work without written authorization. This further supports the premise that actual business practices craft the prevailing business terms, reveal the meeting of the minds, and clarify the ordinary course of business between contractors.

We agree with DACM's findings relative to the approximate passage of time outlined in Section 7 regarding invoicing and payment. However, the time frames are also consistent with the arguments presented above and in our initial report. We believe the facts clearly demonstrate the payment timing in question to be within the industry terms for payments and within the ordinary course of business for general contractors.

## 8. Summary of Opinions

DACM states their opinion of the case in this section referencing alleged "project disruptions" that occurred after June 2004 as a basis for their opinion. We were unable to locate specific references to the post June project disruptions in the body of the DACM report.

As discussed above, the ordinary course of business and the business terms prevailing in the industry must be defined in light of actual business practices not dictionary definitions. What must also be considered is the added impact of the financial stress Peck-Jones was experiencing at the time. Postponing payment to vendors would ordinarily be expected in any business experiencing financial hardship. Peck-Jones's financial distress is supported by Peck-Jones's consequent bankruptcy.

DACM stated they could not identify the reasons that Peck-Jones issued multiple checks to ATI. Issuing multiple checks can readily be connected to poor cash flow. DACM on page 13 of their report quoted from the deposition of Peck-Jones's CFO Gary Melnik regarding the decisions of Alan Friedberg of Peck-Jones. Melnik said, Friedberg "would decide what to pay and who to pay on the basis of the subcontractor submitting the necessary paperwork including all the releases,

Bert L. Howe & Associates, Inc.

Construction Consultants

1-12

and if the company had the financial resources". In light of this, the actions of Peck-Jones in August and September of 2004 make perfect sense. Based upon Melnik's depiction of Friedberg's actions, clearly the ordinary course of business was being followed. Peck-Jones acted in the ordinary course of business for a general contractor especially for one experiencing financial hardship. They paid the invoices they could based on the funds available.

## 9. Analysis of Opinions

DACM restates their opinion of the case in this section; draws attention to the payment dates and times and reasserts their reliance upon the abnormal contracting issues of retention, starting without a contract and invoice full payment as the basis for their conclusions. We addressed each of these specific issues earlier in this rebuttal report. DACM provides no added analysis of their opinion in this section upon which we can provide further commentary.

In preparing this rebuttal, I have relied upon: My experience in the industry as a general contractor and subcontractor as outlined in my CV, my initial Opinion/Report dated February 14th, 2008 **[Exhibit 1]**, the DACM report dated March 27th, 2008 attached **[Exhibit 2]** and the following list of documents:

- Peck Jones Payment Applications
- Checks from Peck-Jones to ATI
- Checks from Owner to Peck- Jones
- ATI Invoices
- ATI Invoice Summaries
- Releases
- Contract Agreements
- Peck-Jones/ATI Subcontract Agreement
- Change Orders
- Pleadings
- Reports
- Correspondence
- Deposition of Alan Cade
- DACM Expert Reports
- 9th Circuit Court Case Opinion (504 F.3d 775)

The information contained in this rebuttal report was prepared without bias and is based on my best knowledge and belief at the time of writing. I am prepared and willing to testify at deposition or trial when called upon.

Within the last four years I have testified as an expert witness on three occasions in deposition and twice in arbitration.

Thank you for the opportunity to be of service.

_____                                    May 28, 2008

John D. Tolman
Senior Consultant
Bert L. Howe Associates Inc.
5415 E. La Palma Ave.
Anaheim Hills, CA 92807
714-701-9180

1-14

Exhibits:

1. Bert L. Howe & Associates, Inc. Report dated February 14th, 2008
2. DACM Report dated March 27th, 2008
3. Bert L. Howe & Associates Inc. Invoice and Payment Analysis
4. ASA survey results
5. Letter from Peck-Jones to ATI dated March 8th, 2008
6. AGC Publication Guidelines for a Successful Construction Project
7. ASA News Release
8. Peck-Jones/ATI Maintenance Agreement
9. Ron Roberts e-mail
10. Inspector General Memo regarding LAUSD
11. LAUSD ERP Project "Vision Statement"
12. LAUSD Vendor Guide
13. LAUSD Did You Know pamphlet
14. Wiki-answers quote
15. Subcontract agreement payment terms

Attachments:

- John Tolman CV

1- 15

# EXPERT OPINION/REPORT

In re: R. Todd Nielson Trustee vs. American Technologies Inc.# LA 04-35757

Prepared for:

Donald E. Leonhardt of
Jackson, DeMarco, Tidus, Petersen, Peckenpaugh
2030 Main Street, Suite 1200
Irvine, CA 92614
February 14, 2008

