activities, and represent the plan with a diagram or chart.

- Particular attention needs to be given to timely receipt and approval of shop drawings, submittal data and procurement times.

- Determine duration, start and completion time for each activity.

- Determine early/late starts – including the possibility of "float."

- Seek input for alternate sequencing in case problems arise.

- Consider alternate resources for labor and equipment, and the adjusted costs for each activity (resource loading).

## Communicate the sequenced project schedule

- Distribute the sequenced project schedule to all project participants and identify critical path items.

- Confirm all participants' understanding of the sequenced project schedule and obtain each party's agreement to accept the agreed-upon schedule.

- Monitor the progress of the job and compare with the target schedule, and take corrective action if required.

## Summary

All parties will clearly benefit from the development and implementation of sequenced schedules. Schedule development will help guide the contractor through the sequencing process, force the identification of what activities must be accomplished and identify who is responsible for each phase of the project and its schedule. Conflicts or problems can be discovered before they occur, enabling the contractor to avoid them or prepare alternate solutions.

Remember that success will only be achieved if ALL parties are committed to the creation of a properly sequenced project schedule. Participation in the development of the sequenced schedule and its implementation are imperative for a successful project. In view of increased owner awareness and enforcement of liquidated damages, proper project scheduling and avoidance of delays are critically important.

For more information on scheduling, see *A.1 Guideline on General Contractor-Subcontractor Relations, B.2 Guideline on Project Scheduling, Delays and Liquidated Damages,* and *C.1 Guideline on Preconstruction Projects.*

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

27

1-180

# C.4
# Guideline on Site Logistics

## Overview

Providing the necessary facilities and services to support successful project delivery is sometimes overlooked or put low on the priority list when bidding or setting up a project.

This section provides a simple checklist for analyzing, developing, implementing, and maintaining a comprehensive Site Logistics plan. It is also suggested that the following "service obligations" serve as a guide for use by contractors and subcontractors in discussing job site conditions relative to safety, temporary job utilities and temporary services. Such discussions may help eliminate misunderstandings and promote cooperation among the members of the construction team. When adequate identification of temporary services is provided and logical assignments of responsibilities are made, the costs of such services may be adequately covered in contract arrangements. **This guideline is a comprehensive outline of key issues to be considered and should be adapted to local conditions, preferably by local industry liaison committees of contractors and subcontractors.**

Achievement of these desirable relationships can be initiated by segregating requirements for each type of temporary service in a manner which is consistent with the organization of the contract documents, the scope of the work of contracting parties who would ordinarily establish and maintain the services, and any jurisdictional divisions of work that may exist. The following general guidelines are suggested:

1. Each employer whether it be general contractor, prime contractor or subcontractor shall be separately responsible for all specific safety requirements promulgated by any governmental authority, including without limitation, the requirements of the Occupational Safety and Health Act of 1970, as amended ("OSHA"), and all standards and regulations which have been or shall be promulgated by parties or agencies which administer the Act. With respect to the requirements of OSHA, each contractor and subcontractor is responsible for the acts of its employees and for appropriate recordkeeping and reporting.

2. Specific timing for the availability of each temporary facility should be established during the preconstruc-

tion conference *(see C.1. Preconstruction Conferences)*. Before the established times, each contractor or subcontractor should satisfy its own requirements for such services.

3. The contract documents prepared by the architect and engineer should clearly indicate the location of existing on-site and off-site utilities, and, where applicable, the quantity and conditions of use with respect to the specific type of temporary services and temporary facilities.

## Analysis/Scope/Plan Development

Understand requirements applying to your work by reviewing:

- Your contractual responsibilities

- Responsibilities of the owner, CM/GC, GC or other participants

When determining the responsible party, the appropriate specification section can be utilized and modified to fit project specific requirements. After determining your contractual responsibilities, a plan can be developed by using the guideline below supplemented by project specific requirements, including who is to pay the temporary services costs.

### 1. Access

The general contractor should provide an adequate access and/or roads to the site of the structure if required. The general contractor should maintain onsite road conditions to allow for easy access around the project and for a minimization of debris being tracked into the buildings or carried offsite by traffic. The general contractor should also provide and maintain at least one temporary or permanent access to each working elevation which is to be permanently occupied.

a. Familiarize yourself with the area surrounding the project (including visiting the project site if possible).

b. From what direction will most construction traffic come?

c. How will nearby businesses, schools, or other facilities be impacted?

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 -187

## C.4 Guideline on Site Logistics

d. Are there any overhead utilities that will impede deliveries or cranes?

e. What type of onsite traffic flow is optimal to support your plans for the project?

f. How many access points are needed and develop the traffic flow on and off the site?

g. Is a truck wheel wash or other method required to clean vehicles tires prior to leaving the project site?

h. How will access be provided to each level of any structures?

i. Review your plan with the appropriate project organizations and with local officials as required.

### 2. Hoisting Facilities

The general contractor and individual subcontractors should be responsible for providing hoisting of their own materials on construction of (fill-in based on grade state or local practice) floors or less above. A tower hoist or other hoisting facility of suitable capacity to carry all normal items of material should be provided on a **pre-agreed basis** to subcontractors by the general contractor on construction more of than (fill-in) floors. Subcontractors should conform to a mutually agreeable schedule during normal working hours. Hoisting facilities should be maintained until the bulk of all materials are stored in the building. When materials exceed the capacity of normal hoisting facilities in either size or weight, or demand excessive time, the individual subcontractor should be required to make its own arrangements. When the magnitude of the work force and the height of the work requires, a suitable personnel elevator or man lift should also be provided by the general contractor.

OSHA compliance for all hoists, conveyors, and elevators on the job site is the responsibility of the installing contractor. Maintenance of the facilities in compliance with the law is the responsibility of the contractor or subcontractors operating the equipment.

### 3. Guardrails, floor and wall openings and stairways

The general contractor should provide guardrails, handrails and covers for floor, roof and wall openings and perimeters, and stairways installed and/or constructed by its own forces. If movement of these protective facilities is required for the subcontractor to perform its work, it should be the responsibility of that subcontractor to give

prior notification to the general contractor and to replace same in satisfactory manner.

### 4. Security

a. Does the project require security fencing?

b. Will you be interfacing with or subject to existing client security plans? If so, familiarize yourself with the requirements and determine any impact to your personnel and plan.

c. Does the project require off-hours security patrols and/or staffed gates?

d. Locate adequate gates to support traffic flow.

e. Determine who will be responsible to open and close gates to support work hours.

f. Will the security plan require modification throughout the project to support different phase requirements?

### 5. Parking

a. Where will onsite management, workers, visitors, inspectors, client representatives, and others park?

b. If space is limited, investigate options for offsite parking and logistics for getting workers to and from the site. Review local labor requirements for terms related to offsite parking and travel time for additional cost impacts.

### 6. Safety Orientation/Training

a. Determine what type of safety training will be required *(See D.1.a. Guideline on Project Health and Safety)*.

b. Determine who will provide the training:

i. CM/GC or GC.

ii. Your company or outside resources.

iii. Client (for interfacing with their facilities/operations).

### 7. Trailers/Shantys

a. What are the space needs for your staff and subcontractors?

b. Determine a location for your trailers/shantys (Can you use existing ones or other existing structures instead?)

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 - 182

## C.4 Guideline on Site Logistics

c. Locate utility connection points. *(See Section 9 below)*

### 8. Break/Lunch Facilities

a. What are the local requirements for break/lunch facilities?

b. Determine peak headcount for your employees.

c. Determine your space requirements (25sf/person average)

d. Where can you locate or can you use existing facilities or the work area?

### 9. Toilets/Wash Facilities

The general contractor should be responsible for furnishing adequate temporary toilet and wash-up facilities on the job site.

a. What are the local requirements for facilities?

b. If flush toilets and running water are required, locate facilities to minimize utility runs.

c. Provide separate facilities for men and women as needed.

### 10. Storage Facilities

The general contractor should coordinate the allocation of storage areas to the various subcontractors.

a. Determine lay-down, storage, staging requirements

b. Will there be any onsite storage available other than inside the work area?

c. Establish maximum loading restrictions, if appropriate.

### 11. Temporary Utilities

a. **Drinking water:** Potable drinking water on the job site should be provided free of charge to subcontractors, in convenient and accessible locations, by the general contractor, so long as the general contractor has personnel on the job requiring drinking water.

b. **Sewer:** The General Contactor should extend and connect sewer service to support construction toilets as required.

c. **Water service:** The General Contractor (through the plumbing contractor) should furnish a temporary water supply at each floor of a building, and at other access points if indicated by the architect/engineer in the specifications, which should also indicate the size, quantity and pressure at the water outlets. In any case, the plumbing contractor should provide at minimum a _____-inch hose bibb supply (state/local practice). During the course of construction the water bill should be paid by the general contractor. Any contractor or subcontractor whose water requirements are in excess of those specified should be responsible for their facility.

d. **Electrical service:** The general contractor (through the electrical contractor) should furnish and maintain temporary electrical service for both power and lighting, if indicated by the architect/engineer in the specifications, which should also indicate the type, quantity, wattage, amperage and voltage characteristics of temporary lighting, power circuits and outlets. But in any case the electrical contractor should provide at a minimum, _____ amperage (state/local practice), _____ voltage (state/local practice), _____ phase electrical receptacles (state/local practice) at each floor of each building so that any point on each floor can be reached by a _____-foot extension cord (state/local practice). Energy charges should be paid by the general contractor. Any contractor having requirements for power, lighting or service other than those discussed in this guideline should make the necessary arrangements at its own expense.

e. **Telecommunication Service:** The general contractor should provide for sufficient voice and data phone lines to support the anticipated needs of the general contractor and onsite subcontractor offices. A convenient connection terminal should be provided by the general contractor to minimize installation costs. Each subcontractor should be responsible for placing orders and paying for their phone charges.

