| | |
|---|---|
| 1 | GEORGE E. SCHULMAN (State Bar No. 064572)<br>JOHN N. TEDFORD, IV (State Bar No. 205537) |
| 2 | AARON E. DE LEEST (State Bar No. 216832)<br>DANNING, GILL, DIAMOND & KOLLITZ, LLP |
| 3 | 2029 Century Park East, Third Floor<br>Los Angeles, California 90067-2904 |
| 4 | Telephone: (310) 277-0077<br>Facsimile: (310) 277-5735 |
| 5 | |
| 6 | Plaintiff R. Todd Neilson, Chapter 7 Trustee |

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | ) Case No. 2:04-bk-35757-VZ |
| PECK/JONES CONSTRUCTION CORPORATION, | ) Chapter 7 |
| Debtor. | ) |
| R. TODD NEILSON, CHAPTER 7 TRUSTEE, | ) Adv. No. 2:07-01050-VZ |
| Plaintiff, | ) **SUPPLEMENT TO APPENDIX 2 TO PRE-TRIAL STIPULATION** |
| vs. | ) Date: December 11, 2008 |
| INTEGRATED MECHANICAL SYSTEMS, INC., a California corporation, | ) Time: 11:00 a.m.<br>) Place: Courtroom 1368 |
| Defendant. | ) 255 E. Temple St.<br>) Los Angeles, CA |

331259.01 [XP]    24132

# Commentary on AIA Document A201-1997

**Table of Contents**

Introduction

Annotated A201

This commentary was prepared by the American Institute of Architects with the assistance of Charles R. Heuer, Esq., FAIA (for the original material) and Howard G. Goldberg, Esq., Hon. AIA (for editorial changes and supplementary material concerning the 1997 Edition of A201).



EXHIBIT Y

All commentary contained herein is copyright © 1999 by The American Institute of Architects. All rights reserved. Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the AIA.

AIA Document A201 is copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, © 1997 by The American Institute of Architects. Fifteenth edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

This publication should not be understood to offer legal or other professional service. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

The American Institute of Architects, 1735 New York Ave., N.W., Washington, D.C. 20006.

# Introduction

Most prime contracts on construction projects include a general conditions document. On building projects in the United States, the one most commonly used is AIA Document A201. Perhaps because this document is so familiar to architects and contractors, its usefulness in coordinating the project is often overlooked.

Subcontracts ordinarily adopt by reference the relevant portions of the contract between owner and contractor—including the general conditions. The subcontracts then require that their terms "pass through" to sub-subcontractors, and so on down through the tiers, so that all parties performing work on the site will be coordinated by one general conditions document. The general conditions define the owner's and architect's roles and authority on the project, and are referenced in turn by the owner-architect agreement. If the contractor provides performance and payment bonds, the contractor's surety guarantees what is required under those same general conditions. If the owner's lender requires assignment of the construction contract, it proposes to assume the owner's responsibilities under the general conditions as well.

On a well-organized project, all participants are bound in some measure by the general conditions. This document brings order to a diffuse process, seemingly made to order for finger-pointing, by establishing clearly defined lines of authority. The general conditions perform another vital function on competitively bid projects, providing a commonly recognized baseline that bidders can use—in a relatively short time and with limited legal services—to measure the risks and benefits of the proposed bargain. Not coincidentally, the widespread use of general conditions in this country may be traced to the years immediately following passage of the Snag Act, which first required open competitive bidding on U.S. government contracts.

The AIA published its first general conditions document, the ancestor of A201, in 1911. Since that time, many procedures that have become customary in construction contracting have originated in AIA general conditions documents. Numerous government construction contract forms have been patterned on A201. The document represents the accumulated experience of generations of owners, architects, contractors, subcontractors and others involved in the construction process, and its language has been drafted with a view to allowing only one unambiguous interpretation. That language has formed the basis for thousands of court decisions. A useful guide to the case law on A201 and other AIA documents is The American Institute of Architects Legal Citator (New York: Matthew Bender, 1999).

