1  GEORGE E. SCHULMAN (State Bar No. 064572)
   JOHN N. TEDFORD, IV (State Bar No. 205537)
2  AARON E. DE LEEST (State Bar No. 216832)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone: (310) 277-0077
   Facsimile: (310) 277-5735
5
   Plaintiff R. Todd Neilson, Chapter 7 Trustee
6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11

12  In re                                    ) Case No. 2:04-35757-VZ
                                             )
13  PECK/JONES CONSTRUCTION                  ) Chapter 7
    CORPORATION,                             )
14                                           )
              Debtor.                        )
15                                           )
    _____       )
16  R. TODD NEILSON, CHAPTER 7 TRUSTEE,      ) Adv. No. 2:07-01050-VZ
                                             )
17            Plaintiff,                     ) **SECOND AMENDED PRE-TRIAL**
                                             ) **STIPULATION**
18       vs.                                 )
                                             ) Appendices 1 and 2 filed contemporaneously
19  INTEGRATED MECHANICAL SYSTEMS,           ) with original pre-trial stipulation
    INC., a California corporation,          )
20                                           ) Date:    April 30, 2009
              Defendant.                     ) Time:    11:00 a.m.
21                                           ) Place:   Courtroom 1368
                                             )          255 E. Temple St.
22  _____       )          Los Angeles, CA 90012

23

24

25

26

27

28

                              -1-

## PRE-TRIAL STIPULATION

Plaintiff R. Todd Neilson, Chapter 7 trustee (the "Trustee" or "Plaintiff") for the estate of Peck/Jones Construction Corporation (the "Debtor"), and Defendant Integrated Mechanical Systems, Inc. ("IMS" or "Defendant"), by and through counsel, submit the following pre-trial stipulation and order pursuant to Local Bankruptcy Rule 7016-1(b)(2).

I.    UNDERLYING ISSUES OF FACT COMMON TO ALL CLAIMS FOR RELIEF

A.    Peck/Jones Construction Corporation ("Debtor") was a general contractor which engaged in large construction projects

NOT CONTESTED

B.    On or about March 12, 2002, Robert F. Kennedy Medical Center (as "RFK" or "Owner") and Debtor (collectively "the Parties") entered into a Standard Form of Agreement Between Owner and Contractor (the "Contract") for a project commonly known as the Robert F. Kennedy Medical Center Psychiatric Unit/Central Storage Remodel and New Patient Tower (the "Project").

NOT CONTESTED

C.    The general form of the Contract and the General Conditions were both drafted by the American Institute of Architects ("AIA"), but certain modifications were made to the forms by the Parties.

NOT CONTESTED

D.    The Contract is AIA Document AIII-1997, and the General Conditions is AIA Document A201-1997 (collectively, the "AIA Form Documents").

NOT CONTESTED

E.    Section 9.6.7 of the General Conditions states: "Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing

-2-

1  contained herein shall require money to be placed in a separate account and not commingled with

2  money of the Contractor, shall create any fiduciary liability or tort liability on the part of the

3  Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages

4  against the Contractor for breach of the requirements of this provision."

5          NOT CONTESTED

6     F.    Ron Clement was RFK's owner's representative for the Project.

7          NOT CONTESTED

8     G.    Mr. Clement has worked in the construction industry since 1984.

9          NOT CONTESTED

10    H.    The AIA published a Commentary (the "AIA Commentary") on Section 9.6.7 of

11  AIA Document 201-1997 (the General Conditions), which states: "This requirement establishes a

12  trust in favor of subcontractors and suppliers of monies received by the contractor by reason of

13  work and materials of its subcontractors and suppliers. This subparagraph gives subcontractors and

14  suppliers a preference in the event of the contractor's bankruptcy and thereby protects the owner

15  from lien claims which could have been asserted by those entities had they not been furnished with

16  this preference. As the recipient of the trust funds, the contractor is under an obligation to properly

17  apply the funds for the account of the subcontractors and suppliers."

18          NOT CONTESTED

19    I.    In its capacity as general contractor on the Project, Peck/Jones required heating

20  ventilating and air conditioning ("HVAC") equipment to be delivered to the Project in a

21  Subcontract Agreement executed between Peck/Jones and Integrated Mechanical Systems ("IMS")

22  dated November 24, 2003.

23          NOT CONTESTED

24    J.    IMS was the HVAC subcontractor on the Project.

25          NOT CONTESTED

26    K.    IMS engaged a number of materialmen and subcontractors, including but not limited

27  to DMG Corporation, M.W. Sausse & Co., Inc., Control Management Systems, Inc., Haldeman,

28

-3-

1    Inc., Air Conditioning Specialties Company, Strobic Air, and York International Corporation to

2    provide materials and/or services under its subcontract agreement with Peck/Jones.

3    <u>NOT CONTESTED</u>

4    L.    IMS sent the debtor a Conditional Waiver & Release dated June 22, 2004 of its right

5    to record a Mechanic's Lien on RFK's property in the amount of $376,672.00.

6    <u>NOT CONTESTED</u>

7    M.    Pursuant to its subcontract agreement, IMS submitted an Application and

8    Certification for Payment Number 3 for the month of June 2004, which sought payment from the

9    Debtor in the total amount of $376,672.00.

10    <u>NOT CONTESTED</u>

11    N.    On or about July 1, 2004, Debtor submitted Application and Certificate for Payment

12    Number 34 ("Payment Application 34") to RFK for the Period ending June 30, 2004, for the

13    Project.

14    <u>NOT CONTESTED</u>

15    O.    The total amount sought by Debtor from RFK in Payment Application 34 was

16    $728,008.13, $376,672.00 of which was for IMS.

