# EXHIBIT "1"

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

**ORIGINAL**

| | |
|---|---|
| In re<br>PECK/JONES CONSTRUCTION CORPORATION,<br>　　　　　Debtor, | Case No.<br>2:04-35757-VZ<br><br>Chapter 7 |
| R. TODD NEILSON, CHAPTER 7 TRUSTEE,<br>　　　　　Plaintiff,<br>　　vs.<br>AMERICAN TECHNOLOGIES, INC.,<br>　　　　　Defendant. | Adv. No.<br>2:07-ap-01058-VZ |
| R. TODD NEILSON, CHAPTER 7 TRUSTEE,<br>　　　　　Plaintiff,<br>　　vs.<br>D & M STEEL,<br>　　　　　Defendant. | Adv. No.<br>2:07-ap-01060-VZ |
| R. TODD NEILSON, CHAPTER 7 TRUSTEE,<br>　　　　　Plaintiff,<br>　　vs.<br>DMG CORPORATION,<br>　　　　　Defendant. | Adv. No.<br>2:07-ap-01034-VZ |
| R. TODD NEILSON, CHAPTER 7 TRUSTEE,<br>　　　　　Plaintiff,<br>　　vs.<br>INTEGRATED MECHANICAL SYSTEMS, INC.,<br>　　　　　Defendant. | Adv. No.<br>2:07-ap-01050-VZ |
| R. TODD NEILSON, CHAPTER 7 TRUSTEE,<br>　　　　　Plaintiff,<br>　　vs.<br>WEISS SHEET METAL COMPANY,<br>　　　　　Defendant. | Adv. No.<br>2:07-ap-01026-VZ |

DEPOSITION OF LONNIE ANDREWS
FRIDAY, APRIL 10, 2009

REPORTED BY:
RENEE D. BAKER,
CSR NO. 10355, RPR



**MICHELS COURT REPORTERS**

5850 CANOGA AVENUE, SUITE 400
WOODLAND HILLS, CALIFORNIA 91367
310-312-0333   818-346-1808   800-353-1500
FAX 866-511-6166
WWW.MICHELSCOURTREPORTERS.COM

**EXHIBIT "1"**

1    Deposition of LONNIE ANDREWS, taken on behalf of

2    Plaintiff R. Todd Neilson, Chapter 7 Trustee, at

3    2029 Century Park East, Third Floor, Los Angeles,

4    California 90067, commencing at 10:03 a.m., Friday,

5    April 10, 2009, before Renee D. Baker, Certified

6    Shorthand Reporter No. 10355, RPR, in the State of

7    California.

8

9    APPEARANCES OF COUNSEL:

10

11   FOR THE PLAINTIFF R. TODD NEILSON, CHAPTER 7 TRUSTEE:

12       DANNING, GILL, DIAMOND & KOLLITZ, LLP
         BY:  GEORGE E. SCHULMAN, ATTORNEY AT LAW
13       2029 Century Park East
         Third Floor
14       Los Angeles, California  90067
         (310) 277-0077
15

16   FOR THE DEFENDANT AMERICAN TECHNOLOGIES, INC.:

17       JACKSON, DeMARCO, TIDUS & PECKENPAUGH
         BY:  EDWARD A. GALLOWAY, ATTORNEY AT LAW
18       2030 Main Street
         12th Floor
19       Irvine, California  92614
         (949)752-8585
20

21   FOR THE DEFENDANT D & M STEEL:

22       DYKEMA GOSSETT, LLP
         BY:  JON D. CANTOR, ATTORNEY AT LAW
23       333 South Grand Avenue
         Suite 2100
24       Los Angeles, California  90071
         (213) 457-1795
25

1    APPEARANCES OF COUNSEL (continued):

2

3    FOR THE DEFENDANT DMG CORPORATION:

4        GIBBS, GIDEN, LOCHER, TURNER & SENET, LLP
         BY:  TRAVIS W. FEUERBACHER, ATTORNEY AT LAW
5             GLENN E. TURNER, III, ATTORNEY AT LAW
         1880 Century Park East
6        12th Floor
         Los Angeles, California  90067
7        (310) 552-3400

8

9    FOR THE DEFENDANT INTEGRATED MECHANICAL SYSTEMS, INC.:

10       GLADYCH & ASSOCIATES, INC.
         BY:  RANDALL S. GURITZKY, ATTORNEY AT LAW
11       1400 Bristol Street North
         Suite 270
12       Newport Beach, California  92660
         (949) 442-8942
13

14   FOR THE DEFENDANT WEISS SHEET METAL COMPANY:

15       ALTSHULER AND SPIRO
         BY:  BRUCE J. ALTSHULER, ATTORNEY AT LAW
16       9301 Wilshire Boulevard
         Suite 504
17       Beverly Hills, California  90210
         (310) 275-4475
18

19   ALSO PRESENT:

20       NAZY EBRAHIMI
         KEVIN CASENHISER
21

22

23

24

25

1

I N D E X

2 DEPONENT   EXAMINATION BY   PAGE

3 LONNIE ANDREWS  MR. GALLOWAY   5, 131

4         MR. ALTSHULER   64

5         MR. GURITZKY   69, 133

6         MR. FEUERBACHER  73

7         MR. CANTOR   75, 133

8         MR. SCHULMAN   112

9

10

11

E X H I B I T S

12 DEPOSITION

PAGE

13  1 Pankow Office Locations and Pankow Company 8
     History (3 pages)

14

   2 Lonnie Andrews, Project Executive, Resume 9
15    (5 pages)

16  3 April 6, 2009, letter to Lonnie Andrews 17
     from George Schulman, Re:  Peck/Jones:
17    Expert Instructions (5 pages)

18  4 Document containing the definition of the 20
     phrase "ordinary business terms" (6 pages)
19

   5 Handwritten timeline prepared by Lonnie 63
20    Andrews (1 page)

21  6 April 6, 2009, letter to Lonnie Andrews 64
     from George Schulman, Re:  Peck/Jones:
22    Expert Instructions with handwritten notes
     of Lonnie Andrews (5 pages)
23

   7 Page 3 of 6 of the general terms from the 107
24    D & M Steel subcontract (1 page)

25

```
 1                    LOS ANGELES, CALIFORNIA

 2              FRIDAY, APRIL 10, 2009; 10:03 A.M.

 3

 4                       LONNIE ANDREWS,

 5       having been called as a witness, was duly sworn and

 6              was examined and testified as follows:

 7

 8                          EXAMINATION

 9     BY MR. GALLOWAY:

10          Q    Good morning, Mr. Andrews.

11          A    Good morning.

12          Q    Please state your full name for the record.

13          A    Lonnie Charles Andrews.

14          Q    Mr. Andrews, my name is Edward Galloway.   I

15     introduced myself to you before, but I want to do it

16     again on the record.   I represent one of the defendants

17     in the bankruptcy proceeding.   My client's name is

18     American Technologies.   This is my client's general

19     counsel sitting to my left, Kevin Casenhiser.

20               Have you ever been deposed before, Mr. Andrews?

21          A    No.

22          Q    Okay.   Where are you currently employed?

23          A    Charles Pankow Builders, Limited.

24          Q    All right.   And what is your title?

25          A    Project executive.
```

1       Q     And how long have you had that position?

2       A     With Pankow for five years now.

3       Q     All right.  What are your responsibilities as a

4    project executive?

5       A     Making sure, I guess, the project team meets

6    contract requirements including scheduling the job;

7    management of payment of billings; processing of

8    contracts, change orders, paperwork.  I have a project

9    manager that handles all of the change orders and

10   contract work, and I have a field team that handles the

11   actual performance of the work and the scheduling.

12      Q     And what --

13      A     Can I go back for one second?

14      Q     Sure.

15      A     Several years ago I was in a series of

16   meetings, and I'm not sure if it was ever -- I'm not

17   sure if it was ever a deposition or not.  So I'm not

18   quite sure on that on a case a long time ago, about 12

19   years ago.

20      Q     Okay.  The court reporter to your left is

21   transcribing everything that is being said here today,

22   and at the conclusion of this deposition, you will be

23   sent a transcript of the deposition, and you will have

24   the opportunity to review the transcript.  And you will

25   have the opportunity to make changes in your testimony

1    if you want to.

2         However, if you do make changes in your

3    testimony, I want you to be aware that the lawyers in

4    this case can comment about the fact that you changed

5    your testimony, and it could affect your credibility.

6    So it is important for you to give us your best answers

7    that you can today.

8         A    Yep.

9         Q    Do you understand that?

10        A    Yep.

11        Q    Okay.  If at any time I ask you something that

12   you don't understand, feel free to say so, and I will

13   try to rephrase the question so that you can understand

14   it.

15        Will you do that?

16        A    Absolutely.

17        Q    Okay.  Also, if you feel the need to take a

18   break, if you're thirsty or need to go to the restroom,

19   feel free to speak up.  This is not a jail cell here.

20        Have you taken any medications or drugs that

21   would affect your ability to recall anything today?

22        A    No.

23        Q    All right.  Let's go back to -- we were talking

24   about your current employment.

