John A. Gladych, Esq., Bar No. 139254
Randall S. Guritzky, Esq., Bar No. 119784
GLADYCH & ASSOCIATES
1400 Bristol Street North, Suite 270
Newport Beach, CA 92660
Telephone: (949) 442-8942
Fax No.: (949) 442-8949

Attorneys for Defendant, INTEGRATED
MECHANICAL SYSTEMS, INC.

FILED
OCT 13 2009
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                Deputy Clerk

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re: <br><br> PECK/JONES CONSTRUCTION CORPORATION, <br><br> Debtor. <br><br> R. TODD NEILSON, CHAPTER 7 TRUSTEE, <br><br> Plaintiff, <br><br> vs. <br><br> INTEGRATED MECHANICAL SYSTEMS, INC., a California corporation, <br><br> Defendant. | LA 04-35757-VZ <br><br> Chapter 7 <br><br> Adv. No. 07-01050-VZ <br><br> **DEFENDANT, INTEGRATED MECHANICAL SYSTEM, INC.'S TRIAL BRIEF** <br><br> **TRIAL DATE:** October 20, 2009 <br> **TIME:** 9:30 A.M. <br> **LOCATION:** Courtroom: 1368 |

1

G:\384.101\TRIAL BRIEF.DOC

**TRIAL BRIEF OF INTEGRATED MECHANICAL SYSTEMS**

# TRIAL BRIEF

1. **BRIEF STATEMENT OF THE CASE.**

This dispute revolves around claims by the Plaintiff/Trustee of Preferential Payments by the debtor, Peck/Jones Construction, Co., to IMS in the amount of $184,000. IMS claims that it has valid defenses consisting of the ordinary course of business exception to the preferential payment code section as is more fully discussed below.

2. **DEFENSE TO PREFERENTIAL PAYMENT CLAIM:**
   **THE TRANSFER WAS MADE IN THE ORDINARY COURSE OF**
   **BUSINESS, ACCORDING TO ORDINARY BUSINESS TERMS.**

It has been stipulated by and between the parties in their pre-trial stipulation as to the following facts: In its capacity as general contractor on the Project, Peck/Jones required HVAC materials to be furnished and installed by IMS to the Project in a Subcontract Agreement executed between Peck/Jones and IMS dated November 24, 2003. IMS sent a preliminary 20-Day Notice via certified mail to the owner and Peck/Jones. IMS submitted invoices to Peck/Jones for payment of monies representing the progress portion of monies then due and owing to IMS for labor and materials provided to the Project. The invoices were received by Peck/Jones in September, 2004.

On or about July 1, 2004, Peck/Jones submitted Payment Application 34 to RFK for the period ending June 30, 2004 for the Project. The total amount sought by Peck/Jones from the owner in Payment Application #34 was $728,008.13. The total amount sought by Peck/Jones from the owner in Payment Application #34 included money for HVAC furnished and installed by IMS at the Project. RFK paid Peck/Jones the sum of $651,506.13 in Check Number 221078, representing the full amount Peck/Jones sought in Payment Application #34 less certain credits. Peck/Jones deposited this check into its general account on August 20, 2004.

On or about September 16, 23, and 27, 2004, and October 4, 2004, Peck/Jones issued checks to IMS which are the checks that the Trustee alleges were preferential transfers to

2

IMS. By this transaction, Peck/Jones disbursed RFK's trust funds to IMS for the HVAC materials furnished by IMS to the Project.

IMS's contends that, in addition to the above, the owner imposed additional requirements upon Peck/Jones before Peck/Jones could receive each progress payment on the Project. First, before Peck/Jones could receive each progress payment, the owner required Peck/Jones to obtain from each material supplier and subcontractor, including IMS, a written document whereby the supplier or subcontractor agreed to waive and release its rights to file a mechanic's lien on the owner's property upon receipt of payment. IMS accordingly offered to waive its mechanic's lien rights upon receipt of payment for the HVAC materials furnished and installed at the Project by submitting a document entitled "Conditional Waiver and Release upon Progress Payment" to Peck/Jones in September 2004.