Prepared by:
Bert L. Howe & Associates, Inc.
5415 E. La Palma Ave. Anaheim, CA 92807 714-701-9180

1 - 16

February 14, 2008

Donald E. Leonhardt
Jackson, DeMarco, Tidus, Petersen, Peckenpaugh
2030 Main Street, Suite 1200
Irvine, CA 92614

## EXPERT OPINION/REPORT

In re: case of R. Todd Nielson Trustee vs. American Technologies
Inc.# LA 04-35757

### PRÉCIS

Bert L. Howe Associates Inc. was retained by the firm of Jackson,
DeMarco, Tidus, Petersen and Peckenpaugh to provide an expert
opinion for the above case. Specifically we were requested to provide
our opinion as to the standard custom and practice of general
contractors in the construction industry relative to the time lapse in
days between the date a subcontractor presents an invoice to a general
contractor for payment and the date the payment is released by the
general contractor.   We were also requested to offer an opinion
whether specific payments from Peck and Jones Construction to
American Technologies Inc., in September of 2004 fell within the
standard time period customary for the construction industry.   While
we reviewed case documents including: the complaint, invoices,
checks etc., this report reflects our opinion as to the standard custom
and practice of general contractor's in the construction industry during
the normal course and scope of their business operations and as those
standard customs and practices relate to those procedures utilized by
the parties related to the case.

2

1 - 17

The facts assumed in formulating this opinion/report include:

a) Standard payment protocol typical for general contractors and the construction industry performed during the normal course and scope of business.

b) Commercial construction operations within the state of California performed within the past ten years.

c) The general contractor and subcontractor are bound under the terms of a valid written subcontract agreement.

## OPINION

It is the standard custom and practice for general contractors in the construction industry to release the majority of their payments to subcontractors up to 120 days following the receipt of invoices from their subcontractors. In the subject case, Peck and Jones released payment to their subcontractor American Technologies Inc. an average of 109 days following the invoice submittal date and no invoice exceeds 120 days. For the invoices and payments in question (table 1) it can be confidently asserted that Peck and Jones released these specific payments well within the standard custom and practice of business operations for general contractors in the construction industry.

Table 1.

| Invoice Date | Invoice # | Date of Payment | Days between invoice and payment |
|---|---|---|---|
| 5/31/04 | 4336533525-07,-08 | 9/10/04 | 102 |
| 5/31/04 | 4336533525 | 9/16/04 | 108 |
| 5/31/04 | 4336533525 | 9/21/04 | 113 |
| 5/31/04 | 4336533525 | 9/21/04 | 113 |

3

1-18

## BACKGROUND

The fundamental contractual relationship between general contractors and subcontractors centers around worthy performance and timely payment. Subcontractors appreciate that contractors require a readily completed high-quality product. Contractors recognize subcontractors want/need to be paid promptly following their performance. Notwithstanding, traditional thinking would suggest that general contractors and subcontractors toil together in an adversarial relationship, subcontractors performing slowly and poorly, general contractors intentionally paying slowly and that "slow-pay" is customary in the construction business. This viewpoint however is transitioning to a perspective of cooperation and team effort.   The dominant industry trend is for subcontractors and general contractors is to view one another as trade partners, understanding each other's business and working together for a common goal. Notwithstanding, payments to subcontractors from general contractors is typically delayed well beyond the terms of their subcontract agreement.

Most construction subcontract agreements provide that the general contractor will pay their subcontractors within 30 days of the subcontractor performing the contractually prescribed tasks and presenting an invoice. As a rule, general contractors process invoices received from subcontractors and prepare checks on a monthly basis with established cut-off dates for invoice submission. If a subcontractor overlooks an invoice submittal deadline, or an invoice is deemed to be incorrect or incomplete, the subcontractor's invoice will not be processed until the following month, or alternatively until corrected.

Subcontract agreements typically contain detail rich, complex and often misunderstood payment procedures. Payment terms also set forth in the subcontract agreement are often disregarded in favor of the construction lender's payment release protocol. Supplementary documentation including: payroll certifications, payment vouchers, specialized payment request forms, joint checks requests, mechanic's lien releases, proof of adequate and correct insurance certifications, business license requirements etc. must be submitted prior to or included with every subcontractor's invoice. Each of these issues or requirements possesses their own sub-set of intricate nuances and taken together combine to frustrate the payment process designating even the most conscientious well intending general contractor as a slow-payer. Even when careful scrutiny and diligence unite and satisfy

4

1 - 19

each of the above payment issues and pre-requisites, if a general contractor has not received payment from the project owner, the payments to the subcontractors could/would be delayed.