### 12. Temporary Lighting

During construction, the general contractor should provide temporary lighting (via the electrical contractor) as follows:

a. **Exterior:** Provides security lighting and general lighting in trailer, parking, lay down, traffic, and other exterior areas to support project work hours.

b. **Interior:** Meets the OSHA minimum requirements for general access lighting. Subcontractors should be responsible for task specific lighting needs.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 – 183

## C.4 Guideline on Site Logistics

**13. Weather Protection and temporary heat/ventilation**

During construction, weather protection and heating/ventilation may be required for protection of workers and protection of construction:

   a. Before permanent enclosure of the building;

   b. After enclosure but before finishing operations; and

   c. During finishing operations.

Local agreements prior to bidding for use in the contract documents should establish the type, duration and level of requirements for heating/ventilating and weather protection.

Generally, the general contractor should be responsible for providing general weather protection. The heating/ventilating contractor should be responsible for providing heating/ventilating of workers and construction after permanent enclosures have been installed and the permanent heating system is sufficiently completed to allow safe operation, as determined by the architect/engineer and/or owner. Subcontractors having specific or unusual HVAC requirements should be responsible for their own requirements.

Because of the many variable climatic conditions which occur throughout the United States, no guidelines are suggested regarding the specifics of weather protection and heating/ventilation requirements. However, such specifications for local use may be prepared in such a manner that the heating and/or ventilation contractor should be required to furnish temporary connection to the permanent heating or ventilation system and the removal of the same. (This also should include placing the system back in first class condition before turning the system over to the owner.) Also, in order that an allowance can be established in the contract price, the architect/engineer should incorporate in the specifications a lump sum dollar amount or a total number of hours that the HVAC contractor should include in its bid for the cost of temporary heat and/or temporary ventilating labor. The HVAC contractor also should state the hourly rates for furnishing labor for temporary heat, in order that a cost adjustment may be made against the stated allowance. The cost of all fuel, water, electricity and other consumable products should be paid by the owner.

**14. Trash/Recycling:**

The general contractor should be responsible for providing trash receptacles on each floor of the building. Each contractor or subcontractor should be responsible for collecting and depositing its debris in such collection facilities. The general contractor should be responsible for the removal of all debris from the jobsite. Trash and debris should not be allowed to accumulate.

   a. What are the contract requirements for trash and recycling?

   b. Depending on local availability, incorporate recycling into your trash plan including separate receptacles for:

      • Wood

      • Cardboard

      • Metal

      • Drywall

      • Others

**15.   Fire Protection**

The general contractor should provide the general temporary fire protection requirements. Subcontractors should be responsible for their own specialty requirements. Permanent fire protection equipment used for fire protection during construction should be the responsibility of the installing contractor.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 -184

# D.1.a
# Guideline on Project Safety and Health

## Safety must be the number one concern in the construction industry!

The construction industry, by its inherent nature, is susceptible to potentially dangerous conditions that affect the safety of all personnel working on construction projects. As a result, it is imperative in all planning, design, bidding, and implementation that safety be the one constant built into each project.

The Associated General Contractors of America (AGC), the American Subcontractors Association (ASA), and the Associated Specialty Contractors (ASC) are committed to maintaining a safe, healthful industry and to protecting the public against any potential hazards caused by construction operations. Every member of the construction team is responsible for safety and should be held accountable for ensuring a safe and healthful worksite.

## Developing a Project Culture that supports worker safety

The foundation to executing a safe project is the early establishment and nurturing of a project culture that is based on the values of good working relationships and candid communication. Without these values, the probability of a safe project is likely to decrease.

The development of the project team's approach to safety is intertwined with the overall approach developed by the general contractor in partnership with the owner and architect and in consultation with major subcontractors. Safety should be an integral part of any Partnering *(see C.2. Partnering)* or Pre-construction Meetings *(see C.1. Pre-construction Conferences)*.

The General Contractor holds the key role in developing coordination and communication methods that will allow for the planning and execution of the work safely *(see D.2.a. Communication)*. These communication channels should allow for:

- Early analysis of the project scope to identify key risk areas;
- Clear communication of the project safety approach, programs, roles and responsibilities;

- Early involvement of key subcontractors;
- Candid dialogue between the General Contractor, Subcontractors, and Craft workers without fear of retribution.

## All parties involved must be totally committed to safety

Each contractor and subcontractor must make a commitment to support the development of the project safety culture. This commitment includes:

- Training their employees to work in a safe and respectful manner.

- Developing a written safety policy that spells out its commitment to run each project in a safe manner. That policy should emphasize the firm's pledge to comply with all federal and state safety laws and regulations.

- Informing employees of employment requirements for safety, and advising them that they will be held accountable for their own actions on the job site.

- Making available to all jobsite personnel a list of all available safety equipment, jobsite safety requirements and prohibited unsafe work habits.

- Enforcement by subcontractors of safety their responsibilities and penalties.

Every member of the construction team, including the project owner, design team, general contractor, and subcontractors, must appreciate the value of a good safety program.

AGC, ASA and ASC each have produced comprehensive safety materials for the use of employers and employees in the construction industry, as have many other trade and professional organizations associated with the construction industry. For more information on safety, contact your sponsoring association.

1 - 185

# D.1.b
# Guideline on Unforseen Environmental Problems in Construction

## Impact of Unforeseen Environmental Problems

1. Few changed conditions can adversely affect a construction project more than the discovery of environmental hazards. Whether the problem is hazardous waste that was not discovered or anticipated by the Owner, or some other environmental contamination, invariably it will require highly specialized responses that are expensive, time consuming, and sometimes risky. A contractor who did not anticipate the performance of environmental work because it was not specified cannot reasonably be expected to assume the cost or the liability related to handling the unforeseen environmental complication.

2. The discovery of an unforeseen environmental problem also damages the owner or client. Because the cost of the problem will not have been built into the original project budget, dealing with it will mean that the project will likely exceed its anticipated cost. As the problem has been uncovered midway through a project, the pressure to take care of it quickly and remain as close to the schedule as possible will mean less opportunity to get the most competitive price for the environmental work. Environmental problems may also jeopardize project funding by triggering concerns about a lender's liability or affect the availability and cost of insurance.

## Industry Practice and Relevant Authorities

3. Best practices in the industry recognize that the fairest and most cost-effective allocation of this risk and responsibility is for the project owner who did not disclose the conditions to undertake full responsibility for the proper remediation of the condition. Environmental laws and regulations, such as the Resource Conservation and Recovery Act, have made owners responsible for all environmental wastes and byproducts of construction projects as the "generator." This means that owners will always retain the authority and control over how environmental issues are handled.

4. Owner responsibility for remediation is embodied in the recognized industry standard form documents such as the AIA A201 form General Condition of the Contract for Construction (contract between the owner and the general contractor) and the Federal Acquisition Regulation Changed Conditions clause. The relevant passages of these documents are indicated below.

### 4.1. AIA A201 (1997 edition)

#### 4.1.1. Article 10.3.1

"If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to person resulting from a material or substance, including but not limited to, asbestos or polychlorinated biphenyl (PCB) encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the area affected and report the condition to the Owner and Architect in writing."

#### 4.1.2. Article 10.3.2

"... When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay, and start-up..."

#### 4.1.3. Article 10.3.3

"To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents, and employees of any of them from and against claims, damages, losses, and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if, in fact, the material or substance presents the risk of bodily injury or death as described in Subparagraph 10.3.1 and has not been rendered harmless ... and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity."

#### 4.1.4. Article 10.5

"If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remedia-

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 -186

**D.1.b Guideline on Unforseen Environmental Problems in Construction**

tion of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred."

### 4.2. FAR Changed Conditions Clause, 48 CFR § 52.243-5

"(b) The Contractor shall promptly notify the Contracting officer, in writing, of subsurface or latent physical conditions differing materially from those indicated in this contract or unknown unusual physical conditions at the site before proceeding with the work.

"(c) If changes under...paragraph (b) increase or decrease the cost of, or time required for performing the work, the Contracting officer shall make an equitable adjustment...."

## Conclusion

5. The relevant authorities, industry practice and history, and common sense all support owners bearing responsibility for unforeseen environmental conditions discovered on a construction project. A properly drafted contract should reflect the owner's responsibility for such work.