A further advantage of A201 is that experienced participants in the construction process are thoroughly familiar with it. They can then focus on the supplementary and other conditions that modify the known baseline. And, at the risk of stating the obvious, the document is intended to be modified. It is a standard form and cannot perfectly fit all the projects on which it is used.

A201's wide acceptance stems in part from the AIA's drafting process, which seeks to develop a consensus among those who represent interests significantly affected by the document. A201-

1997, like its precursors, is the product of years of discussions involving owners, contractors, subcontractors and architects, as well as legal and insurance counsel. It has been approved and endorsed by the Associated General Contractors of America.

Drafting of A201-1997 was coordinated with the drafting of other related AIA documents. These include the 1997 editions of the A101 and A111 agreement forms, the A401 subcontract form and the owner-architect agreements, B141 and B151. All of these documents incorporate the 1997 A201 by reference. Because of interlinkages among the various AIA documents, users should be careful to use only the latest edition of any AIA document in order to ensure consistency in the terms of the various documents.

A201 is also incorporated by reference into some of AIA's owner-construction manager agreements and design/build agreements. Contact the AIA concerning any recently published amendments for use in adapting A201-1997 to these other documents.

A201-1997 is the fifteenth edition, incorporating the latest refinements as well as experience gained over the past century. The revisions are based on input received from owners, contractors, architects, subcontractors and others involved in the construction process. Note, however, that the scope of this Commentary is not limited to the 1997 revisions. The annotations contained herein are intended to cover "frequently asked questions" about the entire document.

**Changes in the 1997 Edition**

The principal changes are summarized below. For a side-by-side comparison of the 1997 edition with its predecessor, showing changes with underlining and strike-throughs, see AIA Document A201: Comparison of 1987 and 1997 Editions. This publication is contained in the A201-1997 Education Kit, along with the Briefing Module Manual and a copy of the document itself.

**Owner's Information.** Under Subparagraph 2.2.1, the owner is required to notify the contractor prior to changing financial arrangements for the project. Under Subparagraph 2.2.3, the contractor is entitled to rely on information provided by the owner. Subparagraph 2.2.4 requires the owner to furnish information or services relevant to the Contractor's Work.

**Contractor's Review of Contract Documents and Field Conditions.** Paragraph 3.2 requires the contractor to review the contract documents and report any errors or omissions to the architect. The contractor performs this review in its capacity as a contractor, and is not required to second-guess decisions made by the architect as a design professional.

**Substitutions.** Under Subparagraph 3.4.2, substitutions may only be made in accordance with a change order, thus requiring the owner's approval.

**Incidental Design Services.** Subparagraph 3.12.10 lays out the ground rules for provision of design services for systems or components by the contractor.

**Indemnification.** The phrase "in whole or in part" has been eliminated from Subparagraph

3.18.1, bringing it fully into line with the comparative fault rule adopted in most jurisdictions. The exception for actions of the architect has also been eliminated. The indemnification provision has also been modified for use with Project Management Protective Liability coverage, discussed below.

**Mutual Waiver of Consequential Damages.** Under Subparagraph 4.3.10, the owner and contractor waive claims for consequential damages. This provision limits the parties to direct damages arising out of any dispute under the contract.

**Mediation.** Under Paragraph 4.5, mediation is now required as a condition precedent to arbitration or litigation. This requirement is independent of the arbitration provision, and will apply even if arbitration is deleted.

**Construction Change Directives.** Subparagraph 7.3.8 requires that amounts not in dispute under construction change directives be included in applications for payment, and provides for interim determination by the architect of amounts that remain in dispute.

**Applications for Payment.** Under Clause 9.3.1.2, the contractor may apply for amounts it does not intend to pay to subcontractors if the work in question has been performed by others whom the contractor does intend to pay.