17    <u>NOT CONTESTED</u>

18    P.    RFK paid Debtor the sum of $651,506.13 in Check Number 221078 dated August 4,

19    2008, representing the full amount Debtor sought in Payment Application 34 less certain credits.

20    <u>NOT CONTESTED</u>

21    Q.    Debtor deposited check number 221078 into its general account on August 20, 2004.

22    <u>NOT CONTESTED</u>

23    The balance in the Debtor's general account as of the close of business on August

24    19, 2004, was $172,680.87.

25    <u>NOT CONTESTED</u>

26    R.    On Friday, August 20, 2004, there were two deposits into the Debtor's general

27    account: (1) a deposit in the amount of $651,506.13; and (2) a deposit in the amount of $75,698.00.

28    There were no other deposits to the Debtor's account on August 20, 2004.

-4-

1     NOT CONTESTED

2     S.     The balance in the Debtor's general account as of the close of business on August

3   20, 2004, was $861,315.00.

4     NOT CONTESTED

5     T.     The following Monday, August 23, 2004, a lump sum of $650,000.00 was wire

6   transferred out of the Debtor's general account into Wells Fargo Bank account number

7   7038281585.

8     NOT CONTESTED

9     U.     The $650,000 transferred out of the Debtor's general account on August 23, 2004,

10   was transferred out of the Debtor's general account into Wells Fargo Account Number

11   7038281585, an account held by one of the Debtor's principals, Guillermo Montero ("Montero").

12     NOT CONTESTED

13     V.     Also on August 23, 2004, an aggregate of $92,144.36 of checks cleared the account.

14   There were zero deposits into the general account on August 23, 2004.

15     NOT CONTESTED

16     W.     The balance in the Debtor's general account as of the close of business on August

17   23, 2004, was only $119,170.64

18     NOT CONTESTED

19     X.     Montero used the $650,000 as security for a line of credit by Wells Fargo Bank for a

20   company Montero owned.

21     NOT CONTESTED

22     Y.     The $650,000 transferred from the Debtor's general account to Montero's personal

23   account (# 7038281585) remained in Montero's personal account until at least December 31, 2004.

24     NOT CONTESTED

25     Z.     Montero's personal account # 7038281585 maintained a balance of at least

26   $650,000.00 until at least December 31, 2004.

27     NOT CONTESTED

28

336395.01 [XP]      24132

1      AA.    The balance in the Debtor's general account as of the close of business on

2  September 9, 2004, was $21,426.89.

3             NOT CONTESTED

4      BB.    The balance in the Debtor's general account as of the close of business on October

5  4, 2004, was $180,901.86.

6             NOT CONTESTED

7      CC.    On or about September 29, 2004, Debtor sent IMS Subcontract Change Order No. 1

8  by facsimile.

9             NOT CONTESTED

10     DD.    On or about September 16, 2004, Debtor issued Check Number 21629 in the amount

11  of $29,481.61 to IMS, which cleared the Debtor's bank account on September 20, 2004.

12           NOT CONTESTED

13     EE.    On or about September 23, 2004, Debtor issued Check Number 21668 in the amount

14  of $46,458.00 jointly to IMS and Control Management Systems, Inc., which cleared the Debtor's

15  bank account on September 29, 2004.

16           NOT CONTESTED

17     FF.    On or about September 27, 2004, Debtor issued Check Number 21697 in the amount

18  of $10,650.72 jointly to IMS and Haldeman, Inc., which cleared the Debtor's bank account on

19  October 1, 2004.

20           NOT CONTESTED

21     GG.    On or about October 4, 2004, Debtor issued Check Number 21719 in the amount of

22  $29,832.62 jointly to IMS and Air Conditioning Specialties Company, which cleared the Debtor's

23  bank account on October 12, 2004.

24           NOT CONTESTED

25     HH.    On or about October 4, 2004, Debtor issued Check Number 21720 in the amount of

26  $22,622.34 jointly to IMS and Strobic Air, which cleared the Debtor's bank account on October 14,

27  2004.

28           NOT CONTESTED

1    II.    On or about October 4, 2004, Debtor issued Check Number 21721 in the amount of

2   $40,593.75 jointly to IMS and York International Corporation, which cleared the Debtor's bank

3   account on October 13, 2004.

4           NOT CONTESTED

5    JJ.    On or about October 4, 2004, Debtor issued Check Number 21723 in the amount of

6   $2,754.86 to IMS, which cleared the Debtor's bank account on October 14, 2004.

7           NOT CONTESTED

8    KK.    On October 7, 2004, IMS sent the Debtor an unconditional waiver and release dated

9   October 7, 2004, of its right to record a mechanic's lien on RFK's property in the amount of

10   $182,393.90.

11           NOT CONTESTED

12    LL.    Section 9.6.2 of the General Conditions states "The Contractor shall promptly pay

13   each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the

14   Contractor on account of such subcontractor's portion of the Work, the amount to which said

15   Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor

16   on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate

17   agreement with each Subcontractor, require each Subcontractor to make payments to Sub-

18   subcontractors in a similar manner."

19           NOT CONTESTED

20    MM.    Section 9.10.2 of the General Conditions states: "Neither final payment for any

21   remaining retained percentage shall become due until the Contractor submits to the Architect (1) an

22   affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with 21

23   the Work for which the Owner or the Owner's property might be responsible or encumbered (less

24   amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that

25   insurance required by the Contract Documents to remain in force after final payment is currently in

26   effect after final payment and will not be canceled or allowed to expire until at least 30 days' prior

27   written notice has been given to the Owner, (3) a written statement that the Contractor knows of no

28   substantial reason that the insurance will not be renewable to cover the period required by the

336395.01 [XP]    24132

1   Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the

2   Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and

3   waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent

4   and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release

5   or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to

6   indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made,

7   the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in

8   discharging such lien, including all costs and reasonable attorneys' fees."