25        What is the business of Pankow industries?

1      A     Commercial construction.

2      Q     All right.  And what are some examples of the

3    kinds of commercial construction that Pankow does?

4      A     Currently involved in preconstruction services

5    for a billion-dollar hospital in San Francisco -- just

6    under a billion dollars.  I also worked preconstruction

7    services for about a quarter of a billion-dollar medical

8    office building across the street from the hospital.

9    Just completing San Mateo Police Station facility.  Also

10    just completing the new civic center for the City of

11    Richmond.  Just completed San Mateo Library.

12        Pankow also specializes in design build,

13    especially for parking garages and that kind of thing,

14    which is a different sector that I'm not involved in.

15      Q     I went on your company's Web site yesterday,

16    and I have something here with me.  I don't actually

17    have extra copies of it, but I can pass this around.

18    I'll mark this as Exhibit 1.

19        (Deposition Exhibit 1 was marked for

20        identification by the reporter and is

21        included herewith.)

22    BY MR. GALLOWAY:

23      Q     Is this a listing of the offices that your

24    company has on Exhibit 1?

25      A     It appears to be correct, yes.

1    Q    All right.  Which office do you work in?

2    A    I work in the Oakland office reporting to Kim

3  Lum, regional manager.

4         (Deposition Exhibit 2 was marked for

5         identification by the reporter and is

6         included herewith.)

7  BY MR. GALLOWAY:

8    Q    I'll show you what's marked as Exhibit 2 and

9  ask you is that your current bio?

10   A    That is my current construction resume, yes.

11   Q    Okay.  Could you describe for us what your

12  responsibility is with respect to dealing with

13  subcontractors at Pankow?

14   A    Currently it's to work with the problem ones,

15  the ones that can't be resolved by either the field team

16  or my project manager.  When it gets to be into a --

17  could head into a dispute --

18        (Cell phone ringing.)

19        THE WITNESS:  Excuse me.  That is one of my

20  project managers.  I apologize.

21        Basically handling the difficult cases again

22  and just overseeing the projects.

23        I have direct involvement in preconstruction

24  services in planning out the project which takes up a

25  great deal of my time.

1   BY MR. GALLOWAY:

2        Q    All right.  You mentioned preconstruction

3   services.  What does that mean?

4        A    Working with the architect during the design

5   phase of the project to make sure that what he's

6   designed and its constructibility fits within the

7   owner's budget can be done within a time frame that's

8   acceptable to the owner at a cost that's acceptable to

9   the owner.

10       Q    All right.  Do you also deal with

11   subcontractors other than problem ones as you mentioned

12   a while ago?

13       A    Especially in the preconstruction services, I

14   work with them and help formulating estimates.  Usually

15   a lot -- most preconstruction teams for a hospital is

16   made up of the primary subcontractors helping to put

17   together the price schedule and constructibility of it.

18       Q    All right.  Do you also deal with

19   subcontractors after the project begins and payments are

20   made to those subcontractors?

21       A    I review a -- what we do at Pankow, they do a

22   payment update on a monthly basis to let me know when

23   we're receiving the owner's payment and to make sure

24   which subs are compliant that we can release payment to

25   them.  It's done on a monthly basis.

1          Again, I don't -- most of that is -- I get the

2     report.  I don't necessarily deal with the actual sub

3     requests or request to the owner for payment currently.

4     I did in the past.  I don't do that currently.

5          Q    And those reports, do those reports that you

6     are referring to state whether or not you've received

7     payment from the owner, for example?

8          A    Yes.

9          Q    Okay.  And then those reports also show if

10    payment has been made to the sub or you ask for

11    authorization to pay the sub?

12         A    The report typically shows the status of those

13    payments of those subs and the ability to release them

14    when we receive payment from the owner.

15         Q    All right.  Are you involved in the

16    decision-making process as to when to pay the subs?

17         A    No.  That's automatic.  When we receive it, it

18    automatically goes out within five to ten days.

19    Everything is already in the books, what's been

20    approved.

21         Q    Are you also involved with drafting the

22    contracts with the subs or the so-called "letting" the

23    contracts with the sub, if you understand what that

24    means?

25         A    Absolutely.

1       Q    What do you understand the term "letting" to

2    mean, the contracts with the subs?

3       A    I would interpret that to be something similar

4    to awarding, to agreeing to the contract terms, final

5    resolution of it, and signature.

6       Q    Okay.  Then let's use that word, "awarding."

7            Are you involved with awarding the contracts to

8    the subs?

9       A    Absolutely.

10      Q    Okay.  Have you now described all of your

11   responsibilities as a project executive at Pankow?

12      A    Probably not.  I'm also responsible for new

13   work, obtaining new work, marketing, business

14   development as a normal course of meeting the builders

15   on ongoing projects and meeting the owners.

16      Q    Okay.  Anything else?

17      A    I guess the standard performance reviews and

18   things that you do for all of my direct reports.

19      Q    In the performance reviews of subs, for

20   example, or your own internal personnel?

21      A    As we close out each project, there is a

22   subcontractor review for each one that's done by the

23   field team on how they performed with that project.

24   That goes into what we call a prequalification -- sub

25   prequalification which most major contractors do.  That

1    questionnaire basically says how they performed and, you

2    know, if there was any problems, that kind of thing.

3            I don't fill them out, but they pass across my

4    desk for review before they're filed -- they're filed --

5    electronically filed.

6        Q    Okay.  Are there any things that you have in

7    your responsibility as project executive other than what

8    you've already described?

9        A    I'm sure.

10       Q    If you think of something later, feel free to

11   say so.

12           All right.  Before you worked for Pankow, where

13   did you work?

14       A    Before Pankow was Swinerton Builders.

15       Q    How do you spell that?

16       A    That's S-w-i-n-e-r-t-o-n Builders.

17       Q    All right.  How long did you work there?

18       A    A little over two years.

19       Q    And what were your responsibilities there?

20       A    Very similar, except I only worked the

21   hospitals for Swinerton, the medical group.

22       Q    What was your job title at Swinerton?

23       A    Project executive.

24       Q    I didn't ask this before, but let me ask this

25   now:  Does Pankow have a general contractor's license?

1      A    Yes, it does.

2      Q    B-1 -- California B-1?

3      A    Yes, I believe so.

4      Q    Okay.  And where is Swinerton -- I'm sorry.

5           Where was Swinerton located when you worked for

6  them?

7      A    I worked out of their Los Angeles office here,

8  downtown.

9      Q    Okay.  Is Swinerton also a California licensed

10  general contractor?

11     A    Yes, they are.

12     Q    When you worked for them?

13     A    Yes, they were.

14     Q    Okay.

15     A    I think they still are.

16          MR. SCHULMAN:  I think it would disturb some of

17  the counsel --

18          MR. TURNER:  I've got a license history if you

19  want to see it.

20  BY MR. GALLOWAY:

21     Q    Okay.  And where did you work prior to working

22  at Swinerton Builders?

23     A    Primarily companies owned by Centex.  I worked

24  for Centex Golden in San Diego; Centex Rodgers out of

25  Nashville, Tennessee, for about 25 years.

1          MR. CANTOR:  Can you spell that, please?

2          THE WITNESS:  C-e-n-t-e-x.  And it was Centex

3    Golden, which was the old MH Golden out of San Diego

4    when Centex bought them.  And it was Centex Rodgers

5    before that, and then it was just Centex Construction

6    Corporation.

7    BY MR. GALLOWAY:

8          Q    When you worked for Centex, were you involved

9    in residential construction?

10         A    No.  Commercial only.

11         Q    Only commercial?

12         A    I've never done residential.

13         Q    Okay.

14         A    Pure residential.  I've done apartments and

15    condos.

16         Q    So when you say "commercial," does that include

17    apartments, for example?

18         A    Yes.

19         Q    Okay.

20         A    I have not done single-residence type.

21         Q    You have not done single-family residential --

22         A    -- single-family homes which Centex was famous

23    for.

24         Q    Okay.  One thing I probably should have said

25    earlier is the court reporter has to transcribe

1    everything that's being said.

2        A    Yes.

3        Q    And sometimes in natural conversation people

4    sometimes talk on top of each other.  It's important for

5    the court reporter's ability to transcribe for us not to

6    do that.

7             So if you can let me finish my question before

8    you start the answer, I'm sure she will be grateful, and

9    it will make for a much cleaner transcript as well.

10       A    Absolutely.

11       Q    Okay.  So while you worked for Centex, you were

12   involved in purely commercial work, and that included

13   apartments.  And what other kinds of things besides

14   apartments?

15       A    99 percent spec office buildings and hospitals.

16   Some education, El Centro High School.  I would say that

17   would be it --

18       Q    Okay.

19       A    -- primarily.

20       Q    Do you hold any professional licenses?

21       A    No, I do not.

22       Q    Have you ever held any in the past?

23       A    I held Centex's contractor's license number for

24   a while.

25       Q    Was that a B-1 license?

1       A     Yes.

2       Q     In other words, a general contractor's license

3    in California?