Next, after Peck/Jones received each progress payment, but before the next progress payment would be submitted to Peck/Jones, the owner required Peck/Jones to obtain from each material supplier and subcontractors, including IMS, a written document whereby the supplier or subcontractor unconditionally waived and released its right to file a mechanic's lien on the owner's property after the subcontractor or supplier received payment for the labor and/or materials it provided to the Project. After receiving payment from Peck/Jones, IMS accordingly submitted to Peck/Jones a document entitled "Unconditional Waiver and Release" in which IMS released its mechanic's lien and stop notice rights in the amount of the payment IMS received.

Then, before any subsequent progress payment would be submitted to Peck/Jones, the owner required Peck/Jones to certify in each payment application that the amounts received from the owner requested in previous payment applications had been paid to the material suppliers and subcontractors.

Under Section 547(c)(2) of the United States Bankruptcy Code applicable at the time the within action was filed, the Trustee may not avoid a preferential transfer to the extent the transfer was:

"(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the    transferee;

3

G:\384.101\TRIAL BRIEF.DOC

**TRIAL BRIEF OF INTEGRATED MECHANICAL SYSTEMS**

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms."

The case of *In re Northpoint Communications Group, Inc v BCCI Construction Co* 361 B. R. 149 (U.S.B.C N.D. Cal 2007) is relevant to the analysis. In setting forth the "objective test" to be applied in the Ninth Circuit the court held:

> "'[T]he court must look to those terms employed by similarly situated debtors and creditors facing the same or similar problems,' creditors are not required to prove a particular uniform set of business terms, rather, 'ordinary business terms' refers to the broad range of terms that encompasses the practices employed by those debtors and creditors, including terms that are ordinary for those under financial distress. Only a transaction that is so unusual or uncommon 'as to render it an aberration in the relevant industry,' falls outside the broad range of terms encompassed by the meaning of 'ordinary business terms.'" *Id* at 160.

In finding that BCCI met its burden of proof in establishing that these contested payments were made within the "ordinary course of business" the opinion referenced the following:

> "BCCI's expert witnesses testified that none of the salient characteristics of the payments in question were unusual in the relevant industry. It was not unusual for a financially troubled company in the telecommunications industry to make payments on a large contract by wire transfer or by check drawn on a payroll account. It was not unusual for a construction company to send with its invoice a notice that it would exercise its mechanics lien rights if not timely paid, especially as the project was completed and mechanics lien rights must be promptly asserted or lost. It was not unusual for payments on a construction contract to be made 95 days after invoice. It was not unusual for a lessee to make payments on a tenant- improvement contract immediately

4

after invoice, where the project was substantially complete, the lessee intended to assign its leasehold, and the lessee would default under the lease by causing a mechanics lien to be filed against the property. Trustee submitted no contrary evidence. Only the $607 payment 286 days after invoice falls outside the 'broad range of terms that encompasses the practices employed by' lessees and contractors making tenant improvements for those lessees." *Id* at 160

A subjective standard governs whether a payment is made in the ordinary course of business: "whether the parties themselves considered the transaction ordinary." *In re Cocolat* (1995) 176 B.R. 540, 549. In determining whether the debt was paid in the ordinary course of business, courts consider a variety of factors, including: the length of the debtor's and creditor's business relationship; whether the amount or form of the transfer was inconsistent with the parties' past practices; whether the creditor employed any unusual collection strategy; and whether the creditor knew and took advantage of the debtor's precarious financial condition. *In re Grand Chevrolet* (1994) 25 F.3d 728, 732. "Even where the parties have not dealt with each other previously, summary judgment is still proper where the parties' transaction was 'ordinary' "in reference to the parties' practice with others." *In re Ahaza Systems, Inc.* (2007) 482 F.3d 1118.