Changing economic conditions have a limited impact on a general contractor's capacity to timely process subcontractor's invoices. During busy or lean times, general contractors adjust staff appropriately limiting the impact of the added or reduced overall quantity of projects. However, the overall financial health of a general contractor will significantly influence the slow-pay or no-pay of their subcontractors. Clearly, if a general contractor is experiencing a cash flow crisis and requires the use of the subcontractor's funds to keep the lights on, all bets are off and the length of payment delay will depend on the subcontractor's resolve to receive payment.

Legitimate and lengthy payment delays may of course result from disputes over the subcontractor's work, the presence of unresolved mechanic's liens, stop notices etc. However, absent acknowledged justification, after 120 days payment delay, subcontractors typically begin threatening to pull off the job, commence a legal action, record mechanic's liens etc. attempting to coerce the general contractor to release payment. If the project is nearing completion, subcontractors are less understanding of payment delays and will typically act sooner to record liens and file suit in order to preserve their mechanics lien rights.

General contractors realize that without reasonable cause for delaying payments to subcontractors, they also risk engendering the ill will and the subsequent loss of trust by the project's owner and lender. That trust is highly valued by general contractors without which receiving their payments from the owner would become more difficult and highly scrutinized, circumstances general contractors not surprisingly want to avoid at all costs.

Excessive payment delay results in diminished commitments of resources from subcontractors and inflated pricing on change orders. Additionally excessive payment delays subject the project to the perils associated with mechanic's liens and the commencement of legal actions often initiating a projects irreversible downward spiral. Lengthy and/or unjustified payment delays damage the working relationships between the general contractor and their subcontractors, the architect and the owner/developer. These

( - 20

relationships are the lifeblood of successful construction firms for obtaining and performing work and are carefully preserved by all successful general contractors.

## BASIS OF OPINION

In preparing this opinion, I relied on my personal experience working in the construction industry as summarized in my CV attached and made part of this opinion/report. In providing my opinion, I drew heavily on my experience with K. Hovnanian as Area President and VP of Operations. In each position at K. Hovnanian, I regularly approved invoices and resolved issues between K. Hovnanian and its trade partners (subcontractors) regarding payment and scope of work issues. Specifically helpful however in preparing



# Preliminary Report of
# DACM Project Management

# In Re:
# R. Todd Neilson, Trustee vs. American Technologies, Inc.
# (Adversary Proceeding)

Date: March 27, 2008

DACM Project Management
Preliminary Expert Report of Opinion
Pertaining To Preference Payments by Peck / Jones Construction Corporation
To American Technologies, Inc.
For St. John's Regional Medical Center Project

## 1. Scope of Analysis

DACM Project Management (DACM) was retained by Danning, Gill, Diamond

above, this Subcontract was not administered, and the payments in question
were not made, within the ordinary course of business.

Attachment  2 –  Invoices from American Technologies, Inc. to Peck / Jones
                 Construction Corporation

Attachment  3 –  Amounts include d by Peck / Jones Construction
                 Corporation relative to American Technologies, Inc. in Pay
                 Applications to St. John's Regional Medical Center

                 by St. John's Regional Medical Center to

The foregoing report "In Re: R. Todd Neilson, Trustee vs. American
~~~~ " dated March 27, 2008 pertaining to the Bankruptcy of

Executive Vice President

# ATTACHMENT 1

Typical Subcontractor Payment Processing Activities and Process

acceptable,
General Contractor prepares Pay Application and Conditional Release
General Contractor submits Pay Application and Conditional Release to
      Architect / Owners' Representative
Architect / Owners' Representative reviews General Contractor Pay

American Technologies, Inc.



INLAND EMPIRE
720 Carnegie Dr.
San Bernardino, CA 92408
(909) 890-5530
(909) 890-5550-Fax

May 18, 2004

| | | |
|---|---|---|
| 1. | Labor | $ 62,040.25 |
| 2. | Per Diem | $ 5,712.00 |
| | **GRAND TOTAL** | **$ 67,752.25** |

VENDOR NUMBER: _____
INVOICE NUMBER: _____

Exhibit 2

**American Technologies, Inc.**

## DESCRIPTION

Microbial Remediation
* Destructive Testing - April 20th though April 30th of 2004          $62,040.25
                                                                       $5,712.00
* Labor
* Per Diem


Amount Billed        $67,752.25

Retainage Held

Net Due:             $67,752.25

All amounts are subject to a liquidated damages/service charge