6. Before relying on any language cited above, the contractor should consult an attorney and the full documents from which these passages have been taken.

7. Further information on the subject can be found in AGC #1184, *Construction Contractor's Environmental Risk Management Procedures Manual,* published by the Associated General Contractors of America: **http://www.agc.org/contractdocuments/**

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 - 187

# D.2.a
# Guideline on Communication

A key ingredient in all successful construction projects is clear, efficient and effective communication between all participants. Good communication does not automatically occur on construction projects, but must be nurtured from project inception through close-out.

The owner, general contractor, and designer must set the stage for effective project communication during initial contract negotiations and teamwork discussions. Use of the Partnering process can facilitate the beginnings of good communication *(see C.2 Partnering)*. Effective Pre-Construction Conferences can also be a vehicle to develop communication channels including subcontractors and inspectors *(see C.1. Pre-construction Conferences)*. The use of clear and concise meeting minutes can minimize miscommunication between parties *(See D.2.b. Project Meetings)*.

Basic concepts of coordination and cooperation, as summarized below, can foster continuing effective communication throughout the project.

## Coordination

1. The general contractor should have a competent full-time superintendent on the project backed up by a general superintendent and/or project manager. Each major subcontractor should have a competent foreman on the job backed up by an outside superintendent and/or project manager who is readily available to represent the subcontractor. Each subcontractor employing only one or two workers on the job should have at least a competent crew leader in charge of the work backed up by an outside superintendent and/or project manager who is readily available to represent the subcontractor.

2. Coordination should be assured through regular on-the-job meetings of the general contractor's authorized project representative and the on-site subcontractors' authorized project representatives. Additional meetings may be required for subcontractors whose work might interfere with another at a given time. Minutes of such meetings should be prepared promptly and distributed to all attendees and their home offices.

3. The general contractor and each subcontractor should

organize their own work in such a way as not to deviate from the schedule, interfere, or otherwise adversely affect the work of others. The general contractor should monitor and coordinate the work of all parties to ensure compliance with the project schedule.

4. The general contractor should establish a comprehensive Site Logistics plan to support all phases of the project *(see C.4. Site Logistics)*. This plan should include, for example:

   - Storage areas for all subcontractors at the appropriate time. Such areas should not obstruct the work. Relocating materials is costly and should be avoided. Subcontractors should store material in designated areas only.

   - Adequate personnel lifts, when required, and cranes and hoists at times and places that will minimize waiting time as much as possible, regardless of who is contractually responsible.

   - Adequate lighting, heating, weatherproofing, ventilating, fire protection, and cleanup is provided in a timely manner regardless of who is contractually responsible

5. The general contractor should monitor and expedite the processing of shop drawings, samples and other submittals for approval. This procedure is especially important when change orders are involved.

6. The general contractor and all subcontractors should respect one another's work. When damage or loss does occur, it should be reported immediately to the injured party, appropriate insurance carriers, and the general contractor, and corrected promptly.

## Cooperation

1. The general contractor should make a good faith effort to effectively and equally represent each subcontractor in disputes with the owner or architect and invite the affected subcontractor to attend and participate in any conferences related to the subcontractor's work.

2. The general contractor and subcontractors should negotiate disputes in good faith with the intent of achieving a fair and expeditious agreement. The general contrac-

1 - 188

## D.2.a Guideline on Communication

tor also should make a good faith effort toward resolving disputes between subcontractors on the project. Monetary issues in connection with disputes should be settled as promptly as possible; however, every effort should be made to avoid departing from the schedule or delaying the project *(see D.3.a. Avoidance and Resolution of Construction Disputes)*.

3. A work authorization form should be completed and signed prior to performing any work for another contractor or subcontractor. "Back charges" work should not be performed unless authorized by such a form or a specifically agreed alternative *(see D.3.e. Charges for Non-contracted Construction Services,* and *E.3. Work Authorization Form)*.

4. Each subcontractor should submit progress and final payment applications in accordance with the contract's established procedure *(see E.2. Subcontractor's Application for Payment)*.

5. It is improper to demand releases or waivers of future claims or claims that, although properly made, remain unpaid.

6. Communications between the subcontractor and the architect/engineer or its consultants for the project should go through the general contractor, in the absence of a specific agreement to the contrary. For example, one such agreement may be for the subcontractor to make reasonable requests directly to the architect/engineer, upon the architect engineer/s consent, about action taken on that subcontractor's payment application.

7. On-the-job relationships should be conducted between the general contractor's and subcontractors' authorized project representatives. Conflicts or problems not promptly settled on site should be handled by home office personnel without disruption to the job.

Communication can either bolster the development of a positive project culture, or can lead to its downfall. All project parties must invest time in developing an effective system for communication and then effectively implement the process.

1 -189

# D.2.b
# Guideline on Project Meetings

Regularly scheduled project meetings, when correctly planned and conducted by the controlling/coordinating contractor/owner agent (responsible contractor), will facilitate the orderly and cost-effective construction and completion of a project.

## Meeting Schedule and Participants

Typically, meetings should be held weekly at the same time each week with bi-weekly meetings appropriate on some projects. Each contractor's authorized representatives should attend meetings starting two weeks prior to mobilization and continuing until their work is completed. Attendance should be required and with authorized representatives knowledgeable of the project scope and requirements. In the event a specific contractors' work is intermittent, it may not be necessary to attend meetings when not on site. One meeting per month should include home office management from each contractor and owner's representative.

## Meeting Content and Structure

The responsible contractor should have previously completed project schedule and sequencing (see C.1. Pre-construction Conferences and B.2. Project Scheduling, Delays, and Liquidated Damages). In addition, the responsible contractor should assign a person who has a comprehensive knowledge of overall project requirements. That individual will have the responsibility to:

1. Prepare and distribute a written agenda.

2. Notify all parties expected to attend. Pre-determine order of each contractor's participation and when practical, excuse contractors from the meeting after receiving their input and determining if subsequent agenda items are irrelevant to their operations.

3. Promptly prepare and distribute minutes of each meeting to all contractors (whether in attendance or not), including a specific list of follow up tasks with assigned responsibilities. The task list automatically becomes an item on the agenda for the next project meeting.

4. Prepare, distribute in advance, review and revise a two week "look ahead" schedule and update at each meeting.

5. Keep and distribute in advance of each meeting a "running" log of outstanding items.

6. Start meetings promptly and keep discussion short and "to the point" with an agreed upon time for adjournment.

7. Have current information on changes requested, changes approved, approved drawings and related project updates at each meeting.

## Web Site Projects

On projects where communications and information exchange is in an electronic format, integrate project meeting minutes with follow up lists of assigned responsibilities, sequencing, changes, and other pertinent project information into the web site.

## Summary

Properly planned and conducted "Project Meetings" will result in positive attitudes, committed participants, less "lost motion", better production, on time completion and higher profits.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1–190

# D.3.a
# Guideline on Avoidance and Resolution
# of Construction Disputes

The construction industry is, by nature, a complex one. In the process, inevitable differences arise concerning scope definition, delays, accelerations, obstructions, and changed conditions. All the while, the process of building must go forward with a minimum of disruption.

Resorting to lawsuits can be costly and time consuming, and judges and juries generally lack an understanding of the construction process. The net result is all too often that only lawyers, consultants and expert witnesses benefit from lengthy court actions.

## Disputes avoidance

The Associated General Contractors of America, the American Subcontractors Association, and the Associated Specialty Contractors support programs to minimize disputes through equitable allocation of risks in contracts and fostering cooperation among members of the construction team throughout the building process. Dispute avoidance and resolution may be accomplished through teamwork programs such as the partnering concept that involves post-award, several-day meetings of owner, design professional, construction manager, and major contractor representatives working together to identify potential problems and to develop practical solutions *(see C.2 Partnering)*. The concept also may involve group bonuses payable only if all trades achieve established project goals.

In principle, a vast majority of construction disputes are susceptible to settlement through a give-and-take process by decision-makers of construction team members without resort to formal third party intervention. All parties in construction projects are urged to minimize the role of lawyers, inasmuch as construction problems usually relate to fact and customary industry practice rather than emphasis on legal issues.

Because of the desirability of settling disputes quickly and inexpensively, language calling for the parties to endeavor to settle disputes through direct discussions before considering mediation or arbitration should be included in all contracts.

## Non-binding alternative disputes resolution (ADR) methods

The most frequently used method of non-binding alternative disputes resolution (ADR) is mediation. Mediation consists of one or more impartial parties advising and consulting with those involved in a dispute. The mediator can not impose a settlement, but rather guides the parties toward their own settlement. Mediation is available to the parties by mutual agreement even though a contract may specify arbitration. Language recommending consideration of mediation prior to arbitration, if the parties so agree, is strongly encouraged for inclusion in all contacts.