**Payments to be Held for Subcontractors.** Subparagraph 9.6.7 requires the contractor, in the absence of a bond, to hold in trust payments received for subcontractors or suppliers who have properly performed work.

**Release of Retainage.** Under Subparagraph 9.8.5, full release of retainage is required at substantial completion.

**Hazardous Materials.** Subparagraph 10.3.1 defines hazardous materials to include harmful substances other than asbestos and PCB. Under Subparagraph 10.3.2, Work in an area affected by hazardous material will resume by agreement of the parties and without a decision by the architect. Under Paragraph 10.4, the owner is absolved of responsibility for materials brought on the site by the contractor (other than those required by the contract documents). Under Paragraph 10.5, the owner indemnifies the contractor for remediation costs of the kind that might arise under CERCLA, provided the contractor was not negligent and incurred liability solely by performing work as required under the contract.

**Insurance.** Paragraph 11.3 gives the owner the option of requiring the contractor to purchase a Project Management Protective Liability policy. This new policy provides primary coverage for the owner's, contractor's and architect's liability to third-parties based on their authority to manage the project. If the owner chooses to exercise this option, the contract sum will be adjusted to reflect the cost of purchase.

**Correction of Work.** Under Clause 12.2.2.1, failure by the owner to notify the contractor of

defective work discovered during the one-year correction period is deemed a waiver of both the correction and warranty remedies with respect to that work.

**Termination by the Owner for Convenience.** Under Paragraph 14.4, the owner is now permitted to terminate the contract for convenience.

As the foregoing discussion makes clear, the 1997 edition of A201 is a refinement of the 1987 edition and builds on the experience gained with it and earlier editions. Much of the document is unchanged. Provisions that are essentially unchanged include the contractor's warranty, shop drawing review, arbitration, change orders, tests and inspections, and termination by the contractor.

Modifying the General Conditions

As mentioned earlier, A201 is intended to be modified. It is designed for general use, and cannot include all the requirements applicable to a specific project and location. changes should be made with great care, however. Numerous considerations specific to each project will determine what modifications are needed, but guidance on how to make them may be given in terms of four broad principles.

**Make sure the changes show.** Parties such as contractors, subcontractors, lenders, insurers and sureties routinely take risks based on contract documents prepared by others. To the extent those documents are based on recognized standard forms, the variations in risk from the baseline of the standard form are exposed for scrutiny. The operative term here is recognized: modifications should be made in such a way that they will stand out clearly from the text of the standard document. If the document is retyped, scanned or otherwise merged with text from another origin, that distinction will be obscured.

There are a number of problems with retyping and scanning: they introduce the possibility of errors, and even minor errors may make the legal effect of the language less certain. The overriding problem, however, is that the baseline of the standard document is obscured and the efficiency inherent in standardization is lost. A lending institution, for example, will often authorize its loan officer to sign off on construction loans when standard forms are used. Retyped or scanned versions of the same forms commonly require review by the lender's attorneys, because these processes introduce many of the same unknowns as are present in manuscript contracts.

Contractors, who must quickly calculate risk based on vast amounts of information, make similar judgments. Lacking the time to have legal counsel review an unfamiliar general conditions document, a prudent contractor will at least apply a contingency multiplier to its bid or proposal. Or, depending on market conditions and the unknowns involved, the contractor may forego the project.

**Make changes in the proper location.** Over the years, the construction industry has developed a pattern of accepted locations of subject matter within the contract documents. AIA Document A521, Uniform Location of Subject Matter, sets out this pattern in great detail. A521 is prepared

and updated by the AIA and the Engineers' Joint Contract Documents Committee (EJCDC), and published jointly by the AIA, EJCDC's member organizations and the Construction Specifications Institute (CSI). No summary statement can substitute for actual study of this document, but the following considerations apply generally to changes to the general conditions.

Matters affecting the basic legal rights and responsibilities of the parties, but which vary from one project to another, should be included in the supplementary conditions.