9           NOT CONTESTED

10          NN.    On or about December 14, 2004 (the "Petition Date"), an involuntary bankruptcy

11  petition was filed against the Debtor in the within bankruptcy case.

12          NOT CONTESTED

13          OO.    The Bankruptcy Court entered its Order for Relief in the Debtor's bankruptcy case

14  on or about January 21, 2005, and thereafter, the Trustee was appointed as Chapter 7 Trustee for

15  Debtor's bankruptcy estate.

16          NOT CONTESTED

17          PP.    On January 19, 2007, the Trustee filed his Complaint to Avoid and Recover

18  Preferential Transfers alleging a single cause of action under Bankruptcy Code Sections 547 and

19  550 by which the Trustee seeks to avoid and recover seven transfers to IMS from the Debtor

20  totaling $182,393.90.

21          NOT CONTESTED

22          QQ.    The Court has jurisdiction of the proceeding pursuant to 28 U.S.C. §§ 1334(b),

23  157(a) and (b )(2)(F).

24          NOT CONTESTED

25

26  II.    **CLAIMS FOR RELIEF**

27          A.    **First Claim: Preferential Transfer - § 547(b)**

28                  1.    Elements of the Claim:

-8-

**a.** A transfer

NOT CONTESTED

**b.** of property of the estate

CONTESTED

Plaintiff: The $182,939.90 in funds transferred from the Debtor's bank account to IMS was property of the Debtor's estate. It came from the Debtor's bank account.

With respect to IMS's argument that the funds were trust funds, the burden is on IMS to establish the existence of a trust and, if a trust existed, that the funds actually received by IMS constituted trust funds. Under Ninth Circuit law, there is a presumption that alleged trust funds that are commingled with non-trust funds constitute property of the debtor. Danning v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214 (9th Cir. 1988) ("Because this money could have been used to pay other creditors, it presumptively constitutes property of the debtor's estate"). Therefore, where a construction trust fund exists, "a laborer/materialman is only entitled to funds under a trust if it can prove that the money it received or claims can be traced to funds paid to the subcontractor by the contractor. In re Sierra Steel, Inc., 96 B.R. 271, 274 (B.A.P. 9th Cir. 1989); see also Bullion Reserve, 836 F.2d at 1218 ("even if an express trust were created, [the transferee] would still have a duty under federal bankruptcy law to trace his funds to the [assets] he received. Such a tracing requirement is necessary to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors.").

There is no dispute that the $651,506.13 received by the Debtor from RFK was deposited by the Debtor into the Debtor's own general Wells Fargo Bank account. There is no dispute that these funds were commingled with other funds of the Debtor. There is no dispute that Montero took virtually all of the funds that the Debtor received from RFK and deposited them into his personal account. There is no dispute that IMS was eventually paid

-9-

$182,939.90 by checks drawn against the Debtor's general account. In light of such facts, under <u>Bullion Reserve</u>, the money paid to IMS is presumed to have constituted property of the Debtor, and IMS has the burden of tracing the $182,939.90 it received to the alleged trust res. IMS cannot do so, even if it can establish generally that a trust existed in the first place.

Evidence:

Testimony of Guillermo Montero and Gary Melnik

Exhibits: In addition to any exhibits identified by IMS, the Trustee identifies Defendant's Exhibits 123 and 124

Defendant: The allegedly preferential transfer from Debtor to IMS was not property of the Debtor's estate, as Debtor held the funds for IMS according to section 9.6.7 of the contract between Debtor and RFK. Furthermore, Business & Professions Code Section 7108 and Penal Code Section 484(b) impose severe penalties upon general contractors for failing to account for and pay funds due subcontractors and material suppliers. As the recipient of the trust funds, the contractor is under an obligation to properly apply the funds for the account of the subcontractors and suppliers. The funds IMS received from Debtor were trust funds.

Evidence:

Testimony of Ron Clement

Testimony of Gary Melnik

Testimony of Guillermo Montero

Testimony of Vachik Armenian

Testimony of Steve Malczewski

Exhibit A: Prime Contract, Section 9.6.7

Exhibit K: IMS's Conditional Waiver and Release submitted to Debtor on or about June 22, 2004.

-10-

336395.01 [XP]    24132

1        Exhibit U: IMS's Unconditional Waiver and Release Upon Final Payment

2        of October 7, 2004.

3        Exhibit Y: AIA Commentary on AIA Document A201-1997

4        **c.**     to or for the benefit of a creditor

5        <u>NOT CONTESTED</u>

6        **d.**     for or on account of an antecedent debt

7        <u>NOT CONTESTED</u>

8        **e.**     made while the debtor was insolvent

9        <u>NOT CONTESTED</u>

10        **f.**     that enables the creditor to receive more on account of his debt than

11        he would receive in a Chapter 7 liquidation

12        <u>NOT CONTESTED</u>

13

14  III.    <u>**DAMAGES**</u>

15      A.    **By reason of the forgoing, the Trustee is entitled to recover the amount of**

16        **$182,393.90, plus interest from the date of filing the complaint, from IMS.**

17        <u>CONTESTED</u>

18        <u>Plaintiff</u>: The Trustee is entitled to recover the amount of $182,393.90, plus

19        interest from the date of filing the complaint, from IMS.