4       A     Yes, sir.

5       Q     Do you recall approximately the years that you

6    had that B-1 license?

7       A     No, I do not.

8       Q     Can you approximate for us how many years you

9    had that license?

10      A     About three years.  And I was the responsible

11   party.

12      Q     You were the responsible managing officer for

13   Centex?

14      A     Yes.

15      Q     Okay.  And did you just let that license

16   expire?

17      A     Yes.

18      Q     Okay.  I'm going to hand you what I'll mark as

19   Exhibit 3.

20              (Deposition Exhibit 3 was marked for

21              identification by the reporter and is

22              included herewith.)

23   BY MR. GALLOWAY:

24      Q     Have you seen this document marked as Exhibit 3

25   before?

1    A    Yes, I have.

2    Q    All right.  And when did you receive it?

3    A    By e-mail April 6.

4         MR. SCHULMAN:  Eddie, could you describe it for

5    the record?

6         MR. GALLOWAY:  Sure.  This is a letter dated

7    April 6, 2009.  It is from counsel for the trustee

8    George Schulman addressed to Mr. Andrews.

9         I passed copies around the table.

10    Q    When you received this letter -- have you done

11    any work in connection with what was referred to in this

12    letter so far?

13    A    I read through it a few times.  I referenced

14    back to some original -- the appointments of expert

15    witness just so see what the amounts were, and I've kind

16    of done a contractor's timeline schedule more manually

17    than -- more graphically than verbally.

18    Q    All right.  Have you prepared a written report?

19    A    No, I have not.

20    Q    Okay.  Did you --

21         MR. CANTOR:  Excuse me.  Could you read his

22    last answer back, please.

23         (The record was read as follows:

24         "A    I read through it a few times.  I

25    referenced back to some original -- the

1        appointments of expert witness just so see what

2        the amounts were, and I've kind of done a

3        contractor's timeline schedule more manually

4        than -- more graphically than verbally.")

5             MR. CANTOR:   Thank you.

6    BY MR. GALLOWAY:

7        Q    Okay.   I want to point you to Paragraph A on

8    the first page of this letter --

9        A    Uh-huh.

10       Q    -- where you see the phrase "ordinary business

11   terms."   Do you see that?

12       A    Yes.

13       Q    Did you make any assumptions about what that

14   means?

15       A    Yes.

16       Q    What did you assume that term to mean?

17       A    Owner's payments within 30 to 45 days, payments

18   to subcontractors typically within -- in the state of

19   California within 10 days after receipt of owner's

20   payment.

21       Q    What I'm asking you, though, is somewhat

22   different, though.

23            What did you assume that that phrase meant?

24   And if you didn't assume anything, that's fine too.

25       A    I guess as it normally happens in the course of

1   business.

2       Q    All right.  I'm going to give you another

3   document.  What are we on?  4?

4            THE REPORTER:  Correct.

5            MR. GALLOWAY:  I'll pass this around.

6            (Deposition Exhibit 4 was marked for

7            identification by the reporter and is

8            included herewith.)

9   BY MR. GALLOWAY:

10      Q    I will represent to you for the record that the

11  term "ordinary business terms" is a term of art in the

12  field of bankruptcy law.

13           MR. SCHULMAN:  Can we see the exhibit before

14  the witness does?

15           MR. GALLOWAY:  Sure.

16      Q    I'm going to ask you to assume for the purposes

17  of my questions that the definition in this document

18  that I'm giving you is the definition of this phrase

19  "ordinary business terms."

20           MR. SCHULMAN:  I object to the use of this

21  document.  First, it's not part of our agreement about

22  what the witness would be told, and it's leading to ask

23  him this before you've asked him questions about what

24  his understanding is.

25  ///

1    BY MR. GALLOWAY:

2       Q    I'm going to ask you to assume that this

3    definition in this document is correct.  I'm going to

4    ask you hypothetical questions based on this definition.

5             If you turn to the second page of this

6    document -- the first page is an e-mail.  You can ignore

7    that.  If you turn to the next page, you see the heading

8    "Definition of 'ordinary course of business,'" and then

9    it goes on for the duration of the next page after that.

10            I'm going to give you a moment to read this

11   because it's quite a bit of reading.

12            Why don't we take a break here for just a

13   moment while you read it.

14            MR. SCHULMAN:  Ed, can we stop for a second?

15   The copy I have has -- one, two, three four five -- six

16   pages.  The first page is the e-mail which you say can

17   be ignored.  The next two pages have text, and the next

18   three pages are essentially blank.

19            That's what you intended?

20            MR. GALLOWAY:  That's correct.  We have

21   redacted everything that had nothing to do with the

22   definition of "ordinary course of business" because

23   those other sections of this e-mail from your office

24   have been changed since then.

25            MR. SCHULMAN:  I just wanted to make sure that

1    you intended that those pages be blank.

2            MR. GALLOWAY:   That's right.

3            MR. CANTOR:   Why don't we take a break.

4    BY MR. GALLOWAY:

5    Q    Why don't we take a break so you can read this.

6            (Recess from 10:26 a.m. to 10:31 a.m.)

7    BY MR. GALLOWAY:

8    Q    Before we proceed, I just want to make sure

9    that you took into account a few of the things that are

10   in this definition that I've given you that's marked as

11   Exhibit 4.

12           First, in no particular order of importance, if

13   you look on what I think is the third page of this

14   exhibit, near the bottom of the page you'll see a quote

15   there under the heading of "In re Inland Global Medical

16   Group, Inc.," where it says the following:

17               "We conclude that 'ordinary business

18           terms' refers to the range of terms that

19           encompasses the practices in which firms

20           similar in some general way to the creditor

21           in question engage, and that only dealings

22           so idiosyncratic as to fall outside that

23           broad range should be deemed extraordinary

24           and therefore outside the scope of the

25           ordinary course of business."

1           Do you see that?

2      A    Uh-huh.

3           MR. GURITZKY:   Yes?

4  BY MR. GALLOWAY:

5      Q    That's a "yes"?

6           And I ask you that question only because, when

7  the court reporter transcribes uh-huh and unh-unh, it's

8  kind of hard for people who read it later to understand.

9  So if you say "uh-huh" or "unh-unh," I'm going to follow

10 up with "Does that mean 'yes' or 'no'?"

11     A    That means yes.

12     Q    Okay.  And then if you look between the second

13 and third page, there's a quote where it says, "only

14 payments which are so unusual as to be 'aberrations in

15 the relevant industry' do not satisfy Section

16 547(c)(2)(C)."

17          Do you see that?

18     A    Yes, I do.

19     Q    Okay.  And then on the first page -- I'm

20 sorry -- the second page of this definition, you'll see

21 a quote where it says, "The creditor" -- which I will

22 represent to you here, by the way, are subcontractors.

23 Whenever you see "creditor" in here, that's a reference

24 for this case to subcontractor.

25     A    Okay.

1      Q    It says --

2           MR. SCHULMAN:  I object to that definition,

3      Mr. Galloway, because I don't think that's accurate.

4      BY MR. GALLOWAY:

5      Q    Well, I'll just say in my case my client is a

6      subcontractor, and for purposes of my questions I want

7      you to assume that "creditor" means "subcontractor."

8      And when you see the word "debtor," I want you to assume

9      that that means "general contractor," which in this case

10     it's Peck/Jones.

11     A    I understand.

12     Q    And the sentence here that's on the second page

13     says:

14               "First the creditor must establish the

15               'broad range' of business terms employed by

16               similarly situated debtors and creditors,

17               including those in financial distress,

18               during the relevant period."

19               Do you see that?

20     A    Yes, I do.

21     Q    All right.  When I ask you these questions I am

22     going to ask you, I want you to assume all of these

23     things as part of the definition of "ordinary business

24     terms."

25               Will you do that?

1       A    Yes.

2       Q    Okay.  And then if you turn back to Exhibit 3,

3    which was Mr. Schulman's April 6 letter, there's some

4    additional facts which you were asked to assume to be

5    correct.  I just want to go through a few of those.

6            Have you got that letter in front of you?

7       A    Yes, I do.

8       Q    Okay.  Where you see the phrase "Debtor's

9    industry" around the second paragraph of that letter and

10   it says, "which was the construction of

11   multimillion-dollar private industrial and commercial

12   construction projects, such as hospitals and related

13   medical facilities."

14           Do you see that?

15      A    Yes.

16      Q    Okay.  For purposes of my questions, I want you

17   to assume that, when I use the word "industry," that

18   that's what that means.

19           Will you do that?

20      A    Yes.

21      Q    Okay.  And then as if that wasn't enough for

22   you to assume, if you turn to the next page of

23   Exhibit 3, there's a subtopic heading called "Facts."

24      A    Yes.

25      Q    Do you see that?

1          All right.  And there are a number of facts

2     there which you were asked to assume.

3     A     Correct.

4     Q     And I want you to assume all those to be

5     true --

6     A     Okay.

7     Q     -- for purposes of the questions I'm going to

8     ask you.  All right?