As to what must be shown by IMS as it relates to the "subjective test" *In re Healthcentral.com* 504 F. 3d 775, 790 (9th Cir. 2007) is instructive for the court. Here the court held:

"In this circuit the rules associated with § 547(c)(2)(B) are well-settled. See *In re Ahaza Sys., Inc.*, 482 F.3d at 1124. To satisfy § 547(c)(2)(B) the creditor must demonstrate that the relevant payments were 'ordinary in relation to past practices between the debtor and [the] ... creditor.' In re Food Catering & Housing, Inc., 971 F.2d at 398. Effectively this breaks down into two components. First, the creditor must show a baseline of past practices between itself and the debtor. See *Id.*; 5 *Collier on Bankruptcy* ¶ 547.04[2][a], 547-60 (rev. 15th ed.2006.). Second the creditor must show that the relevant payments were 'ordinary in relation to [these] past practices.' *In re Food Catering &*

5

*Housing., Inc.*, 971 F.2d at 398. This is most commonly done by demonstrating that the relevant payments did not differ from past payments in 'amount' or 'form,' were not the result of 'unusual collection or payment activit[ies],' or did not come as a result of the 'creditor [taking] advantage of the debtor's deteriorating financial condition.' *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir.1994). But see *In re Ahaza, Inc.*, 482 F.3d at 1129 (finding that traditional factors are non-exclusive and other factors bearing on past practices may be relevant)."

The case of *Lovett v St. Johnsbury Trucking* 931 F 2d 494, 497-498 (8th Cir. 1991) is very instructive as it relates to what is anticipated to be an argument made by the TRUSTEE. The pertinent facts of this case demonstrated that the agreement between the parties required payment "on or before the 30th day after the shipment" had been delivered. The parties operated under the agreement for approximately 19 months. In the 90 days before the filing of the bankruptcy petition, the creditor deposited payments into its account on an average of 62 days after the date of each invoice. While the trial court found that the agreement itself defined the ordinary course of business between the parties the court of appeals found otherwise. In rejecting this conclusion, the court of appeals held:

> "The first ground on which the bankruptcy court rested its decision was that 'the transportation agreement itself defined the ordinary course of business between the parties, and it specified the terms governing those transactions,' namely, payment within 30 days of delivery. The ordinary course of business, however, was the way the parties actually conducted their business dealings, not the conditions specified in the agreement that the parties in fact rarely followed (as shown below). The bankruptcy court's reliance on the provision in the agreement that payment would be made within 30 days was misplaced, and provides no support for that court's conclusion that the payments were not made in the ordinary course of business. Indeed, if all the payments within the 90-day period had been made within 30 days of delivery, presumably the bankruptcy court would have held that they were made in the ordinary course

of business, even though such payments would have been a drastic departure from the previous practice and presumably would have preferred St. Johnsbury over the other creditors.

"'[T]here is no precise legal test which can be applied' in determining whether payments by the debtor during the 90-day period were 'made in the ordinary course of business'; 'rather, th[e] court must engage in a 'peculiarly factual' analysis.' In Re Fulghum Construction Corp., 872 F.2d 739, 743 (6th Cir.1989) (quoting In Re First Software Corp., 81 B.R. 211, 213 (Bankr.D.Mass.1988)). '[T]he cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor.' In Re Magic Circle Energy Corp., 64 B.R. 269, 272 (Bankr.W.D.Okla.1986) (quoted with approval in *WJM, Inc. v. Massachusetts Dept. of Public Welfare*, 840 F.2d 996, 1011 (1st Cir.1988)). In the present case, the analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day period reflected 'some consistency' with that practice.

"A comparison of the payments during these two periods indicates that the times within which payments were made during the 90-day period were sufficiently consistent with the payment times during the prior 12 months to show that the payments in the 90-day period were made in the ordinary course of business." [Emphasis added]

The Ninth Circuit analyzed the subjective test in the case of *In re Grand Chevrolet, Inc.*, 25 F. 3d 728, 732 (9th Cir. 1994) where the court stated:

"We have held that '[d]elay is particularly relevant in taking a payment outside the ordinary course of business exception.' *In re Food Catering*, 971 F.2d at 398. We have not, however, adopted a per se rule that late payments can never be ordinary. Other circuits have held that late payments can fall within the

7

ordinary course of business exception if the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made late. See *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991); *In re Yurika Foods Corp.*, 888 F.2d 42, 44 (6th Cir.1989). We now join those circuits."