Another non-binding ADR method available for use is the mini-trial. This process is not a trial in the usual sense of an adversarial judicial proceeding. Instead, it is a relatively structured process whereby management representatives of the parties to a dispute operate within mutually-agreed upon time limits to conduct informal conferences and hold non-binding, confidential discussions. Typically, attorneys prepare positions for the parties. The basic idea is to have the principals of firms see the relative strengths and weaknesses of their cases and to serve as a basis for negotiations between them to resolve the dispute. Disputes resolution and counseling panels are other non-binding ADR services. These panels use members who are ordinarily technical experts, chosen in advance, to address disputes at the times they arise on a project. The aim is to act quickly on moderate size disputes before confrontational attitudes harden. Panel decisions entered as evidence in arbitration or litigation or, by agreement of the parties can be accepted as final and binding.

**Still other ADR techniques are:**

1. Step negotiations involving the passing of disputes to successively higher levels of management until resolved,

2. Referral of technical questions to project architects for initial decisions,

3. Advisory rulings by neutral experts and,

---

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

38

---

## D.3.a Guideline on Avoidance and Resolution of Construction Disputes

4. Fact-based mediation whereby a mediator suggests a settlement amount and then assists in negotiation.

## Arbitration

Unlike most other ADR methods, arbitration is final and binding. Decisions are subject to challenge only on narrow grounds such as prejudice or bad faith. Arbitration is used widely in the construction industry, and the practice is encouraged by provisions in standard documents calling for arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. (see http://www.adr.org)

Arbitration may involve one or three arbitrators jointly chosen by the parties. The process normally is faster and less costly than litigation and has the major advantage of cases being heard by persons experienced in the construction industry. The desirability of using the flexibility of arbitration by tailoring rules to fit specific cases is an advantage to this approach. However, excessive use of legalistic approaches that unnecessarily slow the settlement process and increase costs to the parties is deplorable.

## Conclusion

AGC, ASA and ASC support initial efforts to settle disputes through direct negotiations. If it becomes necessary to use neutral third parties to assist in the resolution process, we encourage consideration first of the use of mediation or other non-binding ADR methods because of speed and cost considerations. Finally, where parties to a dispute want final and binding resolution, the associations support arbitration using qualified, properly trained persons as arbitrators and utilizing expedited procedures to the extent practical.

---

1-192

# D.3.b
# Guideline on Benefits to the Owner of Effective Allocation, Delegation, and Performance of General Conditions Responsibilities

1. As construction processes change to meet the needs of effective construction project delivery, owners must take care to ensure that all necessary functions of the building process, often called general conditions, are performed on a coordinated, interactive basis.

2. In the traditional project delivery system, there is a clear relationship between the general contractor and its subcontractor. Contract documents, prepared by the owner and/or the owner's representative, spell out the obligations for which each is responsible. The general contractor maintains continuous supervision, administration, and control of a project. Communication of the many details and coordination of the various phases is handled by the general contractor as the job progresses. These responsibilities are part of the general conditions of the project, and the general contractor has a contract with the owner to deliver these services. These general conditions include the temporary infrastructure and services which are needed to support successful completion of the project, but are not a part of the completed project.

3. Alternate project delivery systems have evolved in an effort to shorten project delivery times and to gain other efficiencies and savings. Responsibilities are often divided among unrelated parties and management, and control of the overall project, including general conditions, may not be clearly established. A project may have a general contractor and/or construction manager, but they may not be contractually required to perform all of the traditional duties contained in the typical general conditions. The use of such alternate delivery systems can create confusion among the stakeholders on the jobsite and problems for the owner in the form of delays and additional costs.

4. Regardless of the project delivery system used, owners must ensure that a general contractor or appropriate entity responsible to the owner performs and is liable for the completion of general conditions items. The person or entity responsible for delivery or performance of general conditions items should maintain a jobsite presence. These include, but are not limited to:

- Safety  *(see D.1.a. Project Health & Safety)*

- Scheduling/Coordination  *(see B.2 Project Scheduling, Delays and Liquidated Damages)*

- Site Logistics (site access, temporary utilities, storage, etc.)  *(see C.4 Site Logistics)*

- Communication  *(see D.2.a. Communication)*

- Inspection  *(see D.4.b. Project Inspections)*

- Project closeout  *(see D.5.a. Project Closeout)*

5. While each construction project must be defined in contract terms that express the unique characteristics and requirements of the project, maximum efficiency and successful project delivery are achieved when the owner ensures that a responsible party performs the general conditions work. The value to the owner includes timely project completion, reduced costs, delivery of a quality project, and reduced likelihood of claims.

1 - 193

# D.3.c
# Guideline on Consequential Damages

## Overview

1. Growing windfalls and disproportionately large court and arbitrator awards on lost profit and similarly speculative claims have led to major losses by owners and contractors and increased litigation. These claims involve highly subjective, ripple-effect cost impact estimates growing out of project delays and disruptions.

2. Individual consequential damage awards may far exceed the total value of a contract or subcontract. They are neither insurable nor subject to being recouped through pricing in today's highly competitive construction marketplace. Besides legal and award costs, valuable time is often required of key employees to defend claims. Finally, delays and their resulting costs generally involve complex circumstances where fault is shared by numerous parties. The end result has been uncertainty and a misallocation of risk to those lacking adequate control.

## Contract Language

3. All parties in the construction process are best served through clear contractual understandings that achieve certainty and restrict recovery of claimed damages to amounts, if any, specifically agreed upon by the parties. Accordingly, relevant text should be included on mutual consequential damage waiver language in construction agreements. Both AGC 200 and AIA A201 contain language that accomplishes this goal. Section 4.3.10 of The American Institute of Architects document A201, *General Conditions of the Contract for Construction* (1997 Edition) reads as follows:

   The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

   .1 damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons, and

   .2 damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

4. Owners benefit from the mutual waiver of consequential damages by avoiding potential claims for contractors' and subcontractors' extended home office overhead. These costs are extremely complex and owners and contractors have had to devote significant resources to deal with these claims.[1]

5. Specific waiver language is necessary on each job to avoid liability for consequential damages. Contracts and subcontracts that are silent on the subject offer no protection against all sorts of indirect cost claims for alleged damages or performance deficiencies.

6. Construction projects are frequently based on aggressive target completion dates that make no allowance for delays due to weather, late infrastructure work, labor shortages, changes to plans, and coordination problems. Owners who place reliance on these aggressive target dates in obtaining financial commitments and leasing the premises should be prepared to accept the associated risks.

7. Consequential damages may arise from performance as well as delays. For example, an owner may contend that office-building leasing was slower than anticipated and rental rates were below plan because of intermittent HVAC problems. Speculative claims of this sort are not permitted under the current AIA General Conditions.

8. Liquidated damages, unlike consequential damages, allow contractors and subcontractors to make business decisions about whether or not to bid the work and to include contingencies in their pricing. On projects where it is foreseeable that delay beyond a given date will result in known, specific costs, the parties may agree in advance on a reasonable dollar amount of liquidated damages for each day of unexcused delay. Owners should be aware that inclusion of liquidated damages generally may result in higher prices and perhaps fewer bidders.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 -194

## Conclusion

9. Certainty and predictability are principles on which construction contracts should be based. AGC, ASA, and ASC support the concept that risks should be limited to those foreseen and agreed upon in contracts, with each party specifically disclaiming any right to assert a claim for consequential damages.

[1] *General Contractors and subcontractors may wish, instead, to routinely charge project specific costs (such as salaried supervision) to each job to avoid the consequential damages waiver impact on these well-established cost items.*

1-195

# D.3.d
# Guideline on Procedures for Change Orders

## Reasons for a change order

There are many reasons for issuing a change order on a construction project. The most common reason is to accommodate a change in the owner's requirements. Other common reasons for change orders include: changing requirements of public authorities; deletion of project features; resolution of project coordination problems; correction of errors or conflicts in the plans or specifications; changes in materials or equipment; unavailability or delayed delivery of specified items; or changes in technology.

As the number of change orders on a project increases, so does the possibility of misunderstanding among the contracting parties. Such a misunderstanding may occur because one or more of the parties lacks full knowledge of the change order process itself, the costs involved in implementing changes, or the delays, conflicts, and interruption of the construction sequence and schedule which can adversely impact project coordination.

The following procedures are recommended to owners, architects, contractors, and subcontractors to minimize the possibility of misunderstanding and project disruption stemming from change orders.

## Owner-initiated change order

When a change order is initiated by the owner or owner's agent, the process should begin with a request for proposal (RFP). The RFP should contain all the information needed by the contractor or subcontractors to make a reasonable and realistic estimate of the costs and the time needed to implement the change. This information should include, but may not be limited to:

1. Revised plans and specifications that permit accurate quantification of work to be added, deleted, or substituted and its relation to unchanged work.

2. The time span for making the change and specific authorization for overtime, if required.

3. The amount of supplemental work to be performed if the change is in a completed area.

4. The degree of detail expected in the cost breakdown of the contractor's change order proposal.

5. The period of time during which the change proposed will be open for review, acceptance, or rejection.

## Contractor or subcontractor-initiated change order

When a change order is initiated by the contractor or a subcontractor, the approved project procedure should be followed. The Change Order should include, at a minimum:

1. The reason for the proposed change, a reference to the plans and specifications, the benefit to the owner and the project, and the effect of the change on the project sequence.