Matters having to do with temporary facilities and administrative and procedural requirements should be included in division 1 of the specifications.

Matters relating to specifications are outside the scope of this commentary; readers are referred to AIA's MASTERSPEC™ and CSI's Manual of Practice. Guidance in preparing supplementary conditions may be found in AIA Document A511, Guide for Supplementary Conditions.

As the term would imply, supplementary conditions are usually assembled as a separate document. Users of the software AIA Contract Documents: Electronic Format for Windows™ may wish to incorporate such modifications directly into the text of A201-1997, where they will be distinguished from the standard language via underscoring and strike-throughs. Generally, the use of separate supplementary conditions is the more accepted practice at this time.

**Make only the changes you need.** In order to coordinate the efforts of the various participants on the project, A201's language contains numerous linkages. These occur both within A201 itself and between A201 and other AIA documents. For obvious reasons, A201 is adopted by reference into certain AIA owner-contractor agreement forms. It is also adopted into AIA owner-architect agreements and into AIA's subcontract form. All of these documents rely on common definitions, most of which are found in A201. Finally, "flow down" provisions require that rights and responsibilities originating in A201 and other contract documents be passed through to subcontractors and sub-subcontractors.

All this means that changes made to A201 can have unintended consequences. To guard against this possibility, the wise course is to make only the modifications required and to do so using the vocabulary of the document itself. Purely stylistic changes should be avoided.

**Other AIA General Conditions Documents**

AIA Document A201 is the keystone document for construction projects organized along "conventional", "traditional," or "design/bid/build" lines—where the architect and contractor are retained directly, and separately, by the owner, and where an independent construction manager is not retained. Other AIA general conditions documents are described briefly below.

AIA Document A201/CMa, General Conditions of the Contract for Construction—Construction Manager/Adviser Edition, is intended for use on construction projects where a construction manager is retained in the role of independent adviser to the owner. Note that this document should not be used on projects where the construction manager acts as the constructor, or where

the construction manager contracts directly with those who supply labor and materials for the project.

AIA Document A205, General Conditions of the Contract for Construction of a Small Project, is packaged with AIA Document A105, Standard Form of Agreement Between Owner and contractor for a Small Project. These documents are intended for use on projects of modest size and brief duration where the basis of payment is a stipulated sum. They do not contain the detail of other AIA documents, and should not be considered substitutes for them.

AIA Document A271, General Conditions of the Contract for Furniture, Furnishings and Equipment, is intended for use for use as part of interiors contracts under which only incidental construction is performed.

Condensed general conditions are contained in AIA Documents A107, Abbreviated Owner-Contractor Agreement Form for Construction Projects of Limited Scope, and A177, Abbreviated Owner-Contractor Agreement for Furniture, Furnishings and Equipment. These abbreviated forms should not be used with other general conditions documents.

**General Principles Underlying AIA Forms**

AIA form documents are intended to benefit all who participate in the design and construction process. This includes, above all, the public, whose members are the ultimate users of the built environment. They are, in fact, the focus of the AIA's commitment to "coordinate the building industry and the profession of architecture to insure the advancement of the living standards of our people through their improved environment." To ensure the acceptance of its standard form contracts by the construction industry, the AIA relies on a consensus-building process aimed at balancing the interests of all participants through a reasonable apportionment of risks and responsibilities. No one party's interests are allowed to dominate, including those of the architect. This is the basis of the reputation of fairness and balance that AIA forms have gained in over a century of use. To learn more about the AIA's approach to drafting contract documents, write to obtain a copy of AIA Document M120, Documents Drafting Principles.

| DOCUMENT TEXT | COMMENTS |
|---|---|
| Documents, and shall so notify the Architect. | This precludes the contractor from using money received for subcontractors' work for other purposes. It does not, however, imply that a subcontractor's right to be paid for completed work is contingent upon the contractor's receipt of payment from the owner. |
| 9.6.2  The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner. | If the contractor has a legitimate question about the quality of a subcontractor's work, the proper action would be for the contractor to adjust the application for payment submitted to the owner with regard to that subcontractor for that period. Funds already paid by the owner to the contractor for such subcontractors should either be paid to the subcontractor or returned to the owner.