20        <u>Evidence:</u>

21        Testimony of Greg Jones, Guillermo Montero, and Gary Melnik

22        Exhibits 68, 116, 117, 118, 119, 125, and 126

23        <u>Defendant</u>:

24        <u>Evidence:</u>

25        Testimony of Ron Clement

26        Testimony of Gary Melnik

27        Testimony of Guillermo Montero

28        Exhibits "B" through "W"

-11-

IV. **DEFENDANT'S AFFIRMATIVE DEFENSES**

    A.    **FIRST AFFIRMATIVE DEFENSE**: 11 U.S.C. § 547(c)(2)

        1.    **Elements of Affirmative Defense:**

            a.    **The Transfer was Made in Payment of a Debt Incurred by the Debtor in the Ordinary Course of Business or Financial Affairs of the Debtor and IMS**

NOT CONTESTED

            b.    **The Transfer was made in the ordinary course of business or financial affairs of the Debtor and IMS**

CONTESTED

      Defendant: A subjective standard governs whether a payment is made in the ordinary course of business: "whether the parties themselves considered the transaction ordinary". In re Chocolat (1995) 176 B.R. 540, 549. In determining whether the debt was paid in the ordinary course of business, courts consider a variety of factors, including: the length of the debtor's and creditor's business relationship; whether the amount or form of the transfer was inconsistent with the parties' past practices; whether the creditor employed any unusual collection strategy; and whether the creditor knew and took advantage of the debtor=s precarious financial condition. In re Grand Chevrolet (1994) 25 F.3d 728, 732. Even where the parties have not dealt with each other previously, summary judgment is still proper where the parties' transaction was "ordinary" in reference to the parties' practice with others. In re Ahaza Systems, Inc. (2007) 482 F.3d 1118. The parties considered the transaction ordinary.

      Evidence:

      Testimony of Ron Clement

336395.01 [XP]    24132

1    Testimony of Gary Melnik

2    Testimony of Guillermo Montero

3    Testimony of Vachik Armenian

4    Testimony of Steve Malczewski

5    Exhibits "B" through "X".

6    Plaintiff: The transfer of the $182,393.90 in funds from the Debtor to IMS was not

7    made in the ordinary course of business or financial affairs between the Debtor and

8    IMS.

9    The showing that must be made by a creditor who asserts a defense under §

10    547(c)(2), as to whether a transfer was made in the ordinary course of business or

11    financial affairs of the debtor and the transferee is as follows:

12    To satisfy § 547(c)(2)(B) the creditor must demonstrate that
the relevant payments were "ordinary in relation to past
13    practices between the debtor and [the] ... creditor." In re
Food Catering & Hous., Inc., 971 F.2d at 398. Effectively
14    this breaks down into two components. First, the creditor
must show a baseline of past practices between itself and the
15    debtor. See id.; 5 Collier on Bankruptcy ¶ 547.04[2][a], 547-
60 (rev. 15th ed. 2006). Second the creditor must show that
16    the relevant payments were "ordinary in relation to [these]
past practices." In re Food Catering & Hous., Inc., 971 F.2d
17    at 398. This is most commonly done by demonstrating that
the relevant payments did not differ from past payments in
18    "amount" or "form," were not the result of "unusual
collection or payment activit[ies]," or did not come as a result
19    of the "creditor [taking] advantage of the debtor's
deteriorating financial condition." Sulmeyer v. Suzuki (In re
20    Grand Chevrolet, Inc.), 25 F.3d 728, 732 (9th Cir. 1994). But
see In re Ahaza, Inc., 482 F.3d at 1129 (finding that
21    traditional factors are non-exclusive and other factors bearing
on past practices may be relevant).

22

23    In re Healthcentral.com, 504 F.3d 775 (9th Cir. 2007).

24

25    First, the transaction between the Debtor and IMS with regard to the project

26    was handled differently than with respect to other subcontractors. The Debtor did

27    not regularly enter into contracts with its subcontractors' suppliers (i.e. DMG) –

28    particularly after supplies were delivered to the projects. Indeed, the Debtor often

-13-

1    issued joint checks to a subcontractor and its supplier.  Here, however, even though

2    the Debtor had already sought payment from the owner for amounts that had been

3    sought by IMS, the Debtor entered into a purchase order with DMG for the HVAC

4    equipment that had already been delivered to the project.  This was not ordinary.

5        Second, the Debtor did not consider this ordinary because the Debtor's

6    principal withdrew $650,000 in funds from the Debtor's account, including virtually

7    all of the funds it received from RFK for payment of IMS, and deposited such funds

8    in his personal account.

9                Evidence:

10               Testimony of Alan Cade, Greg Jones, Gary Melnik, Vachik

11               Armenian and Guillermo Montero

12               Exhibits: In addition to any exhibits identified by IMS, the Trustee

13               identifies Exhibits 30, 34, 36, 58, 63, 67, 68, 71, 116, 117, 118, 119

14               120, 121, 122, 123, 124, 125, 126 and 127.

15        **c.      The Transfer was Made According to ordinary business terms.**

16               CONTESTED

17        Defendant:  An objective standard governs whether a challenged transfer is

18    "ordinary".  In re Kaypro (1999) 230 B.R. 400, 404; Diamond v. Gemel Pharmacy

19    Group, Inc. (In re Inland Global Medical Group, Inc. (9th Cir., 2006) 362 B.R. 459,

20    464 (the test "requires a creditor to prove that the payment was ordinary in relation

21    to prevailing business standards").  See also, In re Chocolat, Inc. (1995) 176 B.R.