9     A     Yes.

10    Q     Will you do that?

11          That's a "yes"?

12    A     Yes.

13    Q     Okay.  Based on all that, I want to ask you

14    first, is it in your professional opinion in the

15    ordinary course of business for a general to pay a sub

16    in the industry before the owner has paid the general

17    for that sub's work?

18          MR. SCHULMAN:  I object to the question because

19    you've asked him to assume things in Exhibit 4 which are

20    outside the scope of what we agreed to provide to

21    Mr. Andrews; and thus you've skewed the opinion.

22          If everybody will agree that I have a

23    continuing objection on that basis, I'll let you go

24    ahead, and I won't interrupt your questions with

25    objections each time.  Otherwise, you will force me to

 1    make an objection to every question.

 2          MR. ALTSHULER:  We agree to your continuing

 3    objection.

 4          MR. SCHULMAN:  Everybody?

 5          MR. GURITZKY:  Everybody.

 6          MR. CANTOR:  Everybody.

 7          MR. FEUERBACHER:  Everybody.

 8          MR. GALLOWAY:  Just so you don't have to repeat

 9    it over and over.

10          MR. SCHULMAN:  Why don't we have the court

11    reporter read --

12    BY MR. GALLOWAY:

13      Q    Why don't we read back the question.  You may

14    not even remember the question anymore.

15      A    Thank you.

16          (The record was read as follows:

17          "Q    Based on all that, I want to ask you

18    first, is it in your professional opinion in the

19    ordinary course of business for a general to pay

20    a sub in the industry before the owner has paid

21    the general for that sub's work?")

22          THE WITNESS:  In cases of distress, yes.

23    BY MR. GALLOWAY:

24      Q    In cases of distress by who?

25      A    The subcontractor, to keep them going.

1       Q     All right.   In the cases of a financially

2    distressed general contractor, what would your opinion

3    be?

4            MR. SCHULMAN:   I object as vague and ambiguous

5    as to what that means.

6            But if you understand it, you can try and

7    answer it.

8    BY MR. GALLOWAY:

9       Q     Let me ask you a question to address what I

10   think Mr. Schulman is raising.

11           You used the word "distress" yourself.   What

12   did you understand that to mean when you said that?

13      A     Financial difficulty.

14      Q     Okay.   Can you be more specific?

15      A     The sub's cash flow creates a situation where

16   he cannot continue to perform to my expectations on a

17   project so that I pay him monies that are due for

18   previous work even though I have not yet received

19   payment from the owner to make sure that he can continue

20   his activities.

21           MR. GALLOWAY:   Could you read that back,

22   please.

23           (The record was read as follows:

24           "A     The sub's cash flow creates a

25       situation where he cannot continue to perform to

1  my expectations on a project so that I pay him

2  monies that are due for previous work even

3  though I have not yet received payment from the

4  owner to make sure that he can continue his

5  activities.")

6 BY MR. GALLOWAY:

7  Q All right.  In the instance of a -- using that

8 same definition of "distress," except using it for a

9 general instead of a sub, in your professional opinion,

10 is it in the ordinary course in the industry -- the

11 ordinary course of business for a general to pay a sub

12 before the general has been paid by the owner?

13  A If the general is financially distressed, I

14 would not think so.

15  MR. GALLOWAY:  I'm sorry.  Read that back

16 again.

17  (The record was read as follows:

18  "A If the general is financially

19  distressed, I would not think so.")

20 BY MR. GALLOWAY:

21  Q What if the general is not financially

22 distressed, is it in the ordinary course, in your

23 opinion, for a general to pay a sub before the general

24 has been paid by the owner for that sub's work?

25  A No, it is not.

1.    Q    Okay.  So if, for example, a sub invoices the

2    general and the general doesn't get paid by the owner

3    for, say, two months, just hypothetically, by the owner,

4    then in that instance, in your opinion, it would not be

5    in the ordinary course of business for the general to

6    pay that sub any sooner than two months later after the

7    general has been paid by the owner; is that correct?

8         MR. SCHULMAN:  I'm going to object as vague and

9    ambiguous.  And your phrase "two months later" is not

10   clear as to what that refers back to.

11        MR. GALLOWAY:  Could you read back the

12   question, please.

13        (The record was read as follows:

14        "Q    So if, for example, a sub invoices

15   the general and the general doesn't get paid by

16   the owner for, say, two months, just

17   hypothetically, by the owner, then in that

18   instance, in your opinion, it would not be in the

19   ordinary course of business for the general to

20   pay that sub any sooner than two months later

21   after the general has been paid by the owner; is

22   that correct?")

23        MR. GALLOWAY:  Let me rephrase the question.

24        Q    For example, if a general is not paid by an

25   owner any sooner than two months -- two calendar months

1   after the sub has invoiced the general, it would not be

2   in the ordinary course of business for that general to

3   pay the sub any sooner than when it receives that

4   payment from the owner for the sub's work; is that

5   correct?

6       A    Typical ordinary business is you do not pay the

7   sub until you're paid by the owner.

8       Q    Okay.

9           MR. CANTOR:  Excuse me.  We haven't established

10   that we're talking 2004.  Can we get him to understand

11   that's what we're talking, 2004, not today?

12           MR. ALTSHULER:  Or whether or not there's been

13   any change from then until now in the custom and

14   practice.

15   BY MR. GALLOWAY:

16       Q    If you look back at Exhibit 3, you will see in

17   the letter that Mr. Schulman sent you your assignment,

18   in the first sentence, it says in the last part of that

19   sentence, that your assignment has to do with

20   construction projects in the Los Angeles County

21   metropolitan area in 2004.

22           Do you see that?

23       A    That's correct, yes.

24       Q    All right.  And for purposes of all the

25   questions you're asked by me, at least, I want you to

1    assume that that's what we're talking about.

2         Now, having said that, do you want to change

3    any of your answers that you've given thus far?

4    A    I don't think so.  Other than I'm not quite

5    sure on the dates of when, you know, pay for pay (sic)

6    was changed and the 10-day was changed.  I'm not sure of

7    the exact date of that enactment.  So I don't think it

8    changes any of my answers, though.

9    Q    And when you say -- I think you said pay for --

10   what was it you said?  Pay for what?

11   A    Pay when paid.

12   Q    "Pay when paid," what were you referring to

13   when you mentioned that?

14   A    There have been decisions made that have

15   changed payment periods to subs, say, recently -- again,

16   I don't know the time frame -- that started changing

17   some of the contract terms about you would -- "pay when

18   paid" used to be a standard clause in all subcontracts.

19   And it's been -- it's been changed, and we've added

20   language to still be legal and still be able to enforce

21   that.

22        But pay when paid -- and I'm not sure of the --

23   I don't know the legal ramifications of it.  You can't

24   really do a strict "pay when paid" clause in your

25   contract anymore, from my understanding.

1    Q    And who is it your understanding that -- strike

2    that.

3         Who are you referring to when you say that "pay

4    when paid" became applicable?  Is that something you are

5    referring to in your company or other companies or the

6    industry or legally, for example?

7    A    I can only go by my own history.  And when I

8    came to California about ten years ago and then changed

9    companies, as I was changing companies and changing

10   states, I was asked to or looked at the contracts.  They

11   differed.

12        Now, whether it was for legal or by company,

13   all of it was happening.  I was changing companies, and

14   legal -- I assume legal was changing at the same time.

15   So I'm not sure I can answer that accurately.

16   Q    When you say "legal," what do you mean?  Are

17   you talking about contract terms, for example?

18   A    Contract terms.

19   Q    Okay.  So when you refer to pay when paid,

20   you're talking about what you've seen in contracts?

21   A    Correct.

22   Q    Okay.  Whose contracts?

23   A    The general contractors to subcontractors.

24   Q    In the companies that you worked in?

25   A    Yes.

1          MR. GALLOWAY:  Okay.  Can you read back his

2    answer about three answers ago, please, the lengthy one.

3          (The record was read as follows:

4          "Q    'Pay when paid,' what were you

5    referring to when you mentioned that?

6          "A    There have been decisions made that

7    have changed payment periods to subs, say,

8    recently -- again, I don't know the time

9    frame -- that started changing some of the

10   contract terms about you would -- 'pay when

11   paid' used to be a standard clause in all

12   subcontracts.  And it's been -- it's been

13   changed, and we've added language to still be

14   legal and still be able to enforce that.

15          "But pay when paid -- and I'm not

16   sure of the -- I don't know the legal

17   ramifications of it.  You can't really do a

18   strict 'pay when paid' clause in your contract

19   anymore, from my understanding.")

20   BY MR. GALLOWAY:

21     Q    When you say "there have been decisions,"

22   decisions by who?  The people who are drafting the

23   contracts that you are referring to?

24     A    Yes.

25     Q    At Pankow, for example?

1      A      Since my joining Pankow four years ago, there

2    have been no modifications to that portion of that

3    contract.

4      Q      Pankow's contracts?

5      A      Pankow's contracts.

6      Q      Now, for purposes of my questions, I'm asking

7    you questions not about Pankow specifically but about

8    the industry as we defined it earlier in the deposition.