The case of *Valley Steel Corporation v New Jersey Steel Corporation* 182 B.R. 728 (U.S.B.C. W.D. Virginia 1995) addressed late payments and the effect it had on the ordinary course of business exception. In considering the "objective standard" the court evaluated all of the expert testimony as to the industry standard and concluded:

"…that the time frames in this case, which averaged approximately 54 days during the pre-preference period and 67 days during the preference period, were sufficiently consistent with the terms generally used in the industry. The *Advo-System v. Maxway* case requires the court to demand stricter adherence to the industry standard when the relationship between transferor and transferee is of a short duration. The relationship here lasted at least one and one-half years prior to the bankruptcy filing. There is no evidence as to whether this period constitutes a short or long duration within the steel industry. However, even if that period is considered so short that stricter adherence is required, the facts here show sufficient consistency with the industry practice to satisfy the requirements of section 547(c)(2)(C). On the other hand, if one and one-half years is considered to be a longstanding relationship, then the time for payment between the pre-preference and preference periods presents only a minimal deviation. From either perspective, NJS has carried its burden of showing that the terms of the transactions were ordinary with respect to others in the same industry." *Id.* at 740

Here, as between IMS and Peck/Jones in its capacity as general contractor on the Project, Peck/Jones required HVAC equipment to be delivered to the Project in a Subcontract Agreement executed between Peck/Jones and IMS. IMS then submitted invoices to Peck/Jones for the HVAC materials installed at the Project. Pursuant to the owner's

requirements discussed above, IMS offered to waive its mechanic's lien rights upon receipt of payment for the HVAC equipment supplied to the Project by submitting a document entitled "Conditional Waiver and Release upon Progress Payment" to Peck/Jones. After receiving payment from Peck/Jones, pursuant to the owner's requirements, IMS submitted to Peck/Jones a document entitled "Unconditional Waiver and Release" in which IMS released its mechanic's lien and stop notice rights in the amount of the payment IMS received.

According to the foregoing, the disbursement of funds from Peck/Jones to IMS was squarely within the terms of the purchase order between Peck/Jones and IMS, as Peck/Jones disbursed the funds requested by IMS's invoices by the 20th of the month following submission of IMS's invoices. Additionally, the disbursement of funds from Peck/Jones to IMS was entirely consistent with the requirements enforced by the owner, as IMS submitted a conditional waiver and release before receiving funds from Peck/Jones, and an unconditional waiver and release after receiving funds from Peck/Jones.

The alleged transfer to IMS was disbursed pursuant within the terms of the Subcontract Agreement between IMS and Peck/Jones. Therefore, the alleged transfer was made within the ordinary course of business within the meaning of 11 U.S.C. §547(c)(2).

It is the ordinary custom and practice of Peck/Jones to enter into Subcontract Agreements with its subcontractors to supply labor and materials to construction projects such as the one at issue in this case. Consequently, the alleged transfer was paid in accordance with ordinary business terms within the meaning of 11 U.S.C. §547(c)(2).

Because it is undisputed that the alleged transfer to IMS was on account of a debt incurred by Peck/Jones in the ordinary course of business, and because it is undisputed that the alleged transfer was paid in the ordinary course of business, and because it is undisputed that the alleged transfer was made in accordance with ordinary business terms, IMS has a complete "ordinary course" defense to the Trustee's claims under §547(c)(2).

///

///

///

## The Progress Payments to IMS Were Made According to Ordinary Business Terms

IMS relies upon not only the testimony of its officer, Mr. Jack Lynch, and the court appointed expert, Lonnie Andrews.

The method and mode of payment by and between PECK/JONES on the one hand and IMS establishes that the parties followed the ordinary course of business in the construction industry of large private works projects. According to Mr. Andrews as he testified to at his deposition, the original transcript of which has been lodged with the Court, it is ordinary for a general contractor (PECK/JONES) to pay a subcontractor (IMS) for work, labor, services and materials only after a pay application is submitted by the subcontractor. With this pay application certain documentation is required to be submitted as a condition precedent to receive any funds. It is also the standard business practice and custom that the general contractor makes payment to the subcontractor by way of a check from funds on deposit in its general account.

It was further testified to that a progress payment is a request made by the subcontractor to be paid for a percentage of the total scope of work under the operative subcontract. In order for the general contractor to request a draw from the owner, the general contractor must first obtain a pay application from each and every subcontractor and material house. The date for payment does not commence to run until the general contractor has received all progress payments from each subcontractor and material supplier so that it can then submit a completed payment request to the owner of the work of improvement. The process of obtaining all necessary paperwork could take up to 2 weeks. It would take an additional 3-5 days to review the documentation before presenting the pay request to the owner.