2. The effect of the proposed change on the contract time and price in sufficient detail to permit proper evaluation by the contractor, the owner, and the owner's agent.

3. A reasonable but definite time period for the owner to accept or reject the change proposal without interruption or delay in the project schedule.

The timely issuance of change orders can prevent excessive costs, delays, and friction between the parties. All parties must understand the time constraints in the contract and subcontracts for and abide by these constraints. Accumulating change order requests until the end of the project is not acceptable and will most likely lead to a dispute. Late changes in the contract documents can be reduced by the owner through continual review of the documents and inspection of the work as it progresses.

The owner's agent, the contractor, and subcontractors also can reduce conflicts and last-minute revisions by reviewing plans and specifications before construction and making timely requests for necessary clarifications. The owner's agent should be diligent in the issuance of clarification responses and submittal approvals, thus avoiding interruption in the work and substantial delays in the project schedule.

## Types of change orders

### The lump sum change order

The lump sum change order is the most common type of change order. It is preferred because it defines precisely

1-196

## D.3.d Guideline on Procedures for Change Orders

the total cost or credit and time variation to the contract. It is negotiated by the parties and agreed upon before the work is executed, in most cases.

### Unit price change order

The unit price change order is used when unit prices for specific items or trades are prenegotiated and made part of the contract. Thus, only quantities of each item of work are estimated or measured before or after the changes are performed. However, problems or inequities can arise when the performance of the work conflicts with other trades or delays the construction schedule, or when substantial variations are made to the total quantity of work on which the original prices were based.

### Time and material change order

The time and material change order is most often used when the scope of the change cannot be defined properly before work must begin, either because the parties can not agree or because there is not enough time for standard change order processing. When using a time and material change order, the parties should be sure to have a clear definition of reimbursable costs before the work is begun. Following are some examples of reimbursable items to be clearly defined:

- Labor rates to be charged, including specific percentages for payroll taxes and other statutory and employer-provided benefits.

- Rates for machinery and equipment supplied by the contractor, whether owned or rented.

- Costs of small tools and miscellaneous material, regardless of whether consumed in the work (this may be stated as either a percentage of labor and materials incorporated into the work, or as individual line items).

- Expenses for estimating, engineering coordination and field supervision.

- Overhead expenses on the job and in the home office and a reasonable fee for the additional work. Overhead and fee or profit is not normally deducted on deductive change orders.

### Change directive

Construction change directives formally alter the scope of the work in the same manner as a change order, but without formal agreement as to the proper adjustments for time and price. A contractor or subcontractor does not waive its rights to time and price adjustments when it proceeds pursuant to a signed change directive.

### Recorded minor change order

The recorded minor change order in most cases is initiated by the owner's agent and is used when the change is so minor that there is no significant effect on project cost or time, but the variations to the plans or specifications nevertheless should be recorded for later incorporation into the as-built drawings. This type of change order also is useful to avoid problems later when memories of unrecorded changes might fail or when authorization for the change may be questioned. This procedure also permits the contractor or subcontractor to recover expenses when a large number of minor changes accumulate.

### Authorization of change

Change order work should not begin until after the owner or owner's agent issues a written authorization to proceed. Adherence to this precedence will promote smooth and efficient adjustments by all parties. This written authorization should reflect the variations in the work and the contract cost or time schedule. The authorization also should specify that variations are made in accordance with the terms of the original contract, and, to the extent provided in the contract documents, allow for payment of undisputed amounts as part of monthly progress payments.

When the contract is finalized, the owner should identify those individuals who have authority to authorize changes on the owner's behalf. The contractor and subcontractors also should identify which of their employees are authorized to accept or negotiate changes (preferably job superintendents, job engineers, or the project manager). It is important that the owner or the owner's agent deal only with the contractor's authorized representative.

Special care should be taken with subcontractors and material suppliers to clarify the proper communication paths and to identify the persons in authority. Direct communication between subcontractors and the Owner, Owner's agent, designer, or designer sub-consultants can result in ambiguous contractual issues. Appropriate communication processes should be clearly outlined during the Pre-Construction Conference attended by all parties (See C.1. Pre-construction Conferences).

1 - 197

## D.3.d Guideline on Procedures for Change Orders

The major problem affecting the proper execution of change orders is the time lag between the submittal of the cost and time estimates for the changes and later acceptance or rejection by the owner *(see B.2. Project Scheduling, Delays and Liquidated Damages and D.5.a. Project Closeout)*. The longer the time lag between submittal and acceptance or rejection, the greater the possibility of an increase in cost to the owner or a delay in the completion of the work. The contractor and subcontractors must state prominently, on the face of each proposal, a reasonable time period during which the quoted price may be considered firm and after which the project will be delayed.

Emergency changes require expedited procedures which should be developed and communicated as part of the Pre-Construction Conference. Regardless, emergency changes should be documented by written authorization immediately following.

## Conclusion

Although each change order must be evaluated separately, certain procedures are applicable to most change orders and should be followed.

1. Establish change order handling procedures at the pre-construction conference.

2. Identify those individuals who have authority to negotiate and approve change orders. Also, notify others of any limits on the authority of those individuals. This information should be made known to all parties during the preconstruction conference.

3. No work beyond the scope of the base contract should be performed without prior written authorization from the owner, except in emergencies.

4. The scope of the change order should be clear and the request for the change should contain enough information to enable the contractor or subcontractors to make a realistic estimate of the costs and time involved.

5. Proposals should be submitted as soon as possible after the receipt of a request and, once submitted, should be acted upon immediately.

6. The proposal should acknowledge the contractor's or subcontractor's right to include overhead and profit percentages in additive changes, and to exclude these from deductive changes.

7. All parties should acknowledge and honor the contractor's or subcontractor's right to compensation for the cost of time delays, the cost of processing additive as well as deductive changes, the cost of legally disposing of materials, and all other costs incurred in the execution of the change.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1-198

# D.3.e
# Guideline on Charges for
# Non-contracted Construction Services

The following guidelines are recommended to ensure proper notice and compensation for additional services:

(1) Services should be rendered or material or equipment furnished by the contractor to or on behalf of the subcontractor only on the basis of prior notice by the contractor and concurrence by the subcontractor *(Appendix E.3 Work Authorization Form is suggested).*

(2) Services should be rendered or material or equipment furnished by the subcontractor to or on behalf of the contractor on the basis of prior notice by the subcontractor and concurrence by the contractor *(Appendix E.3 Work Authorization Form is suggested).*

(3) Where prior notice cannot be given due to the need for immediate action, such action as is necessary may be taken by the contractor or subcontractor on behalf of the other.

(4) No charges for services rendered or materials furnished by the contractor to the subcontractor or by the subcontractor to the contractor should be valid unless a written claim is given by the contractor to the subcontractor, or by the subcontractor to the contractor, during the first ten days of the calendar month following that in which the claim originated.

This guideline applies to construction services only, as distinct from changes in the work as required by the contract documents *(see D.3.d. Procedures for Change Orders).*

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

ι - 199

# D.3.f
# Guideline on Prompt Payment

Undue delays by owners, architects/engineers, general contractors, subcontractors and sub-subcontractors in processing payments or in making timely payments impose hardships and improper financial burdens on the contractors and suppliers who await payment, and amount to extensions of credit by the contractor and suppliers to their respective higher tiers.

In order to avoid such problems, all payments should be made on all contracts promptly. This should include payment for all labor, services and materials stored on the job site or other approved storage sites as of the closing date of requisitions. This applies to both progress payments and final payments.

Contractor and subcontractor requisitions should not include amounts that the requisitioner does not intend to pay its subcontractors or suppliers because of a dispute or other reason.

The following schedule of billings, certificates and payments by various participants in the construction process

is suggested. The schedule assumes normal trade contract terms allowing monthly progress payments for work performed and materials suitably stored through the end of the month. This schedule does not refer to payments to suppliers who are not subcontractors.

It is important to note that along the sequence of events, any recipient of a payment request who takes exception to an item of billing should immediately contact the initiating party by telephone and attempt to resolve the matter. Failing resolution, the party taking exception should notify the other party in writing of the reasons for the action.

The schedule should be adjusted by making appropriate billings and payments on the last working day prior to any listed Saturday, Sunday or holiday. It is also suggested that collection efforts be commenced immediately following the day any payment due was not paid.



Prompt Payment Cycle

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

# D.3.g
# Guideline on Payment for Stored Materials and Equipment

Advance procurement of construction materials and equipment is a prudent practice that saves money and promotes the timely completion of construction projects. Construction project owners garner the full benefit of advance procurement by allowing progress payments to include payment for materials and equipment stored at the construction site or some other agreed location.

As a matter of careful construction practice, contractors and subcontractors often purchase and request delivery of construction materials and equipment soon after a contract is executed and well before the equipment or material is needed. The purpose of advance purchases is to assure that specified materials and equipment are available for installation or use in accordance with the construction schedule. Early procurement of materials and equipment also guards against escalating costs, particularly in long-term contracts, and enables the contractor and its subcontractors to make timely purchases when shortages may be a problem.