Unless otherwise provided in the subcontract agreement, the contractor may not retain from payments due to subcontractors more than the owner retains from payments due to the contractor relative to that subcontractor's work. |
| 9.6.3  The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor. | This is one of very few direct contacts between the architect and subcontractors contemplated by AIA Document A201-1997. |
| 9.6.4  Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law. | Lien laws and other state or local law outside of the contract documents may apply. |
| 9.6.5  Payment to material suppliers shall be treated in a manner similar to that provided in Subparagraphs 9.6.2, 9.6.3 and 9.6.4. | |

| COMMENTS | DOCUMENT TEXT |
|---|---|
| The mistaken inclusion of, and payment for, an item of work on one certificate does not preclude the architect from adjusting that item in a subsequent certificate. | |
| This requirement establishes a trust in favor of subcontractors and suppliers of monies received by the contractor by reason of work and materials of its subcontractors and suppliers. This subparagraph gives subcontractors and suppliers a preference in the event of the contractor's bankruptcy and thereby protects the owner from lien claims which could have been asserted by those entities had they not been furnished with this preference. As the recipient of trust funds, the contractor is under an obligation to properly apply the funds for the account of the subcontractors and suppliers. | |
| Absent this provision, the contractor would not be able to co-mingle monies received for the benefit of subcontractors or suppliers with the contractor's own funds. Such a result would create accounting and bookkeeping complexities unnecessary to the accomplishment of the purpose of this provision. | |

| DOCUMENT TEXT | COMMENTS |
|---|---|
| **9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents. | |
| **9.6.7** Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision. | The architect determines the date of substantial completion by establishing the point at which the work or a designated portion thereof *can* be occupied or used as intended. This issue is not affected by the dollar value of the uncompleted work; the absence of a one-dollar part in the only elevator serving a hospital operating room could delay substantial completion.

It often happens that an occupancy permit is issued by the appropriate authority at approximately the same time as the date of substantial completion. These times *are not* interchangeable. The criteria upon which an occupancy permit is issued may vary from jurisdiction to jurisdiction, while the criteria for establishing the date of substantial completion is fixed by contract.

Because the contract time is tolled at substantial completion, contractors sometimes tend to see the work as substantially complete sooner than would more objective observers. As an independent adviser, the architect makes the final decision on this matter. |
| **9.7  FAILURE OF PAYMENT**<br>**9.7.1** If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall | |

**PROOF OF SERVICE**

I, Martha Gonzalez, declare:

I am employed by the law firm of DANNING, GILL, DIAMOND & KOLLITZ, LLP, in the County of Los Angeles, State of California. I am employed in the office of a member of the bar of this court at whose direction the service was made. I am over the age of 18 years and am not a party to the within action. My business address is 2029 Century Park East, Third Floor, Los Angeles, California 90067-2904.

On November 20, 2008, I served the following document(s):

**SUPPLEMENT TO APPENDIX 2 TO PRE-TRIAL STIPULATION**

on the interested parties addressed as follows:

<u>Attorneys for Defendant</u>
Randall S. Guritzky, Esq.
Gladych & Associates
1400 Bristol Street North, Suite 270
Newport Beach, CA  92660

(By Mail) I placed the document for collection and deposit in the mail. I am familiar with this firm's practice for the collection and processing of correspondence for mailing. Under that practice, the document would be placed in a sealed envelope and deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at 2029 Century Park East, Third Floor, Los Angeles, California 90067-2904, in the ordinary course of business. The documents served were placed in sealed envelopes and placed for collection and mailing following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed on November 20, 2008, at Los Angeles, California.

Martha Gonzalez
(Type or print name)    (Signature)

331259.01 [XP]    24132