22    540, 549 (stating, the test "is whether the relevant industry would consider the

23    payment to have been made according to ordinary business terms").  "This test may

24    be satisfied as long as the payment was made within the range of terms that

25    encompasses the practices in which firms similar in some general way to the

26    creditor in question engage...only dealings so idiosyncratic as to fall outside the

27    broad range should be deemed extraordinary..." In re Chocolat 176 B.R. 540, 550.

28    Here, the transfer was made according to ordinary business terms.

-14-

1    Evidence:

2    Testimony of Ron Clement

3    Testimony of Gary Melnik

4    Testimony of Guillermo Montero

5    Testimony of Vachik Armenian

6    Testimony of Steve Malczewski

7    Exhibits "B" through "X".

8

9    Plaintiff: The transfers to IMS were not made in the ordinary course of business

10    terms in the construction industry.

11    A determination of whether a transaction falls outside of the ordinary course

12    of business is a question of fact depending on the nature of industry practice. In re

13    Jan Weilert RV, Inc., 315 F.3d 1192, 1196 (9th Cir. 2003).

14    In Healthcentral.com, the Ninth Circuit also reiterated the showing that must

15    be made by a creditor asserting a defense under § 547(c)(2), with respect to whether

16    a transfer is made according to ordinary business terms:

17

18    To satisfy § 547(c)(2)(C) the creditor must demonstrate that
the relevant payments were "ordinary in relation to prevailing
business terms." In re Food Catering & Hous., Inc., 971 F.2d

19    396, 398 (9th Cir.1992). As before, this effectively breaks
down into two components. First the creditor must establish

20    the "broad range" of business terms employed by similarly
situated debtors and creditors, including those in financial

21    distress, during the relevant period. In re Jan Weilert RV,
Inc., 315 F.3d at 1197-98. Second, the creditor must show

22    that the relevant payments were "ordinary in relation to
[these] prevailing business terms." See In re Kaypro, 218

23    F.3d at 1074. In general, § 547(c)(2)(C) should not pose a
particularly high burden for creditors. See In re Jan Weilert

24    RV, Inc., 315 F.3d at 1198 (holding only payments which are
so unusual as to be "aberration[s] in the relevant industry" do

25    not satisfy § 547(c)(2)(C)).

26    In re Healthcentral.com, 504 F.3d 775 (9th Cir. 2007).

27

28

-15-

The Trustee's expert witness will testify that the $182,393.90 in transfers from the Debtor to IMS were not paid according to ordinary business terms prevailing in the construction industry.

> Evidence:
>
> Testimony of Alan Cade, Greg Jones, Gary Melnik, Vachik Armenian and Guillermo Montero
>
> Exhibits: In addition to any exhibits identified by IMS, the Trustee identifies Exhibits 30, 34, 36, 58, 63, 67, 68, 71, 116, 117, 118, 119 120, 121, 122, 123, 124, 125, 126 and 127.

B.    **SECOND AFFIRMATIVE DEFENSE:**

    a.    **The allegedly preferential transfer from Debtor to IMS was intended by Debtor and IMS to be a contemporaneous exchange for new value given to the Debtor.**

CONTESTED

Defendant: According to Section 9.10.2 of the Contract between Debtor and RFK, Debtor, if a mechanic's lien is recorded by a subcontractor, such as IMS, and such lien remains unsatisfied after payments are made, the Debtor would be required to refund to RFK all money that RFK may be compelled to pay in discharging such lien, including all costs and reasonable attorney's fees." Thus, before Debtor could receive each progress payment, RFK required the Debtor to obtain a document from IMS waiving and releasing IMS's rights to file a mechanic's lien against the property. Further, the Debtor could not receive another progress payment until it could show that all material suppliers and subcontractors, such as IMS, had been paid.

> Evidence:
>
> Testimony of Ron Clement
>
> Testimony of Gary Melnik

-16-

1    Testimony of Guillermo Montero

2    Testimony of Vachik Armenian

3    Testimony of Steve Malczewski

4    Exhibits "A" through "W".

5

6    Plaintiff: IMS's lien releases were not intended by the Debtor and IMS to be a

7    contemporaneous exchange for "new value" given to the Debtor.

8    First, the release of a mechanic's lien is not "new value." The words "new

9    value" in § 547(c)(1) constitute a defined term, meaning

10    money or money's worth in goods, services, or new credit, or
     release by a transferee of property previously transferred to
     such transferee in a transaction that is neither void nor

11    voidable by the debtor or the trustee any under applicable
     law, including proceeds of such property, but does not include

12    an obligation substituted for an existing obligation.

13    11 U.S.C. § 547(a)(2).

14    IMS did not give any money, goods, services or new credit to the Debtor in

15    exchange for the funds transferred by the Debtor to IMS.  IMS also did not release

16    any property that had previously been transferred by the Debtor to IMS.

17    Second, even if IMS's release of its right to record a mechanic's lien

18    generally constitutes "new value" as defined by § 547(a)(2), the release of such a

19    right does not constitute new value "given to the Debtor." See 11 U.S.C. §

20    547(c)(2)(A).  Had IMS exercised a right to record a mechanic's lien, the lien would

21    not have been against any property of the Debtor; instead, it would have been

22    against RFK's property. See Civil Code § 3110.  As a result, IMS's release of a

23    right to record a mechanic's lien was actually for the benefit of RFK, and benefited

24    the Debtor in the sense that it may have allowed the Debtor to claim entitlement to

25    future progress payments.   The fact that the Debtor may have benefited in some

26    way from IMS's release of its mechanic's lien rights as against RFK's property does

27    not mean that anything has been "given to the Debtor" by IMS.

28

-17-

Finally, the transfers that IMS received from the Debtor were not in exchange for the lien release, but, instead were in exchange for materials and services that IMS provided to the RFK project during June 2004.  Accordingly, the $182,939.90 in transfers from the Debtor to IMS from September 29, 2004 to October 4, 2004, were not a substantially contemporaneous exchange.