9             Do you understand that?

10     A      I understand.

11     Q      Okay.  I want to ask you another hypothetical

12    question, again having to do with the ordinary course of

13    business in the industry.

14            Was it, in your opinion, in the ordinary course

15    of business in the industry in 2004 for a general to

16    wait to issue a check to a sub for the sub's work until

17    after the owner's check had been deposited and cleared

18    the general's bank?

19     A      Yes.

20     Q      Now, have you ever seen any situations where

21    a -- in your experience, a general paid a sub later than

22    what the contract says between the general and the sub?

23     A      Not if the request was complete for payment

24    from the sub.

25            THE REPORTER:  Could I get you to put your hand

1  down?

2         THE WITNESS:  (Complies.)

3         MR. GALLOWAY:  Could you read back the answer,

4  please.

5         (The record was read as follows:

6         "A    Not if the request was complete for

7     payment from the sub.")

8  BY MR. GALLOWAY:

9     Q    And what do you mean by when a request is

10  complete?

11     A    There are several pieces and things that need

12  to be -- insurance needs to be continued as per the

13  contract.  The correct releases and waivers have to be

14  attached to the billing.  A bond has to be enforced if

15  the subcontractor's bond is in place.

16         Again, it's a little different in different

17  subcontract agreements on what the stipulations are for

18  that particular sub.  There can be certified payroll

19  requirements.  There can be different stipulations for

20  different contracts.

21     Q    All right.  Any other things that you've seen

22  lead to generals paying subs later than what the

23  contract says?

24     A    Not with the companies that I've been

25  affiliated with.

1      Q    Okay.  I want to make sure I've got a list

2    here.

3           Insurance -- you mentioned insurance.  What

4    were you referring to there?

5      A    Every subcontractor has to have specified

6    insurance per the contract:  general liability,

7    Workmen's Comp.  That insurance has to be current in the

8    time frame for the billing.

9      Q    All right.  You also mentioned releases and

10   waivers.  What were you referring to there?

11     A    There are standard lien releases.  There are --

12   sometimes the owner will require a special release per

13   his contract that is typically passed along to the

14   subcontractors.

15     Q    Anything else?

16          And you're referring, by the way, to a

17   mechanic's lien release?  Is that what you are referring

18   to?

19     A    Yes, the conditional.

20     Q    A conditional release of a mechanic's lien?

21     A    Yes.

22     Q    Just for the record, can you describe more

23   specifically what a conditional mechanic's lien release

24   is?

25     A    Basically, it says, "Upon payment of a

1    stipulated sum, I release my rights to a lien on the

2    project."

3    Q    And a conditional release would be coming from

4    the sub; is that correct?

5    A    It would be coming from the sub, yes.

6    Q    In the ordinary course of business in the

7    industry of 2004, a general wouldn't pay -- in your

8    opinion, a general would not pay a sub until the general

9    has in its possession a conditional lien release from

10   that sub?

11   A    That's correct.

12   Q    All right.  And you also mentioned the term

13   "waiver."  What did you mean by that?

14   A    There are -- I was referring to other --

15   "waiver" may not be the correct term.  I was referring

16   to other forms required by the owner that are typically

17   forms of release or agreements that you won't go after

18   them after you paid them or affect their property in any

19   way.

20   Q    All right.  Now, you also mentioned the term

21   "payroll," I believe.  What did you mean by that?

22   A    There are projects that have, depending on how

23   they're funded and depending on how the owner wants to

24   have the project run, a certified payroll showing that

25   all the correct payments have been made to employees and

1    benefit -- and to benefit pension funds and so on and so

2    forth that have all been -- that have been correctly

3    done in the preceding month before you receive those

4    payments.

5        Q    So, in your opinion, in 2004 in the industry it

6    would be the ordinary course for a general to require

7    the certified payroll information from the sub before

8    the general would pay that sub for the sub's work; is

9    that correct?

10       A    Depending on the contract, yes.

11       Q    Depending on the contract?

12       A    Not all contracts require certified payroll.

13   Many do not.  Public sector contracts typically do not.

14       Q    You mentioned "public sector."  One of the

15   things I want to remind you of is that in Exhibit 3

16   where your assignment was delineated, if you will

17   notice, it says "private industrial and commercial

18   construction projects."

19            Do you notice that?

20       A    Yes.

21       Q    Okay.  What do you understand private projects

22   to mean as opposed to public projects?

23       A    Um.

24       Q    Would a hospital, for example, be a private

25   project?

1      A     It can be.  It can be a public project too for

2      hospitals.

3      Q     All right.  And what would make a hospital

4      project a public project as opposed to a private one?

5      A     Types of owners.

6      Q     All right.  What kind of owners would be public

7      projects?

8      A     City, County, State, federal.

9      Q     Governmental entities, in other words?

10     A     Yes.

11     Q     For purposes of all of my questions I'm asking,

12     I want you to assume we're talking about a private

13     project.  All right?

14     A     Okay.

15     Q     Do you want to change any of your answers that

16     you've given up to now?

17     A     No, because even a private hospital, if they

18     are using some State funds, still has to have certified

19     payroll.  So it can still be applicable to private, but

20     it's not always.

21     Q     Are there any other factors, other than what

22     you've listed so far, in private projects in 2004, in

23     your professional opinion, that you've seen happen cause

24     a general to pay a sub later than what the contract

25     says?

1          For purposes of this I, again, want you to

2     assume that we're talking about, among other things,

3     potentially financially distressed generals as part of

4     the definition.

5          Do you understand that?

6     A    Yes, I do.

7     Q    Okay.

8     A    I can't at this time think of anything other

9     than those.  Those are the main three.

10    Q    All right.  Can you estimate what percentage of

11    the instances you've seen of all the payments by

12    generals to subs that you've seen that were later than

13    what the contract says, in your experience?

14         MR. SCHULMAN:  Objection.  No foundation.

15         MR. GALLOWAY:  Could you read back the

16    question, please.

17         (The record was read as follows:

18         "Q    Can you estimate what percentage of

19    the instances you've seen of all the payments by

20    generals to subs that you've seen that were later

21    than what the contract says, in your

22    experience?")

23    BY MR. GALLOWAY:

24    Q    Do you understand the question?

25    A    Yes, I do.

1      Q     Okay.  Then if you understand it, could you go

2    ahead and answer?

3             Just in the companies you've worked for.

4      A     That's my only reference.

5             So 10 to 15 percent.

6      Q     Now, I'm going to ask you do you have any

7    understanding as to what occurs in the industry as

8    opposed to just the companies you've worked for?

9      A     Only what I've had other subcontractors tell

10   me.

11     Q     All right.  Contractors who have been working

12   for companies other than yours, for example; correct?

13     A     Correct.

14     Q     All right.  And have you had subcontractors

15   tell you what the frequency is in which they get paid

16   later than what their contract calls for?

17     A     Frequency, no.  I've had them tell me of

18   various individual companies that they prefer that they

19   work for us versus them because of timely payments.

20     Q     All right.  And what did those subcontractors

21   tell you?

22     A     Just that there were companies that were not

23   prompt in paying.

24     Q     Did they tell you what range of days in which

25   they were paid after they invoiced?

1      A      None that I can remember specifically.

2      Q      Did any of those subcontractors tell you

3  anything else with respect to situations where they were

4  paid later than what their contract called for between

5  them and their general contractor?

6      A      The only thing that comes to mind is that they

7  would not know the payment was being held until they

8  asked the question and then were told at that time that

9  they were missing some document or some document was not

10  complete for follow-up.

11          So they would never be informed the payment was

12  being held, that just it would be held until they asked

13  the question, and at that point in time they were being

14  told what they were missing or what they were negligent

15  on and what they needed to do to finally get that

16  payment.

17      Q      How many times have you had a subcontractor

18  tell you something like that?

19      A      More than a few, I guess.  I couldn't tell you

20  how many.

21      Q      More than a dozen?

22      A      I would say at least 10, 12 times, yes.

23      Q      Okay.  Over what period of time?

24      A      The last 10, 12 years -- 10 years.

25      Q      Spread out over that whole time period?

1       A    Yes.

2       Q    Have you had conversations with subs where they

3  complained in general about timeliness and getting paid

4  by generals?

5       A    Yes.

6       Q    Okay.  Would you say that you've had more than

7  a dozen conversations on that subject?

8       A    Absolutely.

9            (At 11:02 a.m. Mr. Turner exited the

10           deposition room.)

11  BY MR. GALLOWAY:

12       Q    Okay.  Can you name some of the subcontractors

13  who have said things like that to you?

14       A    It's not been said to me lately.  No, I can't.

15       Q    Okay.  Have you read any articles where you've

16  seen, in any publication having to do with the

17  construction industry, where there have been discussions

18  in those articles regarding the timeliness of payments

19  or lack of timeliness of payments from generals to subs?

20       A    Yes.

21       Q    Okay.  Have you seen more than one article on

22  that subject?

23       A    Probably.

24       Q    Okay.  Do you remember any of the journals

25  where you saw those kinds of articles?

1      A      It would be my standard reading, which would be

2    engineering news, papers, newspapers.