The paperwork process that was followed in this case was pursuant to the subcontract terms and followed the course that is generally accepted in the construction field. Consistent with that process, once the payment request has been submitted by the general contractor to the owner, the owner will need time to review the request with its architect to make sure all of the paperwork is in order and all work subject thereto has been completed. This

10

process will take anywhere from 30-45 days, depending on the terms of the applicable contract. Mr. Andrews testified that the ordinary business practice in the construction industry of this type of construction to have the owner's funds deposited into a general contractor's general bank account could be between 45 and 55 days or even longer.

The payment terms, for progress payments, in the contract between PECK/JONES and IMS can be found in paragraph 11.3. This paragraph states:

"Contractor agrees to pay Subcontractor the Subcontract Price and other amounts that may become due Subcontractor under the Subcontract on a percentage of completion basis, as determined by Contractor, within 30 days of the date Contractor receives payment from the Owner for work completed by Subcontractor; provided, however, that Contractor may retain (without limitation and other rights to withhold funds as may be allowed under Subcontract Documents or at law) as security for Subcontractor's fulfillment of this Subcontract an amount equal to ten percent (10%) of each such progress payment."

Based upon the above, once PECK/JONES submitted its completed pay request to the owner it would take approximately 45-55 days for the money to arrive in PECK/JONES' general bank account. Then according to the contract terms, PECK/JONES would have an additional 30 days to make its required payment. This would therefore total 75-85 days from the date of submittal of IMS'S request for payment. The progress payments at issue were all paid between 43 days and 61 days, well within this time frame.

It is anticipated that the TRUSTEE is going to take the position that because the contract terms required PECK/JONES to make payment within 30 days of the date it received payment from the owner that the reference progress payment was outside the ordinary course of business. In using this analysis the court will find that PECK/JONES received the funds from the owner on August 4, 2004, and that said funds cleared PECK/JONES' account on August 20, 2004. IMS received payments on September 16, 23, 27, 2004, and October 4, 2004. Specifically, payments from Peck/Jones were received as follows:

///

///

11

G:\384.101\TRIAL BRIEF.DOC

**TRIAL BRIEF OF INTEGRATED MECHANICAL SYSTEMS**

| DATE OF PAYMENT: | AMOUNT: | PAYEE: | CLEAR PECK/JONES ACCT. |
|---|---|---|---|
| September 16, 2004 | $29,481.61 | IMS | September 20, 2004 |
| September 23, 2004 | $46,458.00 | IMS & Control Mgmt. | September 29, 2004 |
| September 27, 2004 | $10,650.72 | IMS & Haldeman | October 1, 2004 |
| October 4, 2004 | $9,832.62 | IMS & Air Cond. Spec. | October 12, 2004 |
| October 4, 2004 | $22,622.34 | IMS and Strobic Air | October 14, 2004. |
| October 4, 2004 | $40,593.75 | IMS & York Int'l.Corp | October 13, 2004. |
| October 4, 2004 | $2,754.86 | IMS | October 14, 2004. |

Given these facts, IMS received payments on the 43rd, 50th, 54th, and 61st days following PECK/JONES receipt of monies from RFK. In reviewing the deposition of Mr. Andrews he opined that it would not be extraordinary for a general contractor to pay a subcontractor later than what the contract dictated. Mr. Andrews also testified that has seen chain of events that would have taken up to 90 days to pay the subcontractor after the general contractor received the funds from the owners.

The alleged transfer to IMS from Peck/Jones was on account of a debt incurred by Peck/Jones in the ordinary course of business between Peck/Jones and IMS. Peck/Jones was a general contractor which engaged in large construction projects. In its ordinary capacity as a General Contractor, Peck/Jones required HVAC equipment to be furnished to and installed in the Project. After furnishing and installing HVAC equipment to the Project as required by Peck/Jones, IMS submitted invoices to Peck/Jones for the labor and materials provided by IMS, for which Peck/Jones distributed the alleged transfer to IMS.

Consequently, the alleged transfer to IMS was on account of a debt incurred by Peck/Jones in the "ordinary course of business" within the meaning of 11 U.S.C. §547(c)(2).