The contractor's and subcontractor's progress payments for suitably stored material or equipment should not be withheld until the material or equipment is actually installed in the work. Owners that fail to provide for payment of stored materials and equipment discourage prudent business practices and prompt schedule compliance. Safeguards can be taken to assure that the owner's interests are protected from diversion, destruction, theft, or damage to stored materials or equipment that the contractor or subcontractor is holding for future installation. These safeguards may include, but are not limited to:

- Provision of delivery tickets, packing lists, and/or photographs to substantiate delivery.

- Inspection of stored material by the owner or owner's representative.

- Provision of proof of insurance coverage for off-site storage material.

- Inclusion of all of the above with the progress payment request.

1-201

# D.3.h
# Guideline on Purchase of
# Materials or Equipment by Owner

When an owner decides to purchase materials or equipment directly, it is imperative that adequate details for proper installation be included in all bid documents. In addition, owner purchased materials or equipment may increase the project price because a contractor will have to cover contingencies over which it has little or no control. Before deciding to exercise the direct purchase of equipment or materials option, owners are encouraged to consider the following:

- When an owner purchases equipment and when equipment is installed by the owner's or equipment supplier's employees, there will always be the additional burden of coordinating delivery and installation. There is also a possibility of craft jurisdiction problems.

- Contract performance can be adversely affected on projects experiencing untimely, unscheduled or failed delivery of equipment and materials.

- A contractor is most familiar with local building code requirements, which often address both materials and equipment installation requirements.

- The issue of shipping charges is also important because most manufacturers ship materials so that title passes to the purchaser at the manufacturing or shipping point.

- Under an owner direct purchase option, unless other arrangements are made, the owner may have to assume responsibility for warehousing, transfer and security of materials or equipment.

- When an owner buys materials or equipment, the owner also assumes the responsibility of resolving any warranty issues with the manufacturer.

- A contractor's overhead cost remains the same. In addition, in states in which a contractor is required to pay the sales tax on any equipment it installs whether it purchases it or not, the contractor may build taxes on the retail price of the equipment into its bid.

Owners should consider potential consequences of directly purchased equipment or materials. Complete and full disclosure of all aspects of owner purchases should be communicated and coordinated with the contractor.

# D.3.i
# Guideline on Overtime, Construction Costs and Productivity

The practice of scheduling overtime in machine-paced fabricating and other types of manufacturing operations is widespread. Perhaps some scheduled overtime to maintain production schedules is less costly than bringing new employees into the work force in some repetitive, machine-paced factory operations. However, any advantages of scheduled overtime which might be found in manufacturing do not apply to construction. Non-repetitive work, fatiguing physical labor and other features make construction work far different from machine-paced factory employment.

Scheduled overtime is seldom found on competitively bid, firm-price contracts. Most contractors are mindful of some of the negative effects of overtime on costs and productivity. However, scheduled overtime is sometimes ordered by owners or construction managers, particularly on large cost-reimbursable projects, in an effort to:

- Accelerate completion;

- Make up for previous delays;

- Complete as originally scheduled a project which has been increased in size and complexity by change orders; or

- Compensate for shortages of skilled construction workers in the area.

One of the worst but most common reasons to use overtime premium pay is to induce needed workers to leave other jobs and accept employment on the project on which the overtime is scheduled.

## Productivity Impacts

Simple arithmetic shows that premium pay for double time or time and one-half makes overtime work much more expensive. However, people who insist on overtime seldom realize that other costs associated with overtime may be even more significant than premium pay. Premiums affect only overtime hours, but continuing, scheduled overtime drastically affects the costs of all hours.

All available research findings indicate a serious inverse ratio between the amount and duration of scheduled construction overtime hours and productivity. In the first few weeks of scheduled overtime, total productivity per worker is normally greater than in a 40-hour week, but not as much more as the number of additional work hours. After seven to nine consecutive 50- or 60-hour weeks, productivity is likely to be no more than that attainable by the same work force in a 40-hour week. Productivity will continue to diminish as the overtime schedule continues. After another eight weeks or so of scheduled overtime, the substandard productivity of later weeks can be expected to cancel out the costly gains in total weekly production realized in early weeks of the overtime schedule, so that total work accomplished during the entire period over which weekly overtime was worked will be no greater, or possibly even less, than the work accomplished if the regular schedule had been used.

When the loss of productivity is added to the higher wage cost with premiums, productive value per wage dollar paid after several weeks of scheduled overtime drops to:

- Less than 75 percent for five 10-hour days

- Less than 62 percent for six 10-hour days

- Less than 40 percent for seven 12-hour days

Studies on this subject conducted by the Bureau of Labor Statistics of the U.S. Department of Labor, the Construction Industry Institute, the Business Roundtable, the National Electrical Contractors Association, and the Mechanical Contractors Association of America produced similar results. All of them showed that continuing scheduled overtime has a strong negative effect on productivity which increases in magnitude proportionate to the amount and duration of overtime. Abandonment of the overtime schedule appears to be the only effective remedy. Only the BLS study evaluated what happens when scheduled overtime is discontinued. That study showed a dramatic jump in productivity per hour upon return to a 40-hour week.

## Reasons for declining productivity under overtime schedules

Several logical reasons have been found to account for declining productivity under overtime schedules.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

## D.3.i Guideline on Overtime, Construction Costs and Productivity

### Work pace inertia

Industrial engineers have found that workers expend energy at an established pace determined by long periods of adaptation. Hence, when the hours of work increase, there is a tendency to adjust the pace to accomplish about the same amount of work in an extended workday or workweek as was accomplished before the extension. The interdependency of construction workers with others on the same crew and with workers of other trades on the same project make it difficult or impossible for any individual worker who may attempt to overcome this tendency to do so without the problem of "running out of work" while waiting for other work to be performed.

### Absenteeism

Bureau of Labor Statistics Bulletin 917 states: "But, whatever the reason, one fact stands out clearly in the survey: the longer the hours, the more scheduled work time lost through absenteeism." Absenteeism is promoted when the effects of cumulative fatigue, desires of workers to spend more time with their families, and need for time away from the job to take care of personal business combine with lack of economic necessity to work all available hours because of the high pay received during overtime weeks. Absenteeism of even a few employees seriously disrupts scheduled daily operations and reduces total project efficiency.

### Accidents

When extended overtime is employed, the result is increased accidents and injuries, along with the productivity-killing effects on morale. The BLS Bulletin states: "Injuries also increased as hours increased, not only in absolute numbers, but also in rate of incidence. In most of the observed instances, the number of injuries per million hours worked was very much higher at the longer hours."

### Fatigue

Physical and mental fatigue build up at an accelerated rate from excessive hours on the job and lack of recuperative time off the job, even when overtime work is resulting in little or no additional work being accomplished. In work such as construction, which is not machine-paced and which requires sustained physical effort as well as mental alertness, fatigue obviously reduced productivity during all hours worked. The BLS Bulletin stated: "For hours above 8 per day and 48 per week, it usually took 3 hours of work to produce 2 additional hours of output when work was light. When the work was heavy, it took about 2 hours of work to produce 1 hour of additional output."

### Morale and attitude

Anything which adversely affects morale and which lessens cooperative and positive attitudes toward the work, the employer, and the customer will result in lowered output. Fatigue causes deterioration in morale and positive attitude along with an overall negative impact to the project culture. In addition, continuing expensive overtime can quickly result in an attitude that, "Cost means nothing to the customer, so why should we workers worry about efficiency?" Deteriorating morale and attitude coupled with fatigue increase friction among the workers, grievances against management, and jurisdictional disputes with other trades.

### Turnover

Frequent turnover of workers is expensive and disruptive. Regardless of the skills of new workers, a considerable amount of time is needed to train them to the specific needs of the project and orient them to what they will be doing and how it meshes with the work done by others on the job. Turnover can be expected at an accelerating rate as overtime schedules continue because of fatigue, poor morale and attitude, and lack of economic need to continue working.

### Job shopping

In an area where one or more large projects have scheduled overtime, workers seem to spend more effort finding the project having the highest premiums than in getting the work accomplished. If other construction employers feel induced to schedule overtime to keep their share of the area work force, a daily "auction" for available manpower is likely to occur.

### Supervision problems

Because of their greater responsibilities, supervisory employees are likely to feel the fatiguing and demoralizing effects of prolonged overtime schedules even more than production workers. Loss of key supervisors part way through a construction job can have highly detrimental effects, but such loss can be expected on a job with prolonged overtime due to illness or resignations because of overwork. Pressures resulting from scheduled over-

time also cause supervisors to become careless, to make errors in judgment and to become irritable, adversely affecting their relations with workers and others. Obviously, the alternative of not having experienced supervisors present during all overtime hours being worked can have even more serious consequences.

**Stacking of trades**

Scheduled overtime almost always distorts the orderly sequence schedule originally adopted. This inevitably results in space conflicts and undesirable mixing of employees of different crews and different contractors.

**Pressure for more overtime**

It is common for jobs with scheduled overtime to have worker pressure for more overtime and slowdown among workers receiving less overtime pay than others. Competition to get the largest paychecks seems to become a greater motivator than pride of participating in a successful project.