Evidence:

Testimony of Greg Jones

Exhibits: In addition to any exhibits identified IMS, the Trustee identifies Exhibits  63, 68, 116, 117, 118, 119, 125, and 126.

**b.**    **The allegedly preferential transfer from Debtor to IMS was in fact a substantially contemporaneous exchange.**

CONTESTED

Defendant: According to the conditional waiver and release IMS submitted to the Debtor in advance of payment, IMS released its right to a mechanic's lien upon receipt of payment from the Debtor.  As such, contemporaneously with payment, the Debtor's obligation to RFK to maintain the project free of mechanic's liens and compensate RFK if a mechanic's lien was recorded was effectively released, as was the Debtor's obligation to pay IMS before the Debtor would be entitled to receive a subsequent progress payment.

Evidence:

Testimony of Ron Clement

Testimony of Gary Melnik

Testimony of Guillermo Montero

Testimony of Vachik Armenian

Testimony of Steve Malczewski

Exhibits "A" through "W".

-18-

336395.01 [XP]    24132

Plaintiff:  As discussed above, IMS' release of its mechanic's lien was not "new value."  Furthermore, the $182,939.90 that IMS received from the Debtor was not in exchange for the lien release, but, instead was in exchange for the HVAC services and materials that were provided on the Project during September and October, 2004.  Accordingly, the $182,939.90 in transfers from the Debtor to IMS was not a substantially contemporaneous exchange.

Evidence:

Testimony of Greg Jones

Exhibits: In addition to any exhibits identified IMS, the Trustee identifies Exhibits  63, 68, 116, 117, 118, 119, 125, and 126.

V.  **EXHIBITS TO BE OFFERED BY EACH PARTY AND OBJECTIONS TO EXHIBITS**

A.  **Plaintiff's Exhibits:**  Plaintiff's Exhibits are filed contemporaneously herewith as Appendix 1.

B.  **Defendant's Exhibits:**  Defendant's Exhibits are filed contemporaneously herewith as Appendix 2.

VI.  **WITNESSES TO BE OFFERED BY EACH PARTY**

A.  **Plaintiff:**

A list of the only witnesses Plaintiff shall call to testify at trial, a summary of their intended testimony, and an estimate of the length of direct and cross-examination is attached to this order as Appendix 3.

B.  **Defendant:**

-19-

336395.01 [XP]     24132

1    A list of the only witnesses Plaintiff shall call to testify at trial, a summary of their intended

2    testimony, and an estimate of the length of direct and cross-examination is attached to this order as

3    Appendix 4.

4

5

6    VII.    **REBUTTAL TESTIMONY**

7    Plaintiff, who has the burden of establishing each element of its claim(s) for relief, will be

8    the first to introduce evidence to prove the facts necessary to enable Plaintiff to recover.  When

9    Plaintiff rests, Defendant may then present evidence to contravene any of Plaintiff's claims or in

10    support of any affirmative defenses which the Defendant has included in this pre-trial stipulation.

11    After the close of Defendant's case, Plaintiff may present rebuttal testimony only to counter

12    evidence previously submitted by Defendant on issues not raised in Plaintiff's original presentation

13    of its case.

14                                    **STIPULATION**

15    The foregoing admissions have been made by the parties, and the parties have specified the

16    foregoing issues of fact and law remaining to be litigated.  Therefore, this order shall supersede the

17    pleadings and govern the course of trial in this adversary proceeding, unless modified to prevent

18    manifest injustice.

19

20    **IT IS SO STIPULATED.**

21

22    Dated: April 16, 2009                    DANNING, GILL, DIAMOND & KOLLITZ, LLP

23

24                                            By: _____

25                                                Aaron E. de Leest
                                                Attorneys for Plaintiff R. Todd Neilson,
                                                Chapter 7 Trustee

26

27

28

-20-

336395.01 [XP]    24132

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: April 16, 2009

GLADYCH & ASSOCIATES

By: _____
Randall S. Guritzky
Attorneys for Defendant Integrated
Mechanical Systems, Inc.

-21-

336395.01 [XP]    24132

# APPENDIX 1

**Plaintiff Offers:**

Exhibit 30.......Peck/Jones check no. 21718 dated October 4, 2004, payable to DMG in the amount of $184,106.00; and copy thereof with check stub.

Exhibit 34.......Facsimile dated September 21, 2004, from "Project Administrator" Debbie Serafini to Alan Friedberg and Gary Melnik enclosing copies of purchase orders.

Exhibit 36.......Facsimile dated September 27, 2004, from Vachik Armenian of IMS to Gary Melnik of Peck/Jones enclosing June billing summary, with handwritten notes thereon.

Exhibit 58.......Facsimile dated May 26, 2004, from Alfredo Llop to Gary Melnik enclosing IMS purchase orders.

Exhibit 63.......IMS' Application and Certification for Payment number 3, for period ending on June 30, 2004.

Exhibit 67: ....Subcontract Change Order Number 1 dated September 29, 2004, with transmittal.

Exhibit 68.......Peck/Jones check number 21668 dated September 23, 2004, payable to IMS and Control Management Systems in the amount of $46,458.00.

Exhibit 71.......Facsimile dated October 6, 2004, from Lynn of Peck/Jones to Vachik Armenian of IMS.

Exhibit 116.....Peck/Jones check number 21697 dated September 27, 2004, payable to IMS and Haldeman in the amount of $10,650.72.