3      Q      Okay.  Now, just focusing on the industry

4    again, not specifically the company you work for now or

5    that you have worked for, but the industry as we defined

6    it earlier, is it your opinion that it's an aberration

7    or extraordinary for a general to pay a sub later than

8    what the contract says?

9      A      No.

10          MR. GALLOWAY:  Why don't we take a short break?

11          (Recess from 11:05 a.m. to 11:22 a.m.)

12          (At 11:22 a.m. Kevin Casenhiser was not

13          present in the deposition room.)

14   BY MR. GALLOWAY:

15     Q      I want to talk to you a little further about a

16   subject we discussed briefly a while ago, and that is

17   the documents that you indicated that a general in the

18   ordinary course of business would require from a sub for

19   the general release of payment to a sub.  Specifically I

20   want to talk about releases.

21          Have you ever seen situations where the

22   documents just weren't right that the general got from

23   the sub in order to release the payment to the sub?

24     A      Yes.

25     Q      What are the kinds of things that you've seen

1    just as examples where there were problems in the

2    documents that the general got from the sub?

3        A    The time period was not filled out correctly

4    for the release for the late progress payment, the

5    amount -- the dollar amount on the release and the

6    billing amount did not match.

7        Q    You --

8        A    That's --

9        Q    I'm sorry.  Go ahead.

10       A    That's the main two.

11       Q    Have you ever seen situations, say, where the

12   description of the work didn't match exactly what work

13   was actually done by the sub, in other words, where a

14   sub was asking for payment for work more than what they

15   actually completed?

16       A    I usually see that on the schedule of values,

17   not on the actual release forms.

18       Q    Okay.  Is the schedule of values a document

19   that has to look just right before a general pays a sub

20   in the industry in the ordinary course?

21       A    It should match, yes.  It should match the

22   funds for the work they did.

23       Q    Okay.  What is this document that you are

24   referring to?  Is that something prepared by the

25   general?

1      A      The schedule of values?

2      Q      Yes.

3      A      It is typically prepared by the subcontractor

4    and approved by the general to be an accurate

5    representation of the work under contract.

6      Q      Okay.  And it's, in your opinion, in the

7    ordinary course of business in the industry in 2004 for

8    a subcontractor to prepare the schedule of value for the

9    general as part of the documents that the general

10   requires in order to release payments to the sub?

11     A      Typically, yes.

12     Q      All right.  So if things don't look just right

13   in this document to the general, can that delay payment

14   by the general to the sub?

15     A      It could.

16     Q      All right.  Have you seen instances where that

17   happened, or have you heard about it from other people

18   where that happened?

19     A      Only when you're projecting the work.

20   Typically it's approved and agreed upon before I put it

21   into the owner's billing to forward onto the billing.

22   So it usually doesn't hold out the payment.  It's

23   usually a discussion that happens early on, whether that

24   schedule of values is billed correctly.

25     Q      Now, in the time period that you've been

1    working for Pankow industries, would you consider it to

2    have been a financially distressed company at any time?

3        A    No.

4        Q    All right.  If a general contractor is

5    financially distressed, using the definition you used a

6    while ago, in your experience, can that slow down the

7    general's payments to the subs?  Have you seen instances

8    where that happened, or have you heard of instances

9    where that happened?

10       A    No.  I've not -- other than this case, I've

11   really not been associated with or heard about too many

12   general contractors that have become that financially

13   distressed.

14       Q    Okay.  So Peck/Jones is the first general

15   contractor that you're -- you've had to deal with on a

16   direct level which was what you considered to be

17   financially distressed?

18            MR. SCHULMAN:  I'll object to the use of the

19   phrase "direct level" on that.

20            MR. GALLOWAY:  Let me rephrase it then.

21       Q    Peck/Jones is the first general contractor that

22   you're aware of that was financially distressed at the

23   time it was paying its subs; is that correct?

24       A    No.

25       Q    Okay.  What other general contractor are you

1    aware of that was financially distressed while it was

2    paying its subs?

3         A    Joe M. Rodgers & Associates which became Centex

4    Rodgers was actually bought out by Centex because they

5    were having cash flow problems.

6         Q    And were you working for that company at that

7    time?

8         A    Yes.

9         Q    All right.

10        MR. SCHULMAN:   Eddie, could you get a

11   definition of what the "that" refers to?

12   BY MR. GALLOWAY:

13        Q    Joe M. Rodgers which later became Centex.   Is

14   that what you mentioned?

15        A    Yes.

16        MR. SCHULMAN:   Hold on a second.   That's not

17   what I was -- he was working for which company?

18        MR. GALLOWAY:   That's where I'm going next.

19        Q    Did you work for Joe M. Rodgers while it was

20   financially distressed?

21        A    Yes, I worked for Joe M. Rodgers while it was

22   financially distressed.

23        Q    All right.   What was your responsibilities at

24   that time when you worked at Joe M. Rodgers?

25        A    At that point in time I was a project

1    superintendent running an individual project.  When they

2    were sold, actually I was in Virginia, and the home

3    office was in Nashville, Tennessee, at that point in

4    time.

5        Q    And where was that construction project?

6        A    My construction project was in Virginia.

7        Q    Okay.  And what year was this or years if it

8    was more than one?

9        A    I don't know exactly.  It would have been

10   sometime early '80s.

11       Q    Okay.  So other than Joe M. Rodgers and

12   Peck/Jones, are there any other general contractors that

13   you're aware of who were financially distressed, using

14   the definition you gave earlier, at the time that they

15   were paying their subs?

16       A    I'm aware of other subcontractors going -- or

17   other general contractors going out of business but not

18   aware of any of the details other than that.

19            (At 11:30 a.m. Kevin Casenhiser reentered

20            the deposition room.)

21   BY MR. GALLOWAY:

22       Q    Have you ever talked to any subcontractors who

23   worked on those projects about the subject of when they

24   got paid by the general, whether it was timely or not?

25       A    Not that I can recall.

1    Q    Do you have an opinion as to whether or not the

2    fact that a general contractor is financially distressed

3    could lead to a general contractor to delay paying a

4    subcontractor longer than what the contract specifies?

5    A    If you're asking my opinion, if you don't have

6    the money, it would make sense that you would have

7    trouble paying the subcontractors on a timely basis.

8    Q    So is it your opinion that, if a general

9    contractor is financially distressed, it could cause a

10    general to delay in paying the sub longer than it

11    otherwise would if it were not financially distressed?

12    MR. SCHULMAN:  Objection.  Argumentative.

13    BY MR. GALLOWAY:

14    Q    You can answer.

15    A    Still answer.  Okay.

16    It would make sense -- financial sense.

17    MR. SCHULMAN:  Mr. Andrews, if I could

18    interrupt, when I'm defending, I may make an objection.

19    When others are asking questions, others may make

20    objections.  But I don't believe anybody here in the

21    room has the right to tell you not to answer.  So after

22    we make our objection, which is for the Judge to rule on

23    later, you're free to go ahead and give an answer to the

24    question.

25    THE WITNESS:  I was waiting for further comment

1    back and forth.   Okay.   I understand.

2    BY MR. GALLOWAY:

3        Q    We just make our objections for the record.

4    Obviously the Judge is not here.   So later on he makes

5    rulings to the extent we ask him to make rulings on

6    objections at a deposition.

7        A    Okay.

8        Q    So we're all just -- I may object to questions

9    later that other people ask, but we're just stating them

10   for the record.

11            So could you read back the last answer, please.

12            (The record was read as follows:

13            "A    It would make sense -- financial

14       sense.")

15   BY MR. GALLOWAY:

16       Q    And why is that?   Why would it make sense to

17   you that there would be those delays?

18       A    It's very difficult for anyone, company or

19   anything, to pay the bills if you don't have the cash.

20       Q    All right.   Would, for example, the fact that

21   there are competing subs vying for a limited amount of

22   money be a factor in that decision, all wanting to get

23   paid at the same time, and the general contractor has to

24   decide who they're going to pay?

25       A    I would assume that would be a decision-making

1    process, yes.

2       Q    Now, would it, in your opinion, in the industry

3    be in the ordinary course of business for a financially

4    distressed general to pay a subcontractor 60 days after

5    receiving payment from the owner and all the documents

6    that you have mentioned that a general would require a

7    sub to receive?

8            MR. SCHULMAN:  Objection.  Vague and ambiguous.

9            THE WITNESS:  Actually, I wanted to rephrase

10   that just a little bit.  If the documents were all

11   received in order and then payment was 60 days after

12   that, is that what you're asking?

13   BY MR. GALLOWAY:

14      Q    Right.  Would it be an aberration, would it be

15   idiosyncratic, would it be extraordinary as mentioned in

16   the definition that we gave you earlier in the ordinary

17   course of business?

18      A    I don't believe it would be an aberration, no.

19      Q    Let's say -- same question, but let's say 90

20   days:  Would it be extraordinary?  Would it be

21   idiosyncratic? an aberration as well?

22      A    I've seen chains of events that would take it

23   to 90 days.