It is respectfully submitted to this court that no matter how the days are to be measured the evidence clearly supports the conclusion that PECK/JONES paid the progress payment at issue, to IMS in the ordinary course of business. The course of events that took place between IMS and Peck/Jones are completely consistent with what had taken place previously between the parties, as well as with the general practices in the construction industry. Simply put, none of the progress payments here were so late as to be an

12

aberration, or not ordinary. When the factor of Peck/Jones' financial distress is included and weighed, there is no question that the progress payments at issue were not extraordinary or an aberration.

3. **CONCLUSION**

Based on the foregoing, Defendant, INTEGRATED MECHANICAL SYSTEMS, INC. requests that this Court enter judgment in favor of Defendant and against Plaintiff R. TODD NEILSON, CHAPTER 7 TRUSTEE in this case.

Dated: October 13, 2009

GLADYCH & ASSOCIATES, INC.

By: _____
JOHN A. GLADYCH, ESQ.
RANDALL S. GURITZKY, ESQ.
Attorneys for Defendant INTEGRATED MECHANICAL SYSTEMS

## CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and am not a party to the within action. My business address is 1400 Bristol Street North, Ste. 270, Newport Beach, CA 92660.

On **October 13, 2009** I served the within document(s) described as: **DEFENDANT, INTEGRATED MECHANICAL SYSTEM, INC.'S TRIAL BRIEF,** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

( ) **BY PERSONAL SERVICE:** I caused said document(s), to be hand-delivered by _____ on _____ 2005 to the parties at the address(es) listed on the attached Service List.

(✓) **BY MAIL:** I caused said documents, enclosed in sealed envelope(s), with postage fully prepaid, to be placed in the U.S. Mail at Newport Beach, California on the above date, addressed to those parties as indicated on the attached Service List. I am readily familiar with the firm's practice for collection and processing of mail. It is deposited with the U.S. Postal Service on the same day in the ordinary course of business.

( ) **BY FACSIMILE:** I caused the above-referenced documents to be transmitted during normal business hours via facsimile from "Fax" no. 949-442-8946/9 to the parties and at the "Fax" numbers listed on the attached service list and I received electronic verification that said documents had been received complete and without error at the listed facsimile numbers. A copy of the transmission record is attached to this declaration.

Executed on October 13, 2009 at Newport Beach, California.

( ) **(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

(✓) **(Federal)** I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made.

*Janelle James*
JANELLE JAMES

14

G:\384.101\TRIAL BRIEF.DOC

**TRIAL BRIEF OF INTEGRATED MECHANICAL SYSTEMS**

**PECK/JONES, Debtor/NEILSON v. INTEGRATED MECHANICAL SYSTEMS, INC.**
U.S. Bankruptcy Court, Central District Case No. ADV. NO. 07-01050-VZ

## SERVICE LIST

**Attys. for Plaintiff R. TODD NEILSON, CHAP. 7 TRUSTEE:**
John N. Tedford IV, Esq.
George E. Schulman, Esq.
gschulman@dgdk.com
DANNING, GILL, DIAMOND & KOLLITZ, LLP
2020 Century Park East, 3rd Floor
Los Angeles, CA 90067-2904

**Attys. for Defendant DMG CORPORATION**
Glenn e. Turner III, Esq.
Travis W. Feuerbacher, Esq.
GIBBS, GIDEN, LOCHER, TURNER & SENET LLP
1880 Century Park East, 12th Floor
Los Angeles, CA 90067-1621

**Attys. for WEISS SHEET METAL**
Bruce J. Altshuler, Esq.
ALTSHULER & SPIRO
9301 Wilshire Blvd., Suite 504
Beverly Hills, CA 90210

**Attys. for D&M STEEL**
John D. Cantor, Esq.
DYKEMA GOSSETT
333 S. Grand Ave., Ste 2100
Los Angeles, CA 90071

**Attys. for AMERICAN TECHNOLOGIES**
Edward A. Galloway, Esq.
JACKSON, DEMARKO, et al.
2030 Main St., Ste. 1200
Irvine, CA 92614

G:\384.101\TRIAL BRIEF.DOC

TRIAL BRIEF OF INTEGRATED MECHANICAL SYSTEMS