## Avoiding the effects of scheduled overtime

The following steps are recommended to avoid the effects of scheduled overtime:

(1) All parties concerned with planning and scheduling construction projects, including owners, construction managers, architects, engineers and contractors, should be fully aware of the magnitude of the extra costs caused by scheduling overtime and that productivity losses will affect work during normal hours as well as during overtime hours. All must recognize that the supposed benefits to be gained from scheduling overtime, such as accelerating completion or making up for previous delays, are unlikely to be realized and very costly to attempt.

(2) Initial completion schedules should be realistic and take into account such factors as availability of skilled manpower and potential delays from weather, strikes, licensing delays, interference by environmental interests, etc. Completion schedules should allow sufficient flexibility to absorb unexpected but unavoidable delays. Design should be completed and construction

started early enough that the customer need for a completion date will be taken care of without artificial acceleration.

(3) Change orders of a size or number which will delay completion should be avoided unless the completion time can be extended to permit performance of both the changed work and the original work without resorting to overtime. No change should be contemplated or authorized without full consideration by all parties of its effect on completion time.

(4) If the costs of scheduled overtime are to be paid by the customer under a cost-reimbursable contract or under cost-reimbursement provisions for changes or acceleration orders, the contractor should not be permitted to proceed with scheduled overtime without the previous written agreement of the customer. Before agreeing to the proposed overtime schedule, the customer should thoroughly study the inherent disadvantages, consult with contractor associations in the area for their opinions on what the effects of scheduled overtime will be, and make sure that no other alternative is available.

(5) Contractors on firm-price contracts should be fully compensated for loss of productivity as well as for overtime premiums and additional supervisory and administrative costs resulting from working on overtime schedules when required by the customer to perform changed or accelerated work which necessitates scheduled overtime.

(6) An effort should be made to negotiate and utilize workable shift work clauses to perform much of the work which must be performed outside scheduled working hours with employees who are not employed during regular working hours. It should be recognized, however, that productivity during shift periods is not likely to equal that during regularly scheduled working hours.

(7) Overtime should never be used to induce needed workers to leave other jobs and accept employment on the project for which the overtime is scheduled.

# D.3.j
# Guideline on Risk Allocation

A guideline on this topic is being developed.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American
Subcontractors Association, Inc./Associated Specialty Contractors.

1-206

# D.3.k
# Guideline on Retainage

The holding of retainage is a traditional and common business practice in the construction industry and is used to assure a timely and satisfactory completion of the construction project.

Whenever practical, however, retainage should be eliminated or reduced. If the need for retainage can not be eliminated, an acceptable alternative form of security in lieu of retainage may be used. If retainage is required, the percentage retained should be as low as possible.

Where withholding a retained sum from progress payments is deemed necessary to secure performance on a construction project from prime or subcontractors, the following guidelines are recommended:

- The percentage level of any retainage should be the same for subcontractors as for prime contractors on the project. This approach is applicable provided the subcontractor exhibits the ability to provide the same level of security as the prime contractor and the prime contractor underwrites the cost of any excess required security that is not included in the contract documents.

- Early release of retainage for completed and accepted work should be encouraged. Upon substantial completion of a contractor's or subcontractor's

work, a line item basis should be used by owners and contractors in determining the point of any reduction in the rate of retainage, the time for release of retained funds, and the time for making final payment. For unit price quantities, retainage is not released until final quantities are approved and paid by owner. *(See D.5.a. Project Closeout and D.5.b Punch List Procedures.)*

- Progress payments, reduction of retainage, release of retained funds, and payments for completed work should not be delayed because work under change orders has not been finalized. Final payments for change order work should be made promptly after its completion.

- Where retainage is used, retained amounts should be deposited in an escrow account accruing interest to the contractor and the subcontractor in their respective shares.

- Consideration should also be given to not holding retainage on subcontracts and material purchase agreements of less than $10,000 in order to minimize contract administration efforts.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 - 207

# D.4.a
# Guideline on Total Quality Management

Every member of the construction team can benefit from the implementation of Total Quality Management (TQM) within their companies. The purpose of this guideline is to provide a brief overview of TQM and to assist construction company executives in their understanding of the benefits of implementing TQM in their companies.

There is misunderstanding by many in the construction industry over differences between Total Quality Management and Quality Control or Quality Assurance. TQM is a continuing process of improvement involving all aspects of the business. The wider aim of TQM is to prevent mistakes before they happen. Quality Control and Assurance is just one aspect of the process.

In the construction industry, a total commitment to TQM includes applying the principles of partnering to the individual construction project. All of the construction team members must be given the opportunity to participate in the TQM process *(see C.2. Partnering).*

There is nothing magical about TQM. It is a process to follow in reducing errors in work. The keys to continuous improvement are commitment and teamwork. This commitment must start with the chief executive officer and filter throughout the entire organization. TQM will not work without a total commitment and involvement from top management. Managers, in all areas of the company, must provide employees with the proper training, tools, equipment and work place environment to accomplish the assigned task. The task or requirements must be clearly defined.

## TQM Benefits

Significant improvement in profitability has been achieved by companies embracing TQM. The TQM-focused company can expect:

- Improved project and company culture
- Increased customer satisfaction
- Greater efficiency
- Larger market share
- Reduced rework and warranty work
- Higher profits
- Improved reputation

- Safer work execution and resulting in lower insurance cost
- Lower absenteeism and turnover rate

The individual in a TQM company can expect:

- Fewer job-related injuries
- Greater self-satisfaction
- Higher morale
- Improved working environment
- Increased job security

## Top management's commitment and involvement

Total Quality Management cannot be achieved without the active involvement and firm commitment of top management. The chief executive officer must initiate the quality policy and commit the necessary corporate resources to carry out that policy.

Management must undergo quality training and lead the improvement process in creating a quality attitude within the organization. This training should start at the top and filter down through all levels of management and on to the job site.

TQM is not a program. It is a management process through which quality products and services are provided on a continuing basis. A company can expect a behavioral change as well as a technical change in the corporate attitude. The commitment must be for the long term.

## Develop and communicate mission statement

The company's first step in the TQM process is to develop a mission statement that describes the organization, its values, guiding principles, purposes and vision. It should identify the organization to employees, customers and community as one deserving of admiration.

When the mission is clearly transmitted throughout the organization, employees will identify with it and will be guided by its principles.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1-208

## D.4.a Guideline on Total Quality Management

### Quality policy

A clearly defined statement of an organization's public commitment to quality and continuous improvement makes a powerful impression on the entire company about the importance of quality. The quality policy is focused on quality as it relates to customers, whereas the corporate mission statement encompasses all aspects of a company's existence.

### Resources

Implementation of the TQM process requires an investment of today's resources in the company's future. Training requires time and money. Top management must be prepared to commit both its time and its employees' time, including that of busy managers at all levels. This cost is the first part of the cost of quality, the cost of prevention. The cost of quality is defined as the cost of prevention, plus the cost of errors. The cost of errors includes rework, delays, unplanned work, accidents, excessive paperwork, lost jobs, idle time, excessive crew size, equipment failure and late starts. The cost of prevention includes supervision, training, inspection, planning and meetings.

### Coordinate overall quality improvement process

Quality action teams are established to study needed improvements for targeted processes. Once implemented, the results are monitored and measured against previous performance standards and goals. Employees working in a given process are trained in monitoring and are empowered to affect continuous improvements.

### Upward flow of communications

All participants need the freedom to make suggestions for improvement without fear of reprisal. For some companies or some individuals, this feedback will be foreign to their corporate culture. Management should be committed to recognizing individuals who offer good ideas when presented and again when implemented, regardless of the source. A formal feedback, or "lessons learned" process should be put in place to gather, evaluate, and implement corrective actions.

### Recognition program

Recognizing individual and team achievement is critical

to the success of the TQM process. Celebrate success stories by publishing them in the company newsletter along with a photo of the individual or team and discuss them at meetings. Indicate a description of the problem, the solution, cost savings and team members. Recognition should come from the chief executive officer to reinforce the commitment of the company to the process. Recognition helps to broaden participation. Celebrated successes stimulate participation in the quality improvement process.

Just as important as recognizing internal team members is the recognition of other members of the construction team, including the owner, the architect, engineers, the general contractors, subcontractors, major suppliers and inspectors.

### Independent reading and research

There is a great deal of information available in books, periodicals, and videos on the subject of quality and TQM. External customers can help, too. When an executive gets serious about TQM, the first step is education through independent reading and research programs. Reading this overview is only a start in the educational process. The next place to go is to the AGC publication: *An Introduction to Total Quality Management* (available at *http://www.agc.org/*). The serious executive must dedicate time to the subject to gain more than a cursory understanding of TQM.

### Continuous improvement process

Total Quality Management is a never-ending journey. It is a continuous process of investigation, prevention, evaluation, reviewing and taking corrective action. The process requires top management's total commitment and involvement and a willingness to change the corporate attitude if necessary.

All work is a process. As soon as one process is improved and functioning properly, a TQM company must improve the next process in order of priority and then do it all over again.