Exhibit 117.....Peck/Jones check number 21719 dated October 4, 2004, payable to IMS and Air Conditioning Specialties Co. in the amount of $29,832.62.

Exhibit 118.....Peck/Jones check number 21720 dated October 4, 2004, payable to IMS and Strobic Air in the amount of $22,622.34.

Exhibit 119.....Peck/Jones check number 21721 dated October 4, 2004, payable to IMS and York International in the amount of $40,593.75.

Exhibit 120: ..Prime Contract executed between Debtor and Robert F. Kennedy Medical Center dated March 12, 2002.

Exhibit 121: ..Subcontract executed between Debtor and Integrated Mechanical Systems dated November 24, 2003.

Exhibit 122: ..RFK check no. 221078 dated August 4, 2004, payable to Peck/Jones, in the amount of $651,506.13; and Peck/Jones' Payment Application #34 submitted to RFK.

Exhibit 123: ..Account Statements for Wells Fargo Account Number 7038281585 from August 23, 2004 to December 31, 2004.

Exhibit 124: ..Account Statements for Wells Fargo Account Number 201-7946542 from June 30, 2004 to December 31, 2004

336395.01 [XP]    24132

1   Exhibit 125: ...Peck/Jones check number 21629 dated September 16, 2004, payable to IMS in the amount of $29,481.61.

2

3   Exhibit 126: ...Peck/Jones check number 21723 dated October 4, 2004, payable to IMS in the amount of $2,754.86.

4   Exhibit 127: ...Peck/Jones check number 21722 dated October 4, 2004, payable to M.W. Sausse & Co, Inc., in the amount of $10,262.10.

5

6   Defendant stipulates to the authenticity and admissibility of the above exhibits.

336395.01 [XP]    24132

**APPENDIX 2**

**Defendant Offers:**

A.    Subcontract Agreement of Defendant and Debtor dated November 24, 2003.

B    Submittal Comments by the Engineer dated December 15, 2003.

C.    Response to M-E Project Engineers project review dated December 10, 2003.

D.    Application and Certification for Payment-Contractors Application for Payment dated June 22, 2004.

E.    Credit Memos with DMG for September 2004.

F.    Conditional Waiver and Release Upon Progress Payment of Defendant dated July 1, 2004.

G.    Checks paid to others dated September and October 2004 for Pay Application #34

H    Pay Application 34

I.    Preliminary 20 Day Notice for Defendant.

J.    Preliminary 20 Day Notice for Air Treatment

K.    Conditional Waiver and Release Upon Progress Payment of Defendant dated June 22, 2004.

L.    Preliminary 20 Day Notice for York International

M.    Subcontract Change Order No. 1 Revised dated November 1, 2004.

N.    Subcontract Change Order No 2 dated October 8, 2004.

O.    Invoice of Defendant to Peck/Jones dated June 22, 2004.

P.    Conditional Waivers & Releases Upon Progress Payments by Strobic Air dated August 12, 2004.

Q.    Conditional Waiver and Release of Control Management Systems dated August 4, 2004.

R.    Conditional Waiver & Release upon Progress Payment of Haldeman, Inc. dated August 12, 2004.

S.    Conditional Waiver & Release upon Progress Payment of Air Conditioning Specialties, dated August 13, 2004.

T.    Conditional Waiver of Lien of York International dated August 27, 2004.

U.    Unconditional Waiver & Release Upon Progress Payment of Defendant dated October 7, 2004.

336395.01 [XP]    24132

1 | V.      Job Cost Detail of Defendant dated July 1, 2004.

2 | W.     Job Cost Detail of Defendant dated March 4, 2005.

3 | X.      Prime Contract between RFK and the Debtor.

4 | Y.      AIA Commentary to AIA Document A201-1997

5 |

6 | Plaintiff stipulates to the authenticity and admissibility of the Defendant's exhibits A-E and H-Y.

7 | Plaintiff objects to Defendant's Exhibits F and G.

8 |

336395.01 [XP]     24132

**APPENDIX 3**

**PLAINTIFF'S WITNESSES:**

     1.     Alan Cade – Will testify:

          A.     As the Trustee's expert witness.

          B.     That the $182,393.90 in payments from the Debtor to IMS wer not paid within the ordinary course of business between the parties.

          C.     That the $182,393.90 in payments from the Debtor to DMG was not paid according to ordinary business terms prevailing in the construction industry.

          Estimated Direct:  1 Hour

          Estimated Cross-examination: 1 Hour

     2.     Guillermo Montero – Will testify:

          A.     He was one of the principals of the Debtor.

          B.     He took $650,000 from the Debtor's general account on or about August 23, 2004, and transferred it into his Wells Fargo Bank account number 7038281585 where it remained until at least December 31, 2004.

          C.     The $650,000 was used by him as security for a line of credit by Wells Fargo Bank for another company that he owned.

          D.     His personal account # 7038281585 at Wells Fargo Bank maintained a balance of at least $650,000.00 until at least December 31, 2004.

          E.     To the course of dealing between the Debtor and IMS.

          F.     To the course of dealing between the Debtor and DMG.

          Estimated Direct:  1/2 Hour

          Estimated Cross:  1/2 Hour

336395.01 [XP]    24132

1      3.     J. Gregory Jones – Will testify:

2          A.     That he was the president of the Debtor.

3          B.     To the day to day operations of the Debtor.

4          C.     To the transfers between the Debtor and subcontractors.

5          D.     To the course of dealing between the Debtor and IMS.

6          F.     To the course of dealing between the Debtor and DMG.

7               Estimated Direct:  1/2 Hour

8               Estimated Cross: 1/2 Hour

9

10     4.     Gary Melnik – Will testify:

11         A.     That he was the CFO of the Debtor.

12        B.     Guillermo Montero took $650,000 from the Debtor's general account on or

13 about August 23, 2004, and transferred it into Guillermo Montero's personal account at Wells

14 Fargo Bank where it remained until at least December 31, 2004.

15        C.     The funds transferred to IMS did not come from the Debtor or Montero.

16        D.     That the funds used to pay IMS did not come from the owner of the RFK

17 project but instead came from owners of other projects.