24      Q    Okay.  Do you plan to do any further work

25   beyond what you've done in preparing for today's

1    deposition?

2    A    I guess I have no problem doing additional

3    work.  I found that the original instructions required a

4    report and that I was going to receive a whole lot of

5    documents to review somehow changed in the last thing

6    where I got a single page of stuff in the last week

7    before I was supposed to show here modified my

8    expectations of what I was supposed to perform for here.

9    In reading through the Judge's comments, it seemed very

10   limited in his -- what he was expecting me to respond

11   to -- a very limited scope.  So I would just need to

12   have direction from you.

13   Q    All right.  You have some documents with you

14   that you prepared during this week after you received

15   the assignment; is that correct?

16   A    The timeline, yes.

17   Q    Yes.  And that is the document in front of you?

18   A    Yes.

19        MR. GALLOWAY:  Could I request that we get a

20   copy of that made for all of us here so we can all see

21   it?

22        MR. SCHULMAN:  Sure, at the next break.

23        MR. GALLOWAY:  Yeah, we'll do it at the next

24   break.

25   Q    Are those your notes on that document,

1    Mr. Andrews?

2        A    I have made a couple notes, yes, I have.

3        Q    All right.  And all of those notes are in your

4    handwriting?

5        A    Yes, they are.

6        Q    Okay.  Did anyone assist you in preparing those

7    notes?

8        A    No.

9        Q    All right.  Can you just generally tell us what

10   those notes refer to?

11       A    It is verbatim from the most -- from the DMG

12   time reference showing from February 28 when IMS first

13   wrote a purchase order to DMG all the way till when

14   Peck/Jones paid DMG with notes depicting durations from

15   when billings were received till when requests were made

16   and when the order got paid.  So it not only had the

17   dates, but I kind of noted durations for my own

18   knowledge --

19       Q    All right.

20       A    -- and a couple of questions on it that I had.

21       Q    Do your notes relate entirely to DMG?

22       A    Yes.  There were no timelines given to me for

23   the rest of them.

24       Q    Right.  Okay.  Are there any other documents

25   that you prepared in preparation for the deposition

1  today other than these notes that you have in front of

2  you?

3     A     On the instructions I made some notes and some

4  calculations just for my own benefit along with a couple

5  questions on those trying to ask myself questions to see

6  that I was understanding what I was reading.

7     Q     Okay.  Let me ask you did you have any

8  questions with regard to -- referring to Exhibit 3, the

9  letter from Mr. Schulman to you dated April 6?  Did you

10  have any questions with respect to, say, anything on the

11  first page of that letter?

12     A     No.

13     Q     Did you have any questions with regard to

14  anything on the second page of the letter going down

15  through and stopping at paragraph 6, in other words,

16  right before the references to DMG which start in

17  paragraph 7?

18     A     On line Item No. 3 under "Facts," I basically

19  questioned myself did the general contractor's invoice

20  to the owner include all of the sub invoices for backup

21  as part of the extent of what he gave the owner as part

22  of his billing and what backup did he provide.

23     Q     All right.  And why is that information

24  important to you?

25     A     Without having the general's contract, I didn't

1   know if he was -- at this point in reading through it,

2   whether he was billing the owner a percentage of line

3   items complete or if he actually had to include

4   subcontractor's actual invoices and their schedule of

5   values also.

6       Q    If the general does not have all that

7   information from the sub, in your professional opinion,

8   in the industry in 2004, could that delay payment by the

9   general to the sub?

10      A    If the general has not received it from the

11  sub, typically we do not include it in the request to

12  the owner.

13      Q    Even though the sub has invoiced the general

14  for that work?

15      A    Then I misunderstood your first question.

16      Q    Let's go back.

17          Could you read the last two questions and

18  answers please.

19          (The record was read as follows:

20          "Q    Did you have any questions with

21      regard to anything on the second page of the

22      letter going down through and stopping at

23      paragraph 6, in other words, right before the

24      references to DMG which start in paragraph 7?

25          "A    On line Item No. 3 under 'Facts,' I

1        basically questioned myself did the general

2        contractor's invoice to the owner include all of

3        the sub invoices for backup as part of the

4        extent of what he gave the owner as part of his

5        billing and what backup did he provide.")

6    BY MR. GALLOWAY:

7        Q    All right.  Were there any other items on

8    page 2, other than what you've mentioned, stopping at

9    paragraph 6 that you had questions about?

10       A    On line Item No. 5, the very last sentence

11   about "DMG's purchase order with the Debtor is not"

12   talking about being bound for the 30 days, and I just

13   put a question mark to myself "What were the purchase

14   order terms?"

15       Q    During the break could we also get a copy of

16   the letter with your notes on it?  And the letter I'm

17   referring to is Exhibit 3.

18       A    Yes.

19       Q    Do you mind if I look at it right now just to

20   see if I have any follow-up questions?  It will make it

21   quicker.

22       A    (Complies.)

23            MR. GALLOWAY:  I'll pass this around so

24   everybody can see it.

25       Q    What is your hourly rate for depositions?

1     A     $250 an hour.

2     Q     And approximately how many hours have you spent

3   preparing for the deposition today?

4     A     About an hour and a half.

5     Q     And what did you do during that hour and a half

6   period?

7     A     Read through the instructions, made notes, made

8   a timeline, reread through the instructions again.

9     Q     The timeline that you are referring to, is that

10   the notes that you have here regarding DMG?

11     A     Yes.

12     Q     Did you talk to anyone?

13     A     No.

14     Q     What is your hourly rate for trial testimony?

15     A     The same.

16     Q     Have you ever testified at a trial before?

17     A     No.

18     Q     Have you ever talked to me before today?

19     A     No.

20     Q     Have you talked to Mr. Schulman before?

21     A     Yes.

22     Q     All right.   When did you talk to Mr. Schulman

23   before today?

24     A     He called when my resume first went in to ask

25   me a few questions on my resume.

1      Q     All right.  What did Mr. Schulman ask you?

2      A     General questions about billing procedures and

3   my experience.

4      Q     All right.  Do you recall specifically what

5   Mr. Schulman asked you about billing procedures?

6      A     No, I do not.

7      Q     Do you remember what you told Mr. Schulman in

8   response to his questions?

9      A     Not specifically, no.

10     Q     Do you have any general recollection of what

11   you told Mr. Schulman?

12     A     Very similar to what the questions have been

13   from you today, on what would be standard procedures in

14   my opinion and "promptness of payment" questions.

15     Q     And you don't remember anything about what you

16   told Mr. Schulman?

17     A     It wouldn't have been anything different than

18   what I've been telling you.

19     Q     Okay.  Have you ever spoken with anyone who

20   identified themselves as working for Peck/Jones?

21     A     Not recently.

22     Q     All right.  At some point in time you have

23   spoken to someone who has identified themselves as

24   working for Peck/Jones?

25     A     About five, six years ago a Peck/Jones -- a

1     former Peck/Jones employee came to work for Swinerton

2     for a very brief period of time.  Buck, I think, was his

3     name.  I don't remember his full name.  But I remember

4     he was employed by Peck/Jones at one point in time.

5          Q    I'm sorry.  What was the person's name?

6          A    I remember Buck.  That's all I remember.  I

7     don't even know if that's the first name or last name.

8     He was only there for about two months.

9          Q    Did you have any conversations with that person

10     named Buck about Peck/Jones payment procedures for subs?

11          A    No.

12          Q    Have you ever spoken with anyone who identified

13     themselves as working for Catholic Healthcare West?

14          A    Yes.

15          Q    Okay.  Who did you speak to?

16          A    I would have to get my Day-Timer out.  I have

17     spoken to several people.  It is one -- Catholic

18     Healthcare West is one of our target owners.  So we've

19     talked to them in Sacramento on a repeated basis.  I've

20     returned RFPs to various individuals.  I've done RFP

21     interviews with Catholic Healthcare West for specific

22     projects.  But I've never done a Catholic Healthcare

23     West project.  I've never been successful as to date.

24          Q    And when you say they are a target owner, what

25     do you mean by that?

1     A     They build hospitals, and we would like to

2    build hospitals for them.

3     Q     All right.  Thus far you have not built any?

4    When I say "you," I mean the company that you work for

5    now Pankow.

6     A     Pankow definitely has not.  And me, I have not.

7     Q     Okay.  Have you ever spoken with any attorneys

8    other than Mr. Schulman in his law firm?

9     A     Yes -- oh, in his law firm?

10     Q     Yes.

11     A     Spoken, no.

12     Q     Corresponded from anyone from his office?

13     A     Yes, I received e-mails from Aaron de Leest.

14     Q     All right.  You received e-mails from Aaron de

15    Leest.  Do you have those e-mails with you?

16     A     Yes.

17           (At 11:49 a.m. Randall Guritzky exited

18           the deposition room.)

19    BY MR. GALLOWAY:

20     Q     Okay.  Can you show them to me?

21     A     (Complies.)

22     Q     Okay.  During a break we'll get this copied as

23    well.