### Conclusion

Nearly all successful companies practice some form of management improvement program based upon satisfying customers, striving to perform a task right the first time

1-209

**D.4.a Guideline on Total Quality Management**

and knowing that improvement must be continuous.

Total Quality Management provides an art and science for the practice of good management. It also provides the intellectual foundation for advancing the study of management techniques and how they can be used to better satisfy the consumers of goods and services. TQM techniques have been successfully employed in many manufacturing industries for some time and offer substantial benefits to the construction industry.

1-210

# D.4.b
# Guideline on Project Inspections

Today construction projects are more complex with sophisticated and integrated systems requiring compliance inspections and/or corrections when installed and operated and throughout various phases of the construction process. As a consequence, traditional reliance on an end-of-project punch list is an inefficient and costly approach to ensuring that products, equipment, or systems operate as designed and specified. The goal of the inspections process should be a zero punch list performance through the use of periodic inspections throughout the project *(see D.5.b Punch List Procedures).*

The type and intensity of inspections vary greatly depending upon project complexity and client needs. Virtually all projects come under some minimum code standards with inspections during various phases of the project by code officials. Clients will often specify inspections to occur at specified intervals, for purpose of approving progress payments.

Absent an effective inspection system, experience has demonstrated that "end-of-the-project" punch lists can be overwhelming and delay project completion.

The first step toward a zero punch list is a commitment to a project management process with all the key parties involved. A properly planned project involves a detailed pre-bid process, continuing planning meetings throughout the various phases with everyone involved, and an inspection team committed to a timely completion and a zero punch list. The cost of failing to implement a project-management process is substantial and often results in more time for corrective action and a negative impact on the operation of other integrated or related products, equipment or systems.

## Purpose of the Inspections Protocol

- To ensure a higher level of quality by improving communications and understanding of project requirements.
- To produce a zero punch list and timely, cost effective project completion.

## Coordination Requirements

A pre-project Inspection Conference should be held with the inspector(s), contractor, owner, and designers all present. The conference agenda should include the following items:

1. Scope of project.

2. Specification requirements.

3. Identification of design deficiencies.

4. Material product data sheets.

5. Pre-bid project minutes.

6. Project schedule.

7. Acceptance procedures.

8. Inspector(s) qualifications.

9. Inspector's authority - Prior to the project start, all parties should be advised on the level and limits of authority and responsibility of the inspector(s).

10. Testing procedures and instrumentation - Testing procedures and the required listing of instruments, including calibration, should be reviewed.

11. Procedure for the resolution of disputes.

12. Inspection HOLD Points and Documentation – (Hold Point – a point in the installation schedule at which a specific inspection or testing procedure is required by specification to be performed.)

Upon agreement to these inspection specifics, a second pre-project Inspections Conference should be held with the project subcontractors. Depending on the complexity of the project, inspections may be discussed as part of the overall Pre-Construction Conference for the project in lieu of the second Inspections Conference *(see C.1. Pre-Construction Conferences).*

## Inspection Hold Points and Documentation

1. A schedule of hold points in the sequence of work operations, at which the testing procedures are to be employed (hold points) should be identified. In addition, inspection hold points must be mutually agreed to minimize disruption.

2. The inspector(s) must be committed to the project schedule with inspections conducted accordingly.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1-211

3. Conditions or work practices inconsistent with specification requirements or defective products, equipment, or systems must be reported in writing to the responsible contractor representative.

4. Quality Assurance/Quality Control reports should be provided to not only the owner but also to the performing contractor.

## Resolution of Dispute Procedure

A written procedure should be in place to resolve any dispute or conflict between specifications, manufacturer's literature, work in progress, or completed work *(see D.3.a. Avoidance and Resolution of Construction Disputes)*.

## Requirements for Inspection Personnel

1. Education, Training and Experience – Inspector(s) should have successfully completed an education and training program from a recognized organization offering a curriculum equivalent to the disciplines of the project and a minimum of five years experience in the discipline related to the type of work to be inspected.

2. Physical Qualifications – an inspector should be physically capable of performing the required inspection using standard, OSHA- approved, equipment.

3. Functional Qualifications – an inspector should have a current working knowledge of the operation and use of the inspection equipment required for the project.

4. Knowledge – an inspector should have an understanding of project specifications and plans.

5. Conflict of Interest – a full disclosure should be made by the inspector of any reasons that would prevent an impartial evaluation of the contractor's performance.

## Completion of Work

1. If, after an inspection of work, proper completion is at issue, the inspector should issue a certificate that notes those items in question.

2. If the owner or an installer of the owner's equipment or furnishings damages the work, the inspector should promptly advise the owner of its obligation to repair the damaged work. If the owner wants the contractor to repair such damaged work, or perform maintenance work not specified in the owner/prime contractor agreement, the contractor should be reimbursed for such work.

3. If completed and inspected work is damaged after inspection, it should be repaired through change orders.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1-212

# D.4.c
# Guideline on Commissioning

A guideline on this topic is being developed.

1-213

# D.5.a
# Guideline on Project Closeout

The general contractor and subcontractors should cooperate in accomplishing the following objectives:

- Assure the owner and architect/engineer representatives that all work on the project will be completed in a timely manner and at a level of quality in accordance with the contract documents.

- Cause the owner to provide the general contractor a positive incentive to complete the work properly on or ahead of time by prompt and proper payment for work satisfactorily performed.

- Provide the subcontractors a positive incentive to complete the work properly on or ahead of time by providing prompt and proper payment for work satisfactorily performed.

- Prevent multiple punch lists by encouraging the owner, its architect/engineer and their consultants to:

  - Communicate any known issues throughout the life of the project to the general contractor and subcontractors to allow early agreement and correction. The goal should be to create the shortest possible punch list upon final inspection.

  - Perform a prompt and thorough substantial completion inspection and prepare a punch list of all detected omissions and deficiencies of the designated portion of the project.

  - Include subsequently detected omissions and deficiencies, if any, in such substantially complete portions of the work as part of the warranty punch list.

1. After a subcontractor considers its work completed and before its workers leave the project, the general contractor's and subcontractor's authorized project representatives should prepare a list of items requiring correction or completion. The subcontractor promptly should satisfy such requirements and arrange for any contractually required tests.

2. No party should ask for a substantial completion inspection and punch list until the designated portion of the work has in fact reached substantial completion.

3. Upon achieving substantial completion of the work or designated portion, the general contractor should verify that each subcontractor's work is substantially complete and then request a prompt substantial completion inspection by the owner, its architect/engineer and/or their consultants as contractually required. The general contractor's authorized project representative should be present during the inspection process along with the project representative(s) of the subcontractor(s) whose work is being inspected.

4. Punch lists may contain items that fall into two categories that are difficult to resolve in a timely manner:

  - Scope issues: The punch list process may uncover incomplete work scope that has not been contracted to any subcontractor. The general contractor should expedite performance of such work by the appropriate party.

  - Finish details: Visual inspection, especially of detailed finish work can uncover the need for additional clarification between the general contractor, subcontractors, architect/engineer, and the owner. These items should be highlighted during the punch list process and the project's clarification process should be used to document and formally resolve these items.

These items should be pursued through the appropriate project processes and resolved quickly in order not to impede the overall completion and closeout of the project.

5. At substantial completion, the general contractor and each subcontractor should be preparing the paperwork necessary to complete the closeout. This documentation should include as-built drawings, operation and maintenance manuals, warranties, lien releases, etc.

6. Upon receipt of the substantial completion punch list, the general contractor should request release of final payment, including retainage, less withholding sufficient to complete the punch list of omissions and deficiencies. Upon receipt of such payment, the general contractor should make payment to each subcontractor in the same manner *(see D.3.k Retainage)*.

7. The general contractor promptly should establish a schedule for correction and completion of punch list

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1-214

**D.5.a Guideline on Project Closeout**

items in a way that will minimize interference among trades. Disputes as to contractual requirements of any punch list omission or deficiency should be reported immediately in writing to the owner and/or architect/engineer as appropriate, seeking an early resolution. The general contractor and each subcontractor should immediately correct and complete all other items on the punch list, recognizing that failure to do so will delay payment to all parties.

8. Upon satisfaction that all omissions and deficiencies of the punch list have been completed, with the exception of any excusably delayed items, the general contractor should immediately request a certificate of final completion. Final inspection should determine only the satisfactory correction of the previously documented substantial completion punch list items. Release of

withheld funds should be conditioned solely upon satisfaction of substantial completion punch list items. Omissions and/or deficiencies noted after the substantial completion punch list should be treated as warranty items and therefore independent of substantial completion, the punch list, and the final payment conditions. The general contractor should use its best efforts to assure such understanding by the owner and its architect/engineer.

9. When feasible, the general contractor should seek from the owner release of claim and final payment for that portion of the project performed by a single subcontractor and approved by the owner as satisfactorily complete *(see D.5.b. Punch List Procedures for other recommendations)*.

*Guidelines for a Successful Construction Project.* Copyright © 2006, The Associated General Contractors of America/American Subcontractors Association, Inc./Associated Specialty Contractors.

1 -215