18        E.     To the balance of the Debtor's accounts on certain dates and the source of

19 the funds in such accounts.

20              Estimated Direct:  1/2 Hour

21              Estimated Cross: 1/2 Hour

22

23     5.     Ron Clement – Will testify:

24         A.     To the course of dealing between RFK and the Debtor.

25        B.     That RFK Received Payment Application Number 34 on or about July 1,

26 2004.

27        C.     RFK approved Payment Application Number 34.

28              Estimated Direct:  1/2 Hour

336395.01 [XP]    24132

1              Estimated Cross: 1/2 Hour

3      6.      Vachik Armenian – Will testify:

4            A.     To the course of dealing between the Debtor and IMS.

5            B.     To the course of dealing between IMS and DMG.

6              Estimated Direct:  1/2 Hour

7              Estimated Cross: 1/2 Hour

336395.01 [XP]    24132

**APPENDIX 4**

**DEFENDANT'S WITNESSES:**

      1.     Vachik Armenian – Percipient and Expert.

Mr. Armenian is the First Vice President of Defendant and has personal knowledge regarding all aspects of this case as to the defense. Mr. Armenian will testify to the facts that support the affirmative defenses, as well as provide expert opinion as to the basis for the affirmative defenses, as necessary, i.e., that payments Integrated Mechanical Systems received from the debtor fall within the exception to preferential transfers as set forth in 11 U.S.C. Section 547(c)(2) in that any and all payments received by Integrated Mechanical Systems during the preference period were deliveries of monies by the Debtor: (a) in payment of a debt incurred by Peck/Jones Construction in the ordinary course of business or financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; (b) made in the ordinary course of business or financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; and (c) made according to ordinary business terms. Further, it is expected that Mr. Armenian will testify that the funds that were to be paid were trust funds of the creditor to be held in trust by the debtor.

              Estimated Direct:  1 hour

              Estimated Cross:   1 hour

      2.     Stefan Malczewski – Expert

Mr. Malczewski is the Owner of Pacific West Mechanical, Inc., a subcontractor on the project at issue in this case. Mr. Malczewski will testify to facts and issues related to the affirmative defenses of Defendant, as necessary, including that payments Integrated Mechanical Systems received from the debtor fall within the exception to preferential transfers as set forth in 11 U.S.C. Section 547(c)(2) in that any and all payments received by Integrated Mechanical Systems during the preference period were deliveries of monies by the Debtor: (a) in payment of a debt incurred by Peck/Jones Construction in the ordinary course of business or

financial affairs of Peck/Jones Construction and Integrated Mechanical Systems; (b) made in

the ordinary course of business or financial affairs of Peck/Jones Construction and Integrated

Mechanical Systems; and (c) made according to ordinary business terms.  Further, it is

expected that Mr. Malczewski will testify that the funds that were to be paid were trust funds

of the creditor to be held in trust by the debtor.

                    Estimated Direct:  1  hour

                    Estimated Cross:   1 hour


          3.        Ron Clement: Will testify.

                A.    To the course of dealing between RFK and the Debtor

                B.    Issues regarding the holding of owner's funds in trust for

                    subcontractors.

                C.    Issues of ordinary course as to general contractors dealing directly with

                    suppliers as allowed by contract.

                    Estimated Direct:  20 minutes

                    Estimated Cross:   20 minutes


          4.        Guillermo Montero: Will testify.

                A.    To transactions of Defendant and the Debtor as being "within the

                    ordinary course of business" and "within ordinary business terms."

                    Estimated Direct:  60 minutes

                    Estimated Cross:   30 minutes


          5.        Gary Melnik: Will testify.

                A.    To transactions of Defendant and the Debtor as being "within the

                    ordinary course of business" and "within ordinary business terms."

                    Estimated Direct:  60 minutes

                    Estimated Cross:   30 minutes

| 1 | In re: PECK/JONES CONSTRUCTION CORPORATION, | CHAPTER 7 |
| 2 | Debtor(s). | CASE NUMBER 2:04-35757-VZ<br>ADV. NO.: 2:07-01050-VZ |

**NOTE:** When using this form to indicate service of a proposed order, DO NOT list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/NEF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Danning, Gill, Diamond & Kollitz, LLP, 2029 Century Park East, Third Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as **SECOND AMENDED PRE-TRIAL STIPULATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 16, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:
United States Trustee (LA), ustpregion16.la.ecf@usdoj.gov
Aaron De Leest, aed@dgdk.com
George E Schulman, GSchulman@DGDK.Com
John N Tedford IV, jtedford@dgdk.com

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On April 16, 2009, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*
Attorneys for Defendant: Randall S. Guritzky, Esq., Gladych & Associates. Inc., 1400 Bristol Street North, Suite 270, Newport Beach, CA 92660

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 16, 2009, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*
Via Personal Delivery: Judge: Hon. Vincent P. Zurzolo, U.S. Bankruptcy Court, Roybal Federal Building, 255 E. Temple Street, Bin Outside of Suite 1360, Los Angeles, CA 90012-3332

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 16, 2009 | Martha Gonzalez | *Martha Gonzalez* |
| *Date* | *Type Name* | *Signature* |

336395.01 [XP]    24132