24           Is this the only string of e-mails you had with

25    Aaron de Leest that you just handed to me now?

1       A    Yes.

2       Q    Okay.  Have you ever spoken with anyone who

3    identified themselves as working for a company called

4    American Technologies?

5       A    No.

6       Q    Have you ever heard of a company called

7    American Technologies before today?

8       A    No.

9       Q    Have you ever spoken with anyone who identified

10    themselves as working for the law firm of Jackson,

11    DeMarco, Tidus & Peckenpaugh?

12       A    No.

13          MR. GALLOWAY:  Okay.  I think I'm going to pass

14    the witness for now.

15          MR. SCHULMAN:  I suggest we take a brief break.

16          (Recess from 11:51 a.m. to 12:04 p.m.)

17          (At 12:04 Mr. Guritzky was present in the

18          deposition room.)

19    BY MR. GALLOWAY:

20       Q    Mr. Andrews, I'll hand you what's been marked

21    as Exhibit 5.

22          (Deposition Exhibit 5 was marked for

23          identification by the reporter and is

24          included herewith.)

25    ///

1    BY MR. GALLOWAY:

2        Q    Can you tell us what that is, please?

3        A    It's the handwritten timeline that I prepared.

4        Q    Is that what you were referring to earlier in

5    your deposition regarding DMG?

6        A    That's correct.

7        Q    All right.  And then I'll hand you what's

8    marked as Exhibit 6.

9             (Deposition Exhibit 6 was marked for

10            identification by the reporter and is

11            included herewith.)

12   BY MR. GALLOWAY:

13       Q    Can you tell us what that is?

14       A    It is the expert instructions with my notes on

15   it.

16       Q    All right.  And all of those handwritten notes

17   and markings on Exhibit 6 are yours; is that correct?

18       A    That is correct.

19       Q    Okay.

20

21                            EXAMINATION

22   BY MR. ALTSHULER:

23       Q    Mr. Andrews, my name is Bruce Altshuler, and I

24   represent Weiss Sheet Metal Company.

25            You've never met me before?

1      A    No, sir.

2      Q    We've never spoken?

3      A    That's correct.

4      Q    You mentioned you used to work for Swinerton

5  Builders.  Did you ever have any dealings with any of

6  the subcontractors either at Swinerton or Pankow that

7  are in this case?

8      A    Weiss Sheet Metal.

9      Q    Okay.  I take it your dealings with Weiss Sheet

10  Metal were primarily when you were with Swinerton or

11  also with Pankow?

12      A    I believe it was with Centex.

13      Q    Centex?

14      A    Yeah.

15      Q    Would anything about your relationship with

16  Weiss Sheet Metal affect your testimony today in this

17  case?

18      A    No.

19      Q    Okay.  You don't have any biases either for or

20  against Weiss Sheet Metal?

21      A    No.

22      Q    Were there any legal disputes that you were

23  involved with while you were with Centex or Swinerton or

24  Pankow that you can recall at this time that involved

25  Weiss Sheet Metal?

1.    A    Not that I can recall.

2    Q    Okay.  In the course of your administration of

3  the dealings with subcontractors that you've testified

4  about, are there any occasions in which the

5  subcontractor only issued a two-party check to cover the

6  subcontractor plus a materialman or another

7  subcontractor of that subcontractor?

8    A    Quite often.

9    Q    Okay.  Under what circumstances would that

10  occur that based on your experience?

11    A    Typically to assure timely release of materials

12  or equipment.

13    Q    And how about in terms of payment?  If there

14  was a sub-subcontractor or materialman, was there some

15  concern about whether or not somebody would get a

16  payment with respect to a two-party check or the

17  decision to issue a two-party check?

18    A    Yes.  The request would typically come from

19  either the supplier or the sub-tier party that they

20  would like to be named on the check also.

21    Q    So that request wouldn't necessarily come from

22  the subcontractor himself, would it?

23    A    It would have to be approved by the

24  subcontractor himself.

25    Q    Okay.  He'd have to approve it.

1        Generally speaking, the subcontractor don't

2   generally disapprove a request like that from his

3   sub-tier contractor.

4        MR. SCHULMAN:   I'm going to object.   That was

5   not a question.   You didn't have a question mark at the

6   end.

7   BY MR. ALTSHULER:

8        Q    In your experience, are these requests pretty

9   common in the industry, that there be a two-party check

10   issued if it is known that the ultimate payment would go

11   to the sub-tier contractor?

12        A    It's common, yes.

13        Q    Okay.   Is there a custom and practice in the

14   industry just to make the check directly payable to the

15   sub-tier contractor, or is it more common to have a

16   two-party check issued to both the subcontractor and the

17   sub-tier contractor?

18        A    My experience has always been a two-party

19   check.

20        Q    When that two-party check is issued, who is it

21   usually delivered to, the subcontractor or the sub-tier

22   contractor, within the custom of the industry?

23        A    The only person I have a subcontractor

24   agreement with, which is the subcontractor.

25        Q    So you're in privity or you have that

1    .relationship with the subcontractor; so you deliver the

2    check to the subcontractor.  Is that correct?

3    A    That's correct.

4    Q    And what as a contractor's representative do

5    you expect the subcontractor to do with that check?

6    A    Take it to the sub-tier and provide a lien

7    release from that sub-tier to the general contractor.

8    Q    Okay.  So he can't deliver it to the sub-tier

9    contractor until he gets the necessary paperwork from

10   that person releasing liens or whatever is required; is

11   that correct?

12        MR. SCHULMAN:  I'm going to object.  It

13   misstates the witness's testimony.

14        THE WITNESS:  The check and the unconditional

15   final are usually exchanged and then returned to the

16   contractor.  The contractor will have a conditional in

17   his hand for the amount of the check before the check is

18   written.

19   BY MR. ALTSHULER:

20   Q    In your experience, is it customary and typical

21   for the subcontractor to endorse the check over to the

22   sub-tier contractor once all the paperwork is done, or

23   is it more common for the subcontractor to clear the

24   check in his account and then deliver his own check to

25   the sub-tier contractor, if you know?

1    .   A    I don't know how on a joint check you could put

2    it into your account.

3        Q    Okay.

4        A    You have to have both signatures.  But I've not

5    been part of that.  I usually wait for the final

6    release.

7            MR. SCHULMAN:  I appreciate that you spotted

8    that the question implied that the subcontractor would

9    forge a signature in endorsement of the check.

10           MR. ALTSHULER:  Oh, no.

11       Q    Generally speaking, you're not really concerned

12   with which account the check clears.  You just want to

13   make sure that the sub-tier contractor is paid and

14   releases his lien; isn't that correct?

15       A    That's correct.

16           MR. ALTSHULER:  I have nothing further of this

17   witness.

18           MR. SCHULMAN:  Off the record for a minute.

19           (Brief discussion held off the record.)

20

21                          EXAMINATION

22   BY MR. GURITZKY:

23       Q    Good afternoon.  I've got nothing but softballs

24   for you right now.

25           I just want you to go through Exhibit 2, what

1    I'll call your resume, and look at the projects that

2    you've listed and, as best you can, give me an idea as

3    to when those projects took place.

4         Just start with Richmond Civic Center and move

5    on down the line and through the pages.

6    A    Okay.  Richmond Civic Center is current.

7         San Mateo Police is just completing as we

8    speak.

9         San Mateo Library completed about 2 years ago.

10   Q    `And when did it begin?

11   A    It was a 2-year project.

12   Q    2004?

13   A    Yeah.

14        California Pacific Medical Center is

15   preconstruction right now.  It's ongoing.  Construction

16   is not scheduled to start until 2010.

17        The same for CPMC Medical Office Building.

18        Cedars-Sinai, I left that project midspan when

19   I changed companies.  So that would have been 5 -- about

20   5 years ago.

21        St. Jude's was running concurrent with that.

22        Children's Hospital Orange County would have

23   been nineteen- -- I'm sorry.  This is the pediatric

24   center.  The pediatric center -- I had two -- a couple

25   jobs with Children's Hospital.  The pediatric center was

1    concurrent with St. Jude's.

2            East Los Angeles Municipal Courthouse --

3            MR. ALTSHULER:  It's okay to continue.

4            (At 12:14 p.m. Mr. Altshuler exited the

5            deposition room.)

6            THE WITNESS:  -- approximately 15 years ago.

7            Cal-Poly, similar.

8            Children's Hospital -- and these are

9    approximate.  I can get you actual dates for all these.

10   I'll say Children's Hospital was probably 12, 13 years

11   ago.

12           Kaiser West Los Angeles MOB, probably 7 years

13   ago.

14           Hillcrest, that was 7, 8 years ago.

15           Shriners Hospital for Children, let's say --

16   that's the OR renovation.  The OR renovation was

17   probably 7 years ago.

18           Children's Hospital -- oh, man.  Approximately

19   11 years ago.

20           UCSD was 7 to 8 years ago.

21           Littleton Adventist, about 9 years ago -- 9 to

22   10.

23           Good Sam was preconstruction, 8 to 9 years ago.

24   It was concurrent with Regional Medical Center.  So that

25   would have been 8 to 9 